UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

CIVIL ACTION NO. 04-11934-GAO

| | |
|---|---|
| NOAH GREENBERG<br>        Plaintiff | )<br>)<br>) |
| v. | )<br>) |
| TOWN OF FALMOUTH,<br>AND GANNETT<br>FLEMING, INC.,<br>        Defendants | )<br>)<br>)<br>) |

**DEFENDANT GANNETT FLEMING'S MEMORANDUM
OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR
A PRELIMINARY INJUNCTION**

Now comes defendant and cross-plaintiff Gannett Fleming Engineers and

Architects, PC ("Gannett" or "GF"),[1] through its counsel of record, and hereby opposes

the Motion by plaintiff Noah Greenberg ("plaintiff") for a Preliminary Injunction.

**I.    Introduction and Summary of Argument**

This motion will turn on the "substantial similarity" element of the prima facie

case for copyright infringement. Although not conceded, the Court may find that at the

time of this lawsuit, plaintiff owned registered copyrights in his architectural drawings

for the Falmouth Department of Public Works ("DPW") project; that these architectural

plans were at least partly subject to copyright protection; or that Gannett had access to

Greenberg's initial set of plans. Plaintiff is nonetheless not entitled to injunctive relief.

Gannett believed that plaintiff's initial plans were ineffective and inefficient in many

respects (detailed below) and, in fact, secured the permission of Town of Falmouth

---

[1] The named Defendant in this case is Gannett Fleming, Inc. However, the contract between Gannett and
the Town of Falmouth was with Gannett Fleming Engineers and Architects, PC, and that is the corporate
entity that performed the design services on the subject job. Thus, Gannett Fleming, Inc. is a misnomer.

officials to develop Gannett's own plans from scratch within the inherent limitations of

the site itself.  Thus, instead of using or copying plaintiff's initial plans, Gannett

developed its own entirely different architectural plans for the DPW project.  One look at

the overall floor plans, included at p.8 of plaintiff's Memorandum of Law in Support of

his Motion for a Preliminary Injunction ("Plaintiff's Memorandum"), shows just how

striking the differences in plans are.  As detailed below, even a cursory comparison

between plaintiff's 1994 plans and GF's plans reveals that they envision different

buildings, with completely different footprints, sizes, and dimensions, and with

completely different layouts of rooms, walls, and number of rooms internally.

Without showing substantial similarity, plaintiff cannot prove a likelihood of

success on the merits of his copyright infringement case, and will therefore not be

entitled to injunctive relief.  However, the other three elements of plaintiff's prima facie

case for a preliminary injunction are also not satisfied.  This is a major public works

project in Falmouth that is in the middle of construction.  Even assuming Gannett copied

plaintiff's plans verbatim (which even plaintiff does not claim), plaintiff has an actual

damages remedy.  There is no justification here in halting a significant public

construction project simply because of this dispute over the architectural plans.  Thus,

plaintiff has an adequate remedy at law, the balance of hardships strongly weigh in favor

of defendants, and the public interest will not be served by halting the DPW project in

Falmouth, so that it will not be completed by the time it is needed for snow removal and

other critical public services during the winter months.

## II.    Pertinent Factual Background

### A.    Timeline of Facts, Pertinent Dates

In 1994, plaintiff Greenberg developed preliminary plans for the Falmouth DPW

project.  As noted in the Town counsel's 9/12/02 letter, Greenberg was paid for these

preliminary services, and the "drawings delivered were very preliminary in nature

(indeed conceptual is a better description)."

Apparently because Falmouth did not obtain appropriate financing for the DPW

project between 1993 and 2001, Falmouth started over in 2001, sending out its Request

for Qualifications, Architectural Design Services ("RFQ") as of 5/18/01 (and advertised

in the local register on 5/30 and 6/6/01.)  In its RFQ, Falmouth included copies of

plaintiff's initial drawings.  By his letter of 2/7/02, plaintiff has permitted the Town to

use and distribute copies of his drawings.  One of these RFQ packets went to Gannett,

which submitted a proposal for the job as of 6/21/01.  Part of the assignment from the

Town, in its RFQ, was to review the existing plans for the previous project.  However, as

explained below, Gannett chose not to use these plans and designed its own, from

scratch.  Plaintiff submitted no proposal, the second time around.

During negotiations with the Town for the project, GF identified certain potential

problems with the initial plans, and discussed these with Town officials at a 1/28/02

meeting.  At that time, the Town agreed to consider GF's alternate designs for the job.

On 3/7/02, the Town and GF entered into a contract for architectural services for the job.

In meetings and interviews with DPW personnel, Gannett's Project Manager, in April

and May of 2002, ascertained as much as he could about DPW's personnel and their

space needs.[2]

A few months later, plaintiff notified Gannett that plaintiff reserved all rights in his plans, by letter of 6/7/02 (from plaintiff's counsel Richard Russell). By this time, Gannett's Project Manager Jeff Alberti, had already decided to redesign the project from scratch, and he had obtained preliminary permission from Town officials to do so. These discussions continued at a 9/12/02 meeting between Gannett and Town officials,[3] the notes for which meeting state (in part) that "we cannot construct a central corridor as shown on preliminary plans--too many load-bearings walls." For this and other reasons, Town officials reiterated their permission to Alberti that Gannett could do its own plans for the job and not use Greenberg's preliminary plans. The next year, Greenberg registered his architectural drawings for the job.[4]

### B.    Plaintiff's Facts

Gannett disagrees with many of plaintiff's facts, with a few notable examples. First, plaintiff states that "as late as... nine months after Gannett Fleming commenced work on the project, the plaintiff's plans were still employed in the project," citing to Gannett's Interrogatory Answer No. 4. As just explained, this was not the case. In fact, as of January 2002, Gannett had decided to create new plans for the project and had obtained initial permission from Town officials to do this. As reflected in the referenced interrogatory answer No. 4, in the 9/12/02 meeting, several aspects of the Greenberg

---

[2] Copies of the notes from these interviews are available, and have been produced to plaintiff's counsel as part of Gannett's Rule 26(a)(1) initial document production. *See* Gannett's Interrogatory Answer No. 8, at Exhibit A to Plaintiff's Memorandum.

[3] Present for the Town of Falmouth were DPW's Bill Owen, John Lyons, Rocky Gomes, Brian Dale, and Don Swire.

[4] Greenberg registered architectural drawings #Vau566-971 on 2/3/03, and registered another architectural work at Vau566-972 on 4/11/03. Note that ¶10 of Greenberg's Complaint gives the date for the second registration as 2/11/03, but the copyright registration form *itself* is dated 4/11/03.

plans were discussed and their deficiencies raised; however, these plans were not being *used* for the job at this time.[5]

In ¶5 of his Memorandum, plaintiff quotes in part from an interrogatory response from Gannett, but at an ellipsis omits the sentence "Ultimately, the final plans were radically different from the existing plans." This is a critical omission. GF's complete response to this interrogatory is as follows:

> At an initial meeting called by the Town with various engineering and architectural firms, on 6/5/01, the Town representative indicated that the Town had existing preliminary plans, and although it wanted new ideas, at that time it did not want plans too different from the existing plans. Ultimately, the final plans were radically different from the existing plans. In its RFQ, the Town indicated that architectural firms should review the existing plans. The Scope of Services in the contract between Gannett and the Town, states that Gannett should review the 1994 Greenberg plans. At the 1/28/02 meeting between Gannett and the Town, Gannett expressed reservations concerning the Greenberg plans, and Town representative Bill Owen stated it was *not* necessary to follow the existing preliminary plans at that time. At a meeting between Gannett and the Town on 9/12/02, Gannett raised several aspects of the Greenberg plans that it considered inadequate, inappropriate, or too costly, and told the Town representatives that Gannett did *not* want to use the Greenberg plans for this job. At that 9/12/02 meeting, the Town agreed that Gannett would not be required to use the Greenberg plans for the job. Further responding to this interrogatory, Gannett refers plaintiff to its initial document production pursuant to Rule 26(a)(1).[6]

In ¶13 of his Memorandum (p.5), plaintiff attempts to extract ¶4 of Gannett's cross-claim against co-defendant the Town of Falmouth, and twist it into a purported admission by Gannett that it relied on *plaintiff's* plans in making its own (Gannett's) plans. Gannett has brought a cross-claim against the Town for contribution and indemnification, which cross-claim includes this paragraph:

---

[5] Under the time-tested principles of Baker v. Seldon, 101 U.S. 99, 25 L.Ed. 841 (1879) and its progeny, use (as opposed to copying) of a protected article or material is generally not considered infringement. *Accord*, Innovative Networks, Inc. v. Young, 978 F.Supp. 167, 176 (S.D.N.Y. 1997), *aff'd*, 152 F.3d 919 (2d Cir. 1998). Nor is copying the building itself (without copying the protected plans) considered copyright infringement. Id.

[6] The complete interrogatories from plaintiff, and responses to these interrogatories from Gannett, are included at Exhibit A to Plaintiff's Memorandum.

4.    Gannett Fleming and Falmouth also have a special relationship as to this particular project, based on Gannett Fleming's reliance on Falmouth's provision of Plaintiff's plans and on statements that Plaintiff's plans should be reviewed in making new plans for the subject job. Therefore, Falmouth owes Gannett Fleming a duty of implied contractual indemnification in this case.

This paragraph speaks of reliance on "Falmouth's *provision* of Plaintiff's plans and on statements that Plaintiff's plans should be reviewed in making new plans"; it says nothing about relying on plaintiff's plans themselves. As discussed, Gannett did not in any way rely on plaintiff's plans in making its own plans. In fact, Gannett rejected plaintiff's initial plans very early in the project.[7]

### C.    Differences Between Gannett's Final Plans and Greenberg's Initial Plans

The following is a non-exhaustive description of some of the differences between Gannett's design documents for the subject Falmouth facility, completed in June 2004, and Greenberg's conceptual plans for the same facility, completed in October 1994:

1.    <u>Building Size</u>
GF new structure +/- 43,220 SF floor area
Greenberg new structure +/- 32,600 SF floor area

2.    <u>Elevations</u>
GF building elevations vary dramatically from those prepared by Greenberg. The GF elevations vary in style, shape, height, width, and appearance. GF elevations consist of a gambrel style building, and the Greenberg elevation consists of a high-pitch roof building.

3.    <u>Programs Differences (types of spaces, space adjacencies, interior building circulation, reuse of existing spaces, and modifications to existing building)</u>

a.    GF identified several space needs during the programming phase that Greenberg did not include in its plans. The following is a list of these additional spaces:

• Reception area

---

[7]  *See* Gannett's interrogatory answer No. 6 at Exhibit A to Plaintiff's Memorandum.

- Copy/file/storage area
- Conference room/future Administrative Assistant for Highway
- Conference room/future Administrative Assistant for Parks
- Plumbing/sprinkler room
- Office closet/storage areas
- Parks Maintenance Shop
- Parks Maintenance Storage
- Separate public toilet facilities
- Separate Park Superintendent/Assistant Superintendent toilet facilities
- Separate Highway Superintendent/Assistant Superintendent toilet facilities
- Canopy system for sander storage
- Canopy system for covered material storage
- Electrician Shop

b.    GF programmed two separate lunchrooms as part of the Administration Addition (one for Parks and one for Highway); Greenberg programmed a central lunchroom for Parks and Highway within the existing maintenance facility.

c.    GF programmed a second floor to the Administration Area with an elevator and two stairways; Greenberg did not program a second floor or means to access a second level.

d.    GF programmed a single central vehicle/equipment parking garage with one center drive-through aisle; Greenberg programmed a double wide vehicle storage garage with two drive-through aisles.

e.    GF programmed a drive-through wash bay; Greenberg programmed a drive-in/back-out wash bay.

f.    GF programmed drive-through/stacked vehicle heated storage bays; Greenberg programmed 90-degree parking stalls with drive-through aisle.

g.    GF programmed the facility to separate the Parks operations from the Highway operations; Greenberg programmed the facility to combine these operations in the same area.

h.    GF programmed the central toilet/shower and locker facilities near the employee gathering area (lunch rooms); Greenberg located the locker/shower/toilet facilities in the existing maintenance facility away from the gathering areas.

i.      GF located the Superintendent and Assistant Superintendent offices near the employee gathering areas; Greenberg located the Superintendent and Assistant Superintendent offices away from the employee gathering areas.

j.      GF programmed a new high bay Parks Maintenance Shop; Greenberg did not include a high bay area for these operations.

k.      GF reprogrammed the existing administration and sign shop area to function as the Electrician Shop; Greenberg reprogrammed the existing administration and sign shop area to be used as the Parks Superintendent office, toilet, facilities, and boiler room.

l.      GF removed all toilet facilities from the Repair Shop and created a storage room; Greenberg expanded the existing toilet room in the Repair Shop into a men's locker/shower/toilet room.

m.      GF programmed separate entrances for Parks employees and Highway employees; Greenberg provide a central employee entrance.

n.      GF did not program a mezzanine in the existing Repair Shop areas; Greenberg programmed a mezzanine in the existing Repair Shop.

o.      GF did not program any new walls within the existing maintenance facility; Greenberg programmed several new walls within the existing maintenance facility.

p.      GF did not program the removal of any load-bearing walls within the existing maintenance facility; Greenberg programmed the removal of several existing load-bearing walls within the existing maintenance facility.

q.      GF programmed building roof elevations that match the height of the existing adjacent building; Greenberg's program contains higher roof elevations.

r.      Greenberg programmed a new storage loft in the existing Parks Mechanic Shop; GF program does not include a storage loft for the Parks Mechanic.

4.     Site Plan Differences

a.      Administration/Shop building configuration: GF's administration/shop building and vehicle/equipment storage garage and wash bay are different from Greenberg's in size, shape,

location, and interior layout. Only the general location of the administration functions to the east, and vehicle storage function to the west, are similar to Greenberg's. However, this configuration is a typical configuration for department of public works facilities, and is a matter of functional necessity.

b.    Parking: GF parking layout includes segregated parking areas to the northeast, east, and southeast of the site. Greenberg's parking consists of once central parking area to the front (east) of the building.

c.    Site amenities: Greenberg included an exterior terrace and extensive landscaping; GF did not include a terrace and very minimal landscaping.

d.    Site Circulation: GF programmed the site for counter-clockwise circulation; Greenberg programmed for clockwise circulation.

e.    GF programmed the site layout to take into consideration the existing salt shed operations; Greenberg did not program for existing salt shed operations.

f.    GF programmed the limits of the pavement areas to prevent impacts to the wetland buffers; Greenberg programmed pavement areas within the wetland buffer.

g.    GF programmed the pavement edge to avoid the steep slope to the north of the site; Greenberg programmed the pavement edge within the limits of the steep slope.

This list is illustrative, not exhaustive. Notwithstanding plaintiff's protest to the contrary, the two sets of plans are not even similar, let alone substantially similar.

**III.    Plaintiff Cannot Show a Likelihood of Success on the Merits of His Copyright Infringement Claim Against Greenberg.**

**A.    The Prima Facie Copyright Infringement Elements**

According to the authorities cited in Plaintiff's Memorandum (pp. 6-7), a prima facie case of copyright infringement requires plaintiff to show (1) ownership of valid copyright, and (2) illicit copying of protected material. When there is no direct evidence of illicit copying, this element in turn requires a showing of (1) defendant's access to the

protected work, and (2) substantial similarity between the copyrighted work and the "accused" work (by defendant). GF does not dispute that these are the prima facie elements for copyright infringement, and at this stage of the litigation, GF does not dispute Greenberg's ownership or GF's access. What is at issue here is copying and "substantial similarity."

The analysis of copying is normally considered a two-step process, as follows: (1) the court first dissects the work "perhaps aided by expert testimony, to assess whether there are sufficient architecture similarities to justify a finding that the defendant has copied..." and (2) once copying is established, the court or fact-finder applies the "ordinary observer test, unaided by dissection or expert testimony, to determine whether the copying resulted in substantial similarity between the works." Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, *opinion after remand*, 867 F.2d 606 (1st Cir. 1988); Walker v. Timeline Films, Inc., 784 F.2d 44, 51-52 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986), *citing* Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir. 1946). Determining the extent of protected material and/or expression in the copyrighted work is generally a question of law, whereas substantial similarity is generally a question of fact. *See* Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 33-34 (1st Cir. 2001).

**B.    The Two Sets of Plans Are Not Substantially Similar When Compared.**

In addition to the long list of differences in the factual section above, plaintiff himself has provided graphic illustration of the differences between the two floor plans for the new building. In his Memorandum (p.8), plaintiff juxtaposes the two floor plans side-by-side. What is striking is not the similarities, but the disparities, especially

considering the physical limitations of the site itself (see below).

The footprints of the buildings are completely different, with walls in different places, entrances and doorways in different places. Plaintiff's Memorandum repeatedly makes statements to the effect that the two sets of plans *would be the same if* plaintiff's open terrace were enclosed, or would be the same if the new building had not been substantially enlarged and the room configurations changed, or would be the same if defendant had not added substantial square footage (*see* pp. 8-9). This reasoning is circular: The buildings would be the same if they were not designed differently.

Further, similarities that Plaintiff's Memorandum (pp. 8-10) points out are not in fact similarities. For example, plaintiff states (p.9) that "the shape of the building is the same." But one look at the compared floor plans on p.8 reveals that the shapes of the two buildings are *not* the same. The two buildings are not even designed in the same three rectangular shapes, as plaintiff claims (p.9). Nor are "the front spaces… virtually identical" (p.9): Gannett's is *much* larger,[8] with the entrance in a different place, and different rooms inside. Using plaintiff's artificial division of the shapes into three rectangulars, from front to back, plaintiff claims that the front block meets the middle block "in the same location" (p.9). But a look at the two plans on p.8, reveals that Gannett's is much further back by comparison to the front block. Plaintiff says that Gannett's middle block is longer, but the same width, as plaintiff's (p.9). At least plaintiff concedes that Gannett's is longer; but the plans on p.8 reveal that Gannett's is

---

[8]  For both buildings, the existing and the new construction, measuring by square footage, GF's construction is larger by 34 percent. Focusing only on the construction of the new administration building, the building discussed by Plaintiff's Memorandum, GF's total construction is 350 percent larger than plaintiff's, and 200 percent larger if we do not include the second floor of the administration building that GF added (but that was not included in plaintiff's original plans).

also smaller in width (not to mention that Gannett did differently every room in that block). Plaintiff concedes that Gannett's back or top block is wider and more forward on the site, but claims that it is the same *length* as plaintiff's (p.9). But it is *not* the same length either: Plaintiff's is visibly longer on the plans pictured on p.8.

The summary of purported similarities on p.13 of Plaintiff's Memorandum is salient here. It starts by pointing out two significant *differences*: "The terrace area was covered [in Gannett's plans] and the then-front area was doubled in size [in Gannett's plans] by increasing its length but not its width. This entire area was then moved forward a few feet to accommodate a corridor that was added to separate the second area." This is using plaintiff's own words. The differences here "so outweigh the similarities that the similarities can only be deemed inconsequential," to quote plaintiff's authority.[9] Comparing the plans side-by-side reveals different fronts, different backs, different sides, different rooms, different corridors, different entrances. Gannett's rooms are in different places and there are more of them.

Another technique plaintiff uses is trying to minimize the numerous differences with adverbs such as "slightly" or "merely" or "somewhat" (p.13). Moving a chunk of a building forward "slightly" is a big difference, especially where the architects are working with site constraints around the footprint of the building (see below). On the bottom of p.7 in Plaintiff's Memorandum he states that "the additional structures... on the site... occupy roughly the same area" as those on Gannett's plans. First, Gannett's occupies 30 percent more of the site. Second, because of the shift in alignment of the overall footprints of the two sets of plans (see below), the inaccuracy in this assertion

---

[9] Plaintiff's Memorandum, p.7, *citing* Arthur Ruttenberg Homes, Inc. v. Maloney, 891 F.Supp. 1560, 1565 (M.D. Fla. 1995).

cannot be saved by the word "roughly."

Another way plaintiff attempts to explain away glaring differences, is to claim

that everything is the same, except that the new building was expanded, in order to

accommodate the Town's expanded space needs ten years later. But Gannett understands

that the DPW budgeted the same number of employees ten years ago as it did this year.[10]

Plaintiffs' Memorandum (p.11) makes much of Greenberg's use of 45° angles,

which the Memorandum describes as "entirely arbitrary and non-functional" design

elements. First, at least in GF's plans any such angles at corners/intersections of

corridors are indeed functional, and serve to open up the intersections and minimize

pedestrian collisions.[11]  Second, these 45° angles are not necessarily copied:  They appear

in different places, and the corridors are much narrower in GF's plans, thereby rendering

such corners more functional. Third, basic geometric shapes are not sufficiently original

for copyright protection. <u>Yankee Candle</u>, 259 F.3d at 35, *citing* <u>Atari Games Corp. v.</u>

<u>Oman</u>, 979 F.2d 242, 247 (D.C. Cir. 1992), *and* <u>Kitchens of Sara Lee, Inc. v. Nifty Foods</u>

<u>Corp.</u>, 266 F.2d 541, 545 (2d Cir. 1959), *and* <u>Williams S. Geiger Corp. v. Gigi</u>

<u>Accessories, Inc.</u>, 1997 WL 458668, *2 (S.D.N.Y. 1997). This legal principle is not

surprising:  Comparable 45° angles are commonly utilized to open up corners, and it

would be unfair to permit particular architect(s) to monopolize such a design feature.[12]

On a much larger level, the comparison of the two diagrams on p.8 of Plaintiff's

Memorandum is inherently misleading. First, they are not aligned on the physical

---

[10] The differences in expansion of the new building might more logically be explained by the fact that Gannett took the trouble to interview workers and department supervisors who were slated to work in the new building and to follow their expressed needs.

[11] *See* Gannett's Interrogatory Answer No. 11, at Exhibit A to Plaintiff's Memorandum.

[12] *See, e.g.*, <u>Morrissey v. Procter & Gamble Co.</u>, 379 F.2d 675, 678-79 (1st Cir. 1967).

(geographical) site as they appear to be in Plaintiff's Memorandum: One would have to move Greenberg's plan (on the left of the page) *up* by about 20 percent in order to have it be properly aligned with Gannett's plan (on the right of the page) at the actual geographical site. This also renders plaintiff's overlay diagram, with the transparency, inaccurate and misleading (let alone, immaterial).

Next, the compared plans on p.8 of Plaintiff's Memorandum are misleading to the extent that the Greenberg plan (on the left) shows both renovations and new construction, whereas the Gannett plan (on the right) shows all *new* construction. Further, Plaintiff's Memorandum does not address the back, existing building, and there are significant differences in what Gannett did to alter this existing building, compared to plaintiff's designs. Some of these differences are set forth above in the list of differences between the two packages, and they include differences with the vehicle bays, placement of toilet and shower facilities, placement and design of maintenance shop, etc.

Finally, the drawing on the left on p.10 of Plaintiff's Memorandum is misleading and inaccurate. This is an apparently after-the-fact drawing created for this motion, rather than an original drawing by Greenberg. Basically plaintiff is claiming that if plaintiff *had* designed the depicted areas in this way (as shown in the manufactured plan on p.10), then his plans *would have been* more similar to Gannett's. The point should not be lost that plaintiff *did not* design them this way, or copyright them this way; and whatever he wishes to imagine Monday morning is not relevant to the issues at hand. Asserting, in effect, "Had I designed it this way, it might be substantially similar to Gannett's plan," essentially concedes that he did *not* design it that way, so it is *not* substantially similar to Gannett's.

**C.    Unavoidable, Functional Limitations at the Site, Dictated by Either Practicality or by Geography.**

It is standard industry practice, according to Gannett's Project Manager, and also common sense, to place the administrative offices in the front of a building, nearest the road, in order to permit easier employee and public access; and to place the vehicle service and garage facilities in the back of the building, where there will be no need for public access. Both sets of plans did this, probably at the Town's request. The choice to make this placement (offices in the front, and garages and service shops in the back) is not a copyright infringement. These are general, practical aspects of the design that are not protectable. *See, e.g.,* Elijah Attia d/b/a Architects v. The Society of the New York Hospital, 2001 F.3d 50, 54-56 (2d Cir. 1999). In Elijah Attia, the Second Circuit compared two architectural designs for a new hospital building and parking facility constructed (in part) over FDR Drive in New York; the placement of floors, traffic patterns, alignment of corridors, the placement of the building over FDR Drive were functional elements or "ideas" or concepts, rather than copyrightable expressions. Id.[13]

Moreover, the geographical limitations of the site itself are responsible for certain macro-level similarities between the two design packages. To the North of the structures was located a steep slope; to the Northeast were located wetlands with a 100-foot

---

[13]   By analogy, these functional elements are not protectible for the same reasons that having a border around the label and coloring that border gold (to "signify opulence and quality"), was not copyrightable in Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 35-36 (1st Cir. 2001). For these same reasons, styles of photography or use of common geometric shapes are not copyrightable. Id.

For similar reasons, plaintiffs in cases involving literary works have not been able to obtain copyright protection for the ideas or conceits alone behind their literary works. *See, e.g.,* Walker v. Timeline Films, Inc., 784 F2d 44, 48-53 (2d Cir.), *cert. denied,*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986) (similarities between the novel Fort Apache and the film Fort Apache: the Bronx were not beyond "the level of generalized or otherwise non-protectible ideas," and mainly had to do with background setting--such as showing vermin and drug use in a depressed neighborhood--or with facts that cannot be copyrighted); O'Neill v. Dell Publishing Co., Inc., 630 F.2d, 685, 687-89 (1st Cir. 1980) (only similarity between two novels was conceit of a U.S. submarine getting lost in 1942 and reappearing in 1974, but otherwise the works' treatments, details, scenes, events, and characterizations, were dissimilar).

protected buffer zone; to the South were located an existing salt shed and beach storage

shed that the Town wanted preserved; to the Southeast was an existing fuel island that the

Town wanted preserved, along with underground storage tanks ("USTs"). Thus, anyone

designing renovations and/or new construction for this DPW Project would have to build

toward the East and West. GF's administration addition was located to the East side, the

side closest to Gifford Street, to allow the most direct path for public access. The vehicle

storage garage portion was located to the West side, away from the administration/office

areas. Plaintiff's Memorandum (p.9) points out, for example, that "the left setback (the

90° angle where the first shape meets the second larger shape) is in the same location" on

both sets of plans. First, because the plans as depicted are not accurately overlaid (see

above), they are not in exactly the same location. Second, Gannett incorporated this

setback in order to retain space for circulation around the existing fuel island that the

Town wanted to retain. This design element is functional, not aesthetic.

## IV.    Plaintiff Also Cannot Show the Other Three Required Elements for Obtaining a Preliminary Injunction.

Gannett agrees with Plaintiff's description of the four elements for a preliminary

injunction at p.5 of Plaintiff's Memorandum, *citing* Concrete Machinery, 843 F.2d at

611.[14]

### A.    Plaintiff Has Not Shown That He Has Suffered an Irreparable Injury for Which He Has No Adequate Remedy at Law.

Plaintiff must first show a likelihood of success on his infringement claim, before

there can be any presumption of irreparable injury. Id. at 611-13. As discussed for most

---

[14] At this preliminary injunction stage, Gannett reserves its right to raise other defenses later in this case, such as the implied license defense, as additional grounds militating against plaintiff's likelihood of success on the merits.

of this brief, there is no substantial similarity (let alone similarity) between the two sets of architectural plans.

Even if this Court finds a substantial similarity between the two design packages, plaintiff has a perfectly adequate remedy of actual damages. It would be wasteful and unnecessary to halt a significant construction project in the Town of Falmouth, where Plaintiff can collect damages instead (if any liability is found). *See, e.g.,* Edgar H. Wood Associates, Inc. v. Skene, 347 Mass. 351, 366, 197 N.E.2d 886 (1964) (no injunction against building the infringing building once construction started, where copyright holder can get damages instead).

### B. The Balance of Hardships Weighs Heavily in Favor of Defendants and Against Granting an Injunction Here.

If this Court were to grant a preliminary injunction against the ongoing construction project, building the DPW facility in Falmouth using GF's plans, the Town would suffer unnecessary financial burdens from the delay: Labor and material costs would increase; the general contractor could have a claim for extra compensation for the delay; mobilization and de-mobilization costs would be additional; as would costs for ongoing rental of materials, trailers, and equipment; and insurance and other costs that cannot be set aside during periods of inactivity would accumulate. In contrast, Plaintiff would recover the same actual damages (plus applicable interest, if any) whether he obtains the injunction or not.

### C. Further, the Public Interest Would Not Be Served by Granting This Injunction.

This DPW facility in Falmouth has public safety vehicles and snow and ice removal vehicles. These vehicles respond during snow or coastal storm emergencies or

fires. At least during the winter, when these vehicles are stored outside, the response time maybe reduced, because drivers have to clean off the vehicles or because they are not as likely to start right away because of the cold.

Moreover, the Town of Falmouth will incur the above-listed additional costs from any delay caused by the granting of such an injunction, and the Town's people would suffer the opportunity costs of removal of these monies from an already limited budget.[15]

## V.    Conclusion

For the foregoing reasons, Gannett respectfully asks this Court to deny Plaintiff's Motion for a Preliminary Injunction. Plaintiff has not shown any substantial similarity between the two sets of plans for the DPW project. In fact, even a cursory review of the plans themselves (as shown in Plaintiff's Memorandum) reveals that Gannett's plans are completely different both externally and internally, within the confines dictated by the geography of the site. Moreover, even if plaintiff could show a substantial likelihood, stopping this public construction project in the middle would be an unfair hardship on the Town and the public, where plaintiff has a perfectly adequate actual-damages remedy.

### REQUEST FOR ORAL ARGUMENT

Pursuant to U.S. District Court Local Rule 7.1(D), defendant Gannett hereby requests oral argument. Should this Court deem it helpful, Gannett would also be ready

---

[15]  In a non-copyright context, Massachusetts Courts have considered the adverse public impact of halting a public construction project through injunctive relief, where other remedies are available. *See* LeClair v. Town of Norwell, 430 Mass. 328, 338-39, 719 N.E.2d 464 (1999); Mandell v. Town of Reading, 12 Mass.L.Rptr. 1, 2000 WL 1233050, *4, 12 Mass.L Rptr. 615, 2000 WL 1873987, *5-6 (Mass. Super.).

to conduct an evidentiary hearing if necessary.

The Defendant,
GANNETT FLEMING, INC.

By its attorneys,

Dated: 8/10/05

Paul Michienzie, Esq. – BBO #548701
John C. Barker, Esq. – BBO #637406
Michienzie & Sawin LLC
745 Boylston Street, 5th Floor
Boston, MA   02116-2636
Tel. 617-227-5660