UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NOAH GREENBERG, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | C.A. NO. 04-11934GAO |
| | ) | |
| TOWN OF FALMOUTH and | ) | |
| GANNETT FLEMING, INC., | ) | |
| Defendants | ) | |

### DEFENDANT TOWN OF FALMOUTH'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### Introduction

Defendant Town of Falmouth ("Falmouth") opposes **Plaintiff's Motion for Preliminary Injunction**. This matter stems from an alleged copyright infringement effected by Defendants as to Plaintiff's architectural drawings.[1]

### Facts

Pursuant to a 1993 Request for Proposals for Architectural Services for renovations to a Falmouth DPW building, Plaintiff submitted an architectural design consisting of plans and elevations ("Plaintiff's Design" or "Design").[2] Work on the municipal project was delayed (for unrelated reasons) until 2001.[3] On May 30, 2001, Falmouth advertised in the Central Register a

---

[1]  Early motion practice has narrowed the issues. In granting (in part) Falmouth's dispositive motion, this Court held that Plaintiff cannot recover for events occurring prior to September 3, 2001 (including the 'core' alleged infringement on June 6, 2001). The case goes on, but Plaintiff now must prove that Gannett Fleming committed copyright infringement, and that Falmouth contributed to that infringement, by utilizing his (Plaintiff's) plans in developing the plans Gannett Fleming is now using for the DPW project.

[2]  Plaintiff's Complaint, ¶¶ 11 and 12.

[3]  Complaint, ¶ 14.

Request for Qualifications for Architectural Design Services.[4]  Said Request for Qualifications

for Architectural Design Services included reproductions of Plaintiff's Design.[5]  Gannett Fleming

obtained copies of Plaintiff's Designs when it (Gannett Fleming) received a copy of the Request

for Qualifications.[6]  Plaintiff's plans were generic and failed to specify materials, dimensions or

elevations.[7]  Gannett Fleming identified several problems with Plaintiff's plans including code

issues, inadequate space, inefficient operations and expensive construction.[8]  As early as

September 12, 2002, Gannett Fleming made clear to Falmouth that it had no use for Plaintiff's

plans.[9]  Gannett Fleming did not rely on Plaintiff's plans and, ultimately, the final plans were

radically different from Plaintiff's plans.[10]

## Argument

Plaintiff has little chance of success on his claims, and to an even greater degree, he cannot

show a likelihood of success on the merits at this point in his action.  Most importantly, a

preliminary injunction would have a very negative impact on Falmouth.

---

[4]  Complaint, ¶ 15; Affidavit of William Owen, ¶ 2, attached as Exhibit 1.

[5]  Complaint, ¶ 16.

[6]  **Defendant Gannett Fleming's Responses to Plaintiff's First Set of Interrogatories**, Answer No. 3.

[7]  **Gannett Fleming's Responses**, Answer No. 6.

[8]  **Gannett Fleming's Responses**, Answer No. 6.

[9]  **Gannett Fleming's Responses**, Answer No. 4.

[10]  **Gannett Fleming's Responses**, Answer Nos. 4-5.  Given that the root of Plaintiff's claims now lay in Gannett Fleming's alleged pirating (which Falmouth denies), Falmouth incorporates by reference that portion of Gannett Fleming's opposition which details the differences between Plaintiff's plans and Gannet Fleming's final plans.

A.    Standard

When deciding whether to grant a preliminary injunction, a court performs a multi-part analysis. Packaging Industries Group. Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). Initially, the court must determine whether the moving party has demonstrated a likelihood of success on the merits, and that the moving party faces a substantial risk of irreparable harm--losses that cannot be repaired or for which compensation will not be adequate after final judgment--if the motion for the preliminary injunction is not granted. Id. at 617 & n. 11.

If the moving party has met his burden, the court must then engage in a balancing test in which the irreparable harm faced by the moving party is compared to the harm that an injunction would inflict on the other party. "If the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party." Id. at 617. In balancing these factors, "[w]hat matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party's chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue." Id. The stronger the case is on the merits, the less is required to be shown in terms of irreparable harm. See Gately v. Commonwealth, 2 F.3d 1221, 1224-25, 1234 (1st Cir.1993). In any case, the risk of harm to the public interest is also a consideration. Wine and Spirits Retailers, Inc. v. State of R.I., --- F.3d ----, 2005 WL 1876162 (1st Cir. 2005) (a copy is attached at Exhibit 2).

B.     Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits.

    1)     Plaintiff Submitted an Implied License to Use His Plans.

Even if Plaintiff were to show that Gannett Fleming copied his plans[11] (and that Plymouth contributed thereto), Plaintiff still cannot recover because he provided Plymouth with an implied license to copy those plans. While the touchstone for determining the presence of an implied license is intent, see Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 515 (4th Cir. 2002), the analysis turns on at least three factors: (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible. Id. at 516. This is not an exhaustive list of factors to consider, but it provides useful guidance in determining the crucial question of intent.

The "intent" benchmark is an *objective* inquiry into facts that manifest such a contractual intent. See I.A.E., Inc. v. Shaver, 74 F.3d 768, 777 (7th Cir. 1996) (relevant intent "is not the parties' subjective intent but their outward manifestation of it"). As such, if an architect worked on a short-term assignment with no outward signs of expecting to continue involvement with the larger project, and handed over the requested plans to a client without a contract or other limitations, it

---

[11] In part, Plaintiff argues that Gannett Fleming's plans are nothing more than an enlarged version of his plans. (**Plaintiff's Motion for Preliminary Injunction**, n. 4.) In support of this argument, he posits that Falmouth has greater demands today than it did 1994 (necessitating plans on a larger scale). Plaintiff is wrong. Falmouth DPW's demand for space when Plaintiff delivered his plans - March 1994 - was that same as it is now. Falmouth's Highway Division and Falmouth's Park Division will be housed in the subject building. Own Aff., ¶ 8. The amount of employees of those departments in 1995 was the same as it is today. Own Aff., ¶ 8. There is no need for more space.

would not matter if he harbored private hopes of working on the next phase of the project. See id. This is the case here.

Plaintiff worked on a short-term assignment with no legitimate expectations to continue involvement with the larger project. There is a rebuttable presumption that municipalities that hire an architect for a feasability study will not hire that same architect for the final project. See M.G.L., c. 7, § 38H(i). Section 38H(i) reads, "Awarding authorities in cities and towns may allow a designer who conducted a feasibility study to continue with the design of a project, *provided that* they shall commission an independent review, by a knowledgeable and competent individual or business doing such work, of the feasibility designer's work to insure its reasonableness and its adequacy prior to allowing such a designer to continue on said project." (Emphasis added.)  While Plaintiff was involved, there was never talk of commissioning an independent review of Plaintiff's plans.[12]  In any case, such a review of a project of this magnitude would have been superfluous.[13]  Therefore, any expectation that Plaintiff had to continue in to the bigger project would have been unreasonable and unsupported.

Plaintiff submitted his work to Falmouth without express limitations.[14]  Plaintiff gave his plans to Falmouth on March 15, 1994.[15]  He did so without mention of a prohibition of sharing those

---

[12]  Owen Aff., ¶ 3.

[13]  Owen Aff., ¶ 3.

[14]  Owen Aff., ¶ 4.

[15]  Owen Aff., ¶ 4.

plans.[16]  Even more, he did so with no written statement to that effect.[17]  Nowhere in the record is there evidence that when Plaintiff handed over his plans to Falmouth, he intended Falmouth to never share them.[18]

In light of the foregoing, Plaintiff could not have harbored any reasonable hopes of working on the next phase of the DPW project.  Moreover, any claim Plaintiff might make that he did *not* provide a non-exclusive license does not stand up to reason.  If Plaintiff were to make such an argument, then it would beg this question:  What value would Plaintiff's preliminary plans have if not to aid Falmouth in completing the ultimate project?  In this case, even in Plaintiff's plans were copied, it was only to complete the project for which Falmouth retained Plaintiff's services (for nearly $8,000).  It stands to reason that Falmouth could use the plans to consummate the subject project.  To be sure, Falmouth regularly circulates one entity's preliminary plans to other entities by way of Request for Proposals for final design services.[19]  The preliminary plans are regularly done by someone other than the ultimate designer.[20]  For example, this scenario occurred regarding the Falmouth Band Shell Project and the Falmouth Animal Control Facility.[21]  Never, until now, was

---

[16]  Owen Aff., ¶ 4.

[17]  Owen Aff., ¶ 4.

[18]  In fact, the opposite is true.  With a letter dated February 7, 2000, Plaintiff delivered another copy of his plans and tells Falmouth, "You can reproduce these drawings ... *at your will*, providing only that our NGA Title block is included with all reproductions as a copyright for the design."  (Emphasis added.)  Though it appears that letter was written in the context of acquiring funding, it still shows that Plaintiff had little predilection with the plans being copied for this project.

[19]  Affidavit of Heather Harper, ¶ 2, attached as Exhibit 3.

[20]  Harper Aff., ¶ 2.

[21]  Harper Aff., ¶ 2.

there ever a cry from entities that created the preliminary plans claiming that Falmouth had no right to share the preliminary plans with the ultimate designer.[22]

Given the foregoing, Plaintiff does not enjoy a likelihood of success.

C.    Plaintiff Faces No Substantial Risk of Irreparable Harm.

Plaintiff faces no substantial risk of irreparable harm. If he were facing such dire straits, then left a mystery is the reason why he sat on his rights so long as to infect his suit to the extent that a large part of his cause of action has already been trimmed. He provides no reason for this delay. In any case, this is not the type of damage that warrants the "irreparable harm" moniker. Examples of irreparable harm include loss of trade secrets, loss of goodwill, open meeting law violations and sharing property with others 24 hours a day. See § 5.1.2 Massachusetts Superior Court Civil Practice Manual (2002).

Any damages Plaintiff may suffer are definite and calculable; he faces no risk of losing property, health or liberty. Plaintiff (if successful) can seek the damages outlined in Section 504 of the Copyright Act. 17 U.S.C.A. 504. Section 504 states that an infringer is liable for either 1) the copyright owner's actual damages and any additional profits of the infringer that are attributable to the infringement; or 2) statutory damages. Regarding statutory damages, the copyright owner may elect to recover, instead of actual damages and profits, a statutory award for all infringements involved in the action of no more than $30,000.

---

[22]    Harper Aff., ¶ 2.

D.    The Harm That the Requested Injunction Would Inflict upon
      Falmouth Outweighs the Irreparable Harm (If Any) Faced by Plaintiff.

Given the **un**likelihood that Plaintiff will prevail on the merits, Falmouth need not go far to show that its degree of harm (if the sought-after injunction is allowed) scuttles Plaintiff's motion. See Packaging Industries Group. Inc., 380 Mass. at 616-17 ("[w]hat matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party's chance of success on the merits"). Even if Plaintiff was likely to succeed on the merits, Falmouth would still have sufficient damage to quash Plaintiff's pending motion.

The subject DPW project is nearly 50% complete.[23] Putting a halt on the project mid-flow would make little sense. And if this Court grants an injunction or otherwise limits the project, the effect on Falmouth would be remarkable operationally and financially (the former effect impacting more the public interest).[24]

Operationally, an injunction would cause Falmouth to suffer dramatically and adversely affect the ability of Falmouth to operate efficiently on at least two fronts: First , the majority of the DPW vehicles and equipment are now being stored outside, in the weather, while work on the new building is being done.[25] The longer this material remains outside, the more susceptible it becomes

---

[23]  Owen Aff., ¶ 5.

[24]  Owen Aff., ¶ 5. Plaintiff wants this court to believe that the public interest is of no concern in this matter unless a possible monopoly is being addressed. (**Plaintiff's Motion for Preliminary Injunction**, p. 15.) This is false. A district court has every right, if not obligation, to weigh a preliminary injunction's effect on the public interest. Wine and Spirits., 2005 WL 1876162 citing Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1ˢᵗ Cir. 2004).

[25]  Owen Aff., ¶ 6.

to damage.[26] And the effects of a cold, weather-ridden winter could wreak havoc on the equipment.[27]

Second, an injunction would impair further the fulfillment of the day-to-day responsibilities of the

DPW.[28] Falmouth is managing today despite the displacement of space and equipment.[29] But if the

project is put at a standstill now, the displacement will be prolonged and more issues will arise, such

as the storage of sanders for the winter (that will affect DPW's ability to clear the roads of ice and

snow).[30]

      Financially, the effect on an injunction would be high.  The costs of the project would rise

as damages claims would ensue from the approximately fifteen contractors working that would be

forced to stop their work.[31] Moreover, Falmouth financed this 5.425 million dollar project through

municipal bonds.[32]  Incumbent on municipalities that borrow funds through municipal bonds is a

spend down schedule dictated by the Internal Revenue Service.[33]  The spend down provision

applicable here could be violated if Falmouth is forced to halts this project.[34]  Such violations could

result substantial penalties assessed by the IRS.

------

[26]   Owen Aff., ¶ 6.

[27]   Owen Aff., ¶ 6.

[28]   Owen Aff., ¶ 6.

[29]   Owen Aff., ¶ 6.

[30]   Owen Aff., ¶ 6.

[31]   Owen Aff., ¶ 7.

[32]   Affidavit of Carol Martin, ¶ 2, attached as Exhibit 4.

[33]   Owen Aff., ¶ 2.

[34]   Owen Aff., ¶ 2.

## Conclusion

For the foregoing reasons, Braintree respectfully requests that this Court deny Plaintiff's motion for preliminary injunction.

Respectfully submitted,

The Defendant,
TOWN OF FALMOUTH,
By its attorneys,

**PIERCE, DAVIS & PERRITANO, LLP**

John J. Davis, BBO #115890
Daniel G. Skrip, BBO #629784
Ten Winthrop Square
Boston, MA 02110
(617) 350-0950

Dated: August 11, 2005

I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each (other) party by ~~mail~~ (by hand) on ___8-11-05___.

-10-

EXHIBIT # 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NOAH GREENBERG,               ) <br>       Plaintiff,             ) <br>                                ) <br> v.                           ) <br>                                ) <br> GANNETT FLEMING, INC.,     ) <br>       Defendant/           ) <br>       Cross-Claim Plaintiff,   ) <br> and                        ) <br> TOWN OF FALMOUTH        ) <br>       Defendant/           ) <br>       Cross-Claim Defendant.   ) | C.A. NO. 04-11934GAO |

## <u>AFFIDAVIT OF WILLIAM B. OWEN</u>

I, William B. Owen, hereby depose and state:

1.     I am employed by the Town of Falmouth as the Director of Public Works. I have been so employed for nearly 22 years.

2.     On May 30, 2001, Falmouth advertised in the Central Register a Request for Qualifications for Architectural Design Services.

3.     While dealing with Robert Charles Group and Noah Greenberg in the midst of the creation of the conceptual plans for the subject project, we never discussed commissioning an independent review of Mr. Greenberg's plans so that we could eventually award him the final project. Commissioning such a review of a project of this magnitude would have been superfluous.

4.     Mr. Greenberg submitted his work to Falmouth on March 15, 1994, without express limitations. He never mentioned a prohibition on sharing those plans. And he sought no written statement to that effect.

5.     The subject DPW project is nearly 50% complete. If an injunction, or any other limitation, affects the project, then the effect on Falmouth would be remarkable operationally and financially.

6.     An injunction would cause Falmouth to suffer dramatically and adversely affect the ability of Falmouth to operate efficiently on at least two fronts: First, the majority of the DPW vehicles and equipment are now being stored outside, in the weather, while work on the new building is being done. The longer this material remains outside, the more susceptible it

Case 1:04-cv-11934-GAO     Document 55

becomes to damage. And the effects of a cold, weather-ridden winter could wreak havoc on the equipment. Second, an injunction would impair further the fulfillment of the day-to-day responsibilities of the DPW. Falmouth is managing today despite the displacement of space and equipment. But if the project is put at a standstill now, the displacement will be prolonged and more issues will arise, such as the storage of sanders for the winter (that will affect DPW's ability to clear the roads of ice and snow).

7.  Financially, the effect of an injunction would be high. The costs of the project would rise as damages claims would ensue from the approximately fifteen contractors working on this multimillion dollar project.

8.  The DPW's demand for space in March 1994, when Mr. Greenburg delivered his plans, was that same as it is now. Falmouth's Highway Division and Falmouth's Park Division will both housed in the subject building. The amount of employees of those departments in 1995 was the same as it is today.

9.  I am over the age of 18 and I understand the obligation of an oath.

10.  The statements in this affidavit are based on my personal knowledge.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 11th DAY OF AUGUST, 2005.

William B. Owen, Director
Falmouth of Public Works

EXHIBIT # 2

2005 WL 1876162 (1st Cir.(R.I.))
--- F.3d ---

Only the Westlaw citation is currently available.

United States Court of Appeals,
First Circuit.
WINE AND SPIRITS RETAILERS, INC. and John Haronian, Plaintiffs, Appellants,
v.
State of RHODE ISLAND et al., Defendants, Appellees.
No. 05-1549.
Heard June 7, 2005.
Decided Aug. 10, 2005.

Appeal from the United States District Court for the District of Rhode Island, Ernest C. Torres, U.S.
District Judge.
Evan T. Lawson, with whom Robert J. Roughsedge, Michael Williams, and Lawson & Weitzen, LLP
were on brief, for appellants.
Rebecca Tedford Partington, Deputy Chief, Civil Division, Department of Attorney General, with whom
Patrick C. Lynch, Attorney General, was on brief, for state appellees.
Joseph S. Larisa, Jr., with whom Larisa Law and Consulting, LLC was on brief, for intervenor-appellee.

Before SELYA, Circuit Judge, HILL, [FN*] Senior Circuit Judge, and LYNCH, Circuit Judge.


SELYA, Circuit Judge.
**\*1** Rhode Island, like many states, regulates the intrastate channels through which alcoholic
beverages may be manufactured, imported, and sold. One recently enacted piece of this regulatory
mosaic prevents any franchisor or franchisee from holding a Class A retail liquor license. See R.I. Gen.
Laws § 3-5-11.1. Another piece, enacted at the same time, amended a related statute, which
prohibits any "chain store organization" from holding such a license, id. § 3-5-11(a), so that it
explicitly encompasses package stores that engage in certain coordinated business activities, see id. §
3-5-11(b).
Plaintiff Wine & Spirits Retailers, Inc. (W & S), a franchisor of package stores, brought this action
against the State seeking, inter alia, to enjoin the enforcement of those new enactments. [FN1] W &
S premised its suit on the thesis that the two statutes, singly and in combination, violate (i) its First
Amendment rights to speech and association and (ii) its Fourteenth Amendment right to equal
protection.
In this early chapter of the litigation, W & S appeals from the district court's denial of its motion for a
preliminary injunction. Having weighed the considerations relevant to the preliminary injunction
balance, we conclude that the district court did not abuse its discretion in determining that W & S
failed to show a likelihood of success on the merits of its claims and, therefore, did not demonstrate
an entitlement to preliminary injunctive relief.
**I. BACKGROUND**
Under Rhode Island law, any individual or entity engaged in the manufacture, sale, or importation of
alcoholic beverages must hold a valid license issued by the Department of Business Regulation (DBR).
See R.I. Gen. Laws § 3-5-1. A Class A retail license entitles the holder to obtain alcoholic beverages
from licensed wholesalers and to operate a retail package store, from which the beverages may be
sold in sealed containers. See id. §§ 3-7-1, 3-7-3. Since 1933, the State has prohibited chain store
organizations from holding Class A liquor licenses. See 1933 R.I. Pub. Laws ch.2013, § 6 (current
version at R.I. Gen. Laws § 3-5-11). This enactment gave the DBR full discretion to determine
whether an entity fell into the "chain store" category. Id.
The ingenuity of lawyers is nearly endless and, recently, franchised package stores began to crop up
throughout Rhode Island. In an apparent effort to block this easy evasion of the chain store
prohibition, the Rhode Island General Assembly amended section 3-5-11 to identify a set of licensee
activities that would allow the DBR to find that an entity was in fact a chain store organization. The
new statute, enacted July 8, 2004 and effective April 1, 2005, expanded the term "chain store
organization" to encompass:

Any group of one or more holders of Class A liquor licenses who engage in one or more of the following practices with respect to the business conducted under such licenses, either directly or indirectly, or have any direct or indirect beneficial interest in the following practices:

**\*2** (i) Common, group, centralized or coordinated purchases of wholesale merchandise.

(ii) Common billing or utilization of the services of the same person or the same entity in the management or operation of more than one liquor licensed business.

(iii) Participation in a coordinated or common advertisement with one or more liquor licensed business in any advertising media.

(iv) Coordinated or common planning or implementation of marketing strategies.

(v) Participation in agreed upon or common pricing of products.

(vi) Any term or name identified as a chain or common entity.

R.I. Gen. Laws § 3-5-11(b)(1). By its terms, this statute restricts a holder of a Class A liquor license from participating in many business activities that are typical of a franchise relationship.

Simultaneous with the enactment of section 3-5-11(b), the General Assembly passed what is now section 3-5-11.1. This provision has a similar but more direct effect: it explicitly excludes franchisees from holding Class A liquor licenses. The amended statute reads in pertinent part:

To promote the effective and reasonable control and regulation of the Rhode Island alcoholic beverage industry and to help the consumer by protecting their choices and ensuring equitable pricing. Class A liquor license[s] authorized by this title shall not be granted, issued, renewed or transferred to or for the use of any liquor franchisor or franchisee. Class A liquor license holders are expressly prohibited from utilizing the provisions of the Franchise Investor [sic] Act, [R.I. Gen. Laws] § 19-28-1 et seq.

Id. § 3-5-11.1(a). The latter statute also nullifies all franchise agreements involving the retail sale of alcoholic beverages, id. § 3-5-11.1(b); stipulates that any franchisor or franchisee who is a party to such an agreement must terminate it within thirty days of the statute's effective date, id. § 3-5-11 .1©); and empowers the DBR to fine violators (including franchisors) and to revoke or suspend a transgressor's liquor license and/or franchise registration, id. § 3-5-11.1(d).

At the time these bills were passed, W & S had been operating for roughly seven years as a franchisor of independently owned Class A liquor retailers. It had a portfolio of eleven franchise agreements in Rhode Island, all of which were registered under the Franchise Investment Act, R.I. Gen. Laws §§ 19-28.1-1 to 19-28.1-34. These franchisees conducted business under names owned by W & S (seven under the name "Douglas Wine & Spirits" and four under the name "People's Liquor Warehouse").

In general, W & S's franchise agreements provided that, for an annual fee, royalties, a commitment to maintain certain quality standards, and a pledge to pay into a joint advertising and promotion fund, the franchisee would receive an exclusive franchise territory. The franchisee also would receive the right to use either the Douglas or People's trade name and other proprietary marks, and would be given access to a compendium of marketing, advertising, training, accounting, purchasing, and consulting services. Additionally, the franchise agreements authorized W & S to require the franchisees to carry certain products, to designate vendors for those items, and to dictate the layout of each retail store (including product placement).

**\*3** In July of 2004 (when sections 3-5-11(b) and 3-5-11.1 were enacted), W & S was negotiating with two more potential Rhode Island franchisees. Recognizing the relevance of the new statutes to its operation, W & S wrote to the DBR on August 12, 2004, asking whether it would be permissible to register those two new franchises prior to the statutes' effective date. The DBR responded on September 1, 2004, explaining that W & S would have to submit applications in order for any new franchise registrations to be considered. The DBR's letter left no doubt that this would be an exercise in futility; the epistle declared the DBR's position to be "that as of April 1, 2005, all store franchise agreements as of that time will become null and void and it [thereafter] will be illegal for a Class A package store to operate under a franchise agreement."

## II. TRAVEL OF THE CASE

With the death knell set to toll, W & S filed this action on September 29, 2004. Its complaint set forth eight statements of claim. On January 18, 2005, W & S moved to enjoin enforcement of the challenged provisions throughout the currency of the litigation. In the motion for preliminary injunctive relief, it relied on only three of its eight claims: (i) that sections 3-5-11 and 3-5-11.1 prohibit it from engaging in expression protected by the First Amendment; (ii) that the laws violate its First Amendment right to association; and (iii) that the laws violate the Equal Protection Clause of the Fourteenth Amendment by treating it differently from others who are similarly situated. The State opposed the motion. The United Independent Liquor Retailers of Rhode Island (UILRRI), an

association of Class A licensees that had lobbied for passage of the challenged laws, successfully moved to intervene as a party defendant and sided with the State.

Following a hearing, the district court denied the request for a preliminary injunction, principally on the ground that W & S had not demonstrated a likelihood of success on the merits. *See Wine & Spirits Retailers, Inc. v. Rhode Island,* 364 F.Supp.2d 172, 176-83 (D.R.I.2005). W & S filed a timely notice of appeal. *See* Fed. R.App. P. 4(a); 28 U.S.C. § 1292(a)(1). We granted expedited review.

In the meantime, the district court had granted an injunction pending appeal, *see* Fed.R.Civ.P. 62©), to prevent the State "from enforcing R.I. Gen. Laws § 3-5-11 to the extent that the enforcement action is based solely on a Class A licensee's use of a name similar to or the same as that of another licensee." *Wine & Spirits Retailers, Inc. v. Rhode Island,* No. 04-418 (D.R.I. April 29, 2005) (unpublished order). At W & S's request, we extended that injunction to the date of the issuance of our mandate but, like the lower court, denied other requested relief. *See Wine & Spirits Retailers, Inc. v. Rhode Island,* No. 05-1549 (1st Cir. May 23, 2005) (unpublished order); *see also* Fed. R.App. P. 8 (a)(2). We heard oral argument on June 7, 2005 and took the matter under advisement. We now affirm.

## III. JUSTICIABILITY

***4** W & S maintains that the district court wrongfully denied its request for a preliminary injunction against the enforcement of sections 3-5-11 and 3-5-11.1. Both the State and UILRRI assert that W & S lacks Article III standing to challenge those laws.

It is axiomatic that Article III standing is a constitutional precondition to a federal court's power to adjudicate a case. *Osediacz v. City of Cranston,* --- F.3d ----, ---- (1st Cir.2005) [No. 04-2673, slip op. at 2]; *R.I. Ass'n of Realtors, Inc. v. Whitehouse,* 199 F.3d 26, 30 (1st Cir.1999). When standing is put in issue, a reviewing court is warranted in confirming its existence before proceeding to tackle the merits of the case. We do so here.

The burden of establishing standing lies with the party invoking federal jurisdiction. *Osediacz,* --- F.3d at ---- [slip op. at 3]. Accordingly, W & S "must show that (1) it personally has suffered some actual or threatened injury, (2) the injury fairly can be traced to the challenged conduct, and (3) a favorable decision likely will redress [the injury]." R.I. Ass'n of Realtors, 199 F.3d at 30.

W & S easily satisfies these requirements with respect to section 3-5-11.1. After all, it alleges that section 3-5-11.1's prohibition on liquor franchises nullifies its franchise agreements with no fewer than eleven franchisees and subjects it, as a franchisor, to monetary penalties should it attempt to maintain its franchise relationships. *See* R.I. Gen. Laws § 3-5- 11.1(b), (d). Those imminent consequences satisfy the requirement of an injury in fact. That injury, in turn, is fairly traceable to the statute and redressable in a federal court proceeding. Consequently, W & S has standing to press its constitutional claims insofar as those claims implicate section 3- 5-11.1.

With respect to section 3-5-11, the defendants' cardinal contention is that W & S cannot meet the standing requirement because it does not itself hold a Class A liquor license and, therefore, is not subject to any enforcement action or penalty under the statute's terms. This contention has a patina of plausibility. Section 3-5-11 does not carry any direct penalties applicable to franchisors but, rather, applies directly to holders of Class A liquor licenses. Thus, it cannot be enforced against a franchisor, like W & S, which does not itself possess such a license.

In the end, however, this statutory configuration does not undermine the allegation that W & S has suffered an injury that is fairly traceable to the statute. That allegation draws its essence from W & S's claim that section 3-5-11, by restricting the holders of Class A liquor licenses from engaging in certain business activities vital to franchise arrangements, infringes on a franchisor's First Amendment rights of speech and association and thereby causes W & S economic harm. No more is exigible to clear the standing hurdle.

The requirement that an alleged injury be fairly traceable to the defendant's action does not mean that the defendant's action must be the final link in the chain of events leading up to the alleged harm. *See Bennett v. Spear,* 520 U.S. 154, 168-69, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Nor does that requirement exclude injuries produced by "coercive effect upon the action of someone else." *Id. at 169.* Given these principles, the fact that the deleterious effect of a statute is indirect will not by itself defeat standing. *See Becker v. FEC,* 230 F.3d 381, 387 (1st Cir.2000); *see also Eulitt v. Me. Dep't of Educ.,* 386 F.3d 344, 353 (1st Cir.2004) (holding that parents had sufficiently alleged an Article III injury even though "it [was] the educational institution, not the parent[s]," that was denied access to certain tuition payments under the challenged statute); *Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 183 (1st Cir.1999) (finding that trash hauler had standing to assert a constitutional challenge to an ordinance mandating residents' use of a town-designated competitor);

*Wash. Legal Found. v. Mass. Bar Found.,* 993 F.2d 962, 972 (1st Cir.1993) (finding that client had standing based on alleged injury to her constitutional rights that was fairly traceable to a rule, enforceable only against attorneys, that required them to place client funds in a pooled interest-bearing account).

**\*5** These precedents are determinative here. Section 3-5-11(b)(1) has an obviously coercive effect on W & S's franchisees; under its terms, those franchisees either must desist from engaging in certain collective business activities with W & S or forfeit their Class A liquor licenses. Either way, W & S's business relationship with the franchisees, which it claims to be constitutionally protected, is damaged. [FN2] Consequently, the economic harm that W & S alleges is fairly traceable to the statute (and, thus, to the State).

To cinch matters, the threat to the franchisees is both actual and imminent. It is undisputed that the DBR has taken preliminary steps to enforce the statute against non-compliant holders of Class A liquor licenses and has warned that it will undertake such enforcement from and after the statute's effective date. That is enough to show that the threatened harm is imminent. *See, e.g., Aroostook Band of Micmacs v. Ryan,* 404 F.3d 48, 65-66 (1st Cir.2005); *Montalvo-Huertas v. Rivera-Cruz,* 885 F.2d 971, 976 (1st Cir.1989); *see also Berner v. Delahanty,* 129 F.3d 20, 24 (1st Cir.1997) (noting that to ground a claim of standing, harm must be actual or imminent rather than conjectural or speculative). Granting the requested declaratory and injunctive relief plainly would palliate this threatened harm.

To say more on this point would be to paint the lily. For the reasons elucidated above, we conclude, without serious question, that W & S has alleged an injury fairly traceable to each of the challenged statutes and redressable by the federal courts. Accordingly, it has standing to pursue the claims that it asserts.

## IV. THE PRELIMINARY INJUNCTION STANDARD

We turn next to the legal standards that apply to the grant or denial of preliminary injunctions. A district court must weigh four factors in determining whether to issue a **preliminary injunction**: (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the **public interest**.

*Bl(a)ck Tea Soc'y v. City of Boston,* 378 F.3d 8, 11 (1st Cir.2004) (citing *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir.1996)). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.,* 287 F.3d 1, 9 (1st Cir.2002).

This court reviews the grant or denial of a preliminary injunction for abuse of discretion. *Bl(a)ck Tea Soc'y,* 378 F.3d at 11; *Ross-Simons,* 102 F.3d at 16. Under that rubric, findings of fact are reviewed for clear error and issues of law are reviewed de novo. *Air Line Pilots Ass'n, Int'l. v. Guilford Transp. Indus ., Inc.,* 399 F.3d 89, 95 (1st Cir.2005); *New Comm Wireless Servs.,* 287 F.3d at 9. Judgment calls and issues that demand the balancing of conflicting factors are reviewed deferentially. *Bl(a)ck Tea Soc'y,* 378 F.3d at 11. In the last analysis, then, we will set aside a district court's ruling on a preliminary injunction motion only if the court clearly erred in assessing the facts, misapprehended the applicable legal principles, or otherwise is shown to have abused its discretion. *McGuire v. Reilly,* 260 F.3d 36, 42 (1st Cir.2001).

## V. THE FIRST AMENDMENT CHALLENGE

**\*6** W & S asserts that sections 3-5-11 and 3-5-11.1 impair its First Amendment rights to free speech and expressive association by (i) constricting its ability to peddle marketing and management advice, advertising services, and trade name protection to holders of Class A liquor licenses and (ii) making it unlawful to engage in a franchise relationship with those license holders. We consider these assertions separately.

### A. The Free Speech Claim.

The Free Speech Clause provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. By incorporation through the Fourteenth Amendment, this prohibition applies to states and their political subdivisions. *Knights of Columbus v. Town of Lexington,* 272 F.3d 25, 30 (1st Cir.2001).

In this case, W & S directs its free speech claim to section 3-5-11(b)(1). It asseverates that various provisions of that section adversely affect its ability to sell business advice (sub-paragraphs (i), (ii), (iv), and (v)), advertising design and placement services (sub-paragraph (iii)), and trade name rights

(sub-paragraph (vi)) to the holders of Class A liquor licenses. Thus, the law unduly infringes on W & S's right to communicate with the license holders. We examine this asseveration.

As an initial matter, we assess each of the activities identified by W & S in light of its allegation that section 3-5-11(b)(1) operates to prohibit or unduly curtail the activity. We then consider the contention that the activity constitutes protected speech or expressive conduct.

**1.** *Business Advice.* W & S maintains that the provision of business advice for a fee is speech protected by the First Amendment. The advice in question takes the form of a marketing and management plan (including recommendations about purchasing and pricing). The Supreme Court has recognized that some profit-directed speech, such as legal or medical advice, is entitled to constitutional protection. *See Bd. of Trs. of State Univ. of N .Y. v. Fox,* 492 U.S. 469, 482, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). Here, however, we need not determine whether and to what extent the business advice offered by W & S to Class A license holders fits within this taxonomy. The plain, hard fact is that section 3-5-11(b)(1) simply does not prohibit the communication of advice between a franchisor and the holders of Class A liquor licenses.

To begin, nothing in the statute prevents W & S from selling or otherwise communicating its recipe for the operation of a successful package store to a Class A license holder. Nor does the statute forbid a license holder from purchasing or receiving that information. While the statute prevents certain conduct--the implementation of W & S's business model--that prohibition imposes no legally cognizable burden on the exchange of information between the speaker (W & S) and the invited audience (the holders of Class A liquor licenses).

Stripped of rhetorical flourishes, W & S's real complaint is that section 3-5-11(b)(1) will have the incidental effect of suppressing or eliminating the market demand for the particular type of business advice that W & S offers (that is, marketing and management strategies whose successful implementation requires the coordination of business activities with those of other market players). That circumstance does not suffice to hoist the red flag of constitutional breach: the First Amendment does not guarantee that speech will be profitable to the speaker [FN3] or desirable to its intended audience. *See AMSAT Cable Ltd. v. Cablevision of Conn. Ltd. P'ship,* 6 F.3d 867, 871 (2d Cir.1993); *see also Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 78, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (Powell, J., concurring) (noting that "[t]he inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of [the challenged] ordinance upon freedom of expression").

**\*7** By the same token, the First Amendment does not safeguard against changes in commercial regulation that render previously profitable information valueless. That is a commonplace occurrence in today's fast-moving world (an example would be the closing of a tax loophole that renders a previously profitable tax shelter worthless). The First Amendment's core concern is with the free transmission of a message or idea from speaker to listener, not with the speaker's ability to turn a profit or with the listener's ability to act upon the communication.

That ends this aspect of the matter. Because section 3-5-11(b)(1), on its face, imposes no burden on the ability of a business advisor to relay marketing and management advice to holders of Class A liquor licenses, W & S is unlikely to succeed on this facet of its First Amendment claim.

**2.** *Advertising Services and Trade Names.* W & S suggests that section 3-5- 11(b)(1)(iii)'s proscription on the ability of the holders of Class A liquor licenses to participate jointly "in a coordinated or common advertisement" and section 3-5-11(b)(1)(vi)'s prohibition on a license holder's use of "[a]ny term or name identified as a chain or common entity" constitute undue restraints on commercial speech. We take no view on that suggestion for two reasons: first, it would require us to examine the commercial speech rights of Class A licensees--none of whom are before this court--and second, W & S has not established any basis upon which it can assert those rights on behalf of third parties (including its franchisees). The only question properly before us is narrower: whether the joint advertising and common naming restrictions infringe on any speech or expressive conduct of W & S that is protected by the First Amendment. We answer that question in the negative.

Let us be perfectly clear. We agree with W & S's underlying premise that commercial speech, including truthful liquor advertising, is entitled to a measure of protection under the First Amendment. *See 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 501, 516, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 770, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). We nonetheless reject W & S's suggestion because, in performing its role in the activities in question, it does not engage in commercial speech.

The activities that W & S claims to be protected as commercial speech are its provision of advertising

services, including designing advertisements, arranging for their placement in various media, and licensing the common use of trade names that, according to W & S, have become synonymous with quality and value. *See* Appellants' Br. at 5, 8; *see also Wine & Spirits,* 364 F.Supp.2d at 177. The commercial speech doctrine protects the communication of truthful information to potential customers about a proposed commercial transaction. *See Fox,* 492 U.S. at 482; *Cent. Hudson,* 447 U.S. at 561-63. W & S's assertions do not amount to a claim that the joint advertising and common naming restrictions impede its right to communicate with its potential customers, rather, the claim is that those restrictions interfere with a right to provide certain services. The provision of advertising and licensing services is not speech that proposes a commercial transaction and therefore does not constitute commercial speech. *See Fox* 492 U.S. at 482 (distinguishing between the proposal of a commercial transaction, "which is what defines commercial speech," and the provision of certain services for a profit, which is not commercial speech).

**\*8** Nor do these activities--W & S's creation of advertisements, assistance in their placement, and facilitation of the use of its trade names by franchisees--fall into the broader category of expressive activity in which conduct itself can be said to convey a particularized message and, thus, be entitled to protection as symbolic speech. *See United States v. O'Brien,* 391 U.S. 367, 376-77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *see generally Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group,* 515 U.S. 557, 569-70, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (discussing instances in which the Supreme Court has found conduct to be inherently communicative). It is the duty of the party seeking to engage in allegedly expressive conduct to demonstrate that the First Amendment applies to that conduct. *Clark v. Cmty. for Creative Non-Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). W & S has offered no plausible argument as to why the provision of advertising services is an inherently expressive activity.

Of course, W & S also complains that the advertising and common naming restrictions infringe on the franchisees' rights jointly to propose retail liquor sales through newspaper advertisements and the like. Though loudly bruited, that complaint lacks force because W & S has not established standing to pursue it.

A party ordinarily has no standing to assert the First Amendment rights of third parties. *See Eulitt,* 386 F.3d at 351. While there is an isthmian exception that applies when some barrier or practical obstacle deters a third party from asserting its rights, *see, e.g., Powers v. Ohio,* 499 U.S. 400, 414-15, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (allowing criminal defendant to assert rights of jurors because they lack financial incentive to undertake the burden of litigation), nothing in the record indicates that W & S's franchisees are unable or unlikely to protect their own rights.

In some circumstances, out of concern that an overly broad statute might chill constitutionally protected speech, the Supreme Court has relaxed the prudential limitations on third-party standing to permit a litigant to pursue a facial challenge to such a statute on overbreadth grounds, even though the litigant's own conduct could be regulated validly by a more narrowly drawn statute. *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Here, however, any assertion that the advertising and common naming provisions substantially overreach would fail because the overbreadth doctrine is inapplicable in the commercial speech context. *See, e.g., Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 496-97, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Bates v. State Bar of Ariz.,* 433 U.S. 350, 380-81, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). To recapitulate, W & S has not laid any groundwork sufficient to establish third-party standing, so it cannot assert the commercial speech rights of Class A license holders. W & S's spavined attempt to assert a facial challenge affords no safety net for this claim. Accordingly, we endorse the district court's conclusion that W & S's free speech claim has little chance of succeeding on the merits.

### B. *The Freedom of Association Claim.*

**\*9** W & S strives to persuade us that the challenged statutes, by directly and indirectly prohibiting the holders of Class A liquor licenses from engaging in franchise relationships, impinge on its First Amendment right to associate with its franchisees for the purposes of joint advertising and development of common management and marketing strategies. We are not convinced.

The Supreme Court long has recognized that freedom of speech embraces the "freedom to engage in association for the advancement of beliefs and ideas." *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). This freedom of expressive association emerges from the insight that expressive rights explicitly guaranteed by the First Amendment "could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts v. U.S. Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Because protection of the right to associate evolves from the First

Amendment's guarantees of speech, assembly, petition, and free exercise, the scope of protection for association corresponds to the constitutional solicitude afforded to the mode of First Amendment expression in which a particular group seeks collectively to engage. *See id.*

It follows logically that, in a free speech case, an association's expressive purpose may pertain to a wide array of ends (including economic ends), *see id.,* but the embedded associational right protects only collective speech and expressive conduct in pursuit of those ends; it does not cover concerted action that lacks an expressive purpose, *see City of Dallas v. Stanglin,* 490 U.S. 19, 24-25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989). So viewed, the right to expressive association does not confer a generalized freedom for individuals or entities collectively to engage in activity that is otherwise regulable when undertaken by a single individual or entity. *See id.* As one treatise has noted, "[t]he Court has tended to view the right of association as dependent on underlying individual rights of expression; there is no right of association in the abstract." Kathleen M. Sullivan & Gerald Gunther, Constitutional Law 1337 (14th ed.2001). Thus, W & S must demonstrate that sections 3-5-11 and 3-5-11.1 unduly curtail its associational right to engage in activities protected by the First Amendment. Elsewise, it cannot prevail on its associational claim.

We already have explained why section 3-5-11(b)(1) does not violate any of W & S's speech rights. *See supra* Part V(A). The question, then, reduces to whether section 3-5-11.1 may be said to work such a violation. To this end, W & S labors to characterize its concerted business activities as speech or expressive conduct protected by the First Amendment. That effort fails.

Business entities have no First Amendment right to combine operations or coordinate market activities for the purpose of obtaining a greater market share for each participant. The fact that communication serves as the primary instrument of conducting business among separate enterprises does not alter this conclusion. The Supreme Court elaborated on this point more than half a century ago in *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949).

***10** The *Giboney* Court acknowledged that, although courses of conduct are, in most instances, effectuated by speaking or writing, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language." *Id.* at 502. Indeed, "[s]uch an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society." *Id.; see also Calif. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 513-15, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (explaining that while communication is an integral part of joint conduct, that fact cannot be used as a pretext for obtaining immunity from laws prohibiting anticompetitive commercial activities). After all, the Court has made clear that "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456 (1978) (citing "the exchange of price and production information among competitors" as an example of "communications that are regulated without offending the First Amendment").

Against this backdrop, we turn to the case at hand. In enacting section 3- 5-11.1, Rhode Island exercised its police power, including its power under the Twenty-First Amendment, [FN4] to regulate commercial transactions involving liquor and the organizational structure of the market in which such transactions take place. Seen in this light, the statute is tantamount to an antitrust law--a category of regulation that recognizes the authority of the State to adjust the distribution of market power among commercial entities so as to prevent conditions that are, in its reasonably held view, harmful to healthy competition and free trade.

It is black letter law that "the constitutionality of the antitrust laws is not open to debate." *Calif. Motor Transp.,* 404 U.S. at 515. Such laws, by definition, regulate the ways in which market players may pool their capabilities to acquire market power. While the State cannot regulate the right of speakers to band together to convey a common message in the marketplace of ideas, it most assuredly can exercise control over the efforts of market players to exploit the principle of strength in numbers in the marketplace of goods. *See U.S. Jaycees,* 468 U.S. at 638 (O'Connor, J., concurring) (positing that "there is only minimal constitutional protection of the freedom of *commercial* association," *id.* at 634, and that, in all events, "no First Amendment interest stands in the way of a State's rational regulation of economic transactions by or within a commercial association"); Kathleen M. Sullivan, *Free Speech and Unfree Markets,* 42 U.C.L.A. L.Rev. 949, 950 (1995) (observing that, in the modern constitutional order, legislatures are free to pass laws "that override private economic arrangements on allocative grounds--such as correcting for collective action problems, externalities, information asymmetries, or monopolies--or for reasons of redistribution or paternalism").

**\*11** The case law dealing with claimed exceptions to antitrust or commercial conspiracy laws on First Amendment associational grounds indicates that the State's right to enforce such laws against collusive market behavior must abate only in instances in which the joint activity constitutes an exercise of a core speech right. In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc. ., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)*, the Supreme Court recognized that commercial actors' concerted petitioning for legislative change was a form of political expression protected by the First Amendment and, therefore, exempt from certain applications of the antitrust laws. *Id.* at 136-38. In *NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982)*, where black citizens had banded together to boycott white merchants as a means of protesting discriminatory practices, the Supreme Court held that the merchants could not premise liability for state antitrust violations and common law conspiracy on the boycotters' collective exercise of First Amendment rights. *See id.* at 890-92, 915, 933. Finding that the boycott involved the exercise of core First Amendment rights (speech, petition, and assembly), the Court ruled that the State's right "to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution." *Id.* at 914. Several other cases in that lineage also turned on the fact that the concerted activity implicated exceptions to the antitrust laws designed to protect core speech rights. *See, e.g., Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56-60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993)* (explaining that antitrust liability cannot be imposed upon entities that collectively pursue objectively reasonable litigation, even when an anticompetitive intent motivates the suit); *United Mine Workers of Am. v. Pennington, 381 U.S. 657, 669-70, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)* (decreeing that antitrust laws cannot be interpreted to prohibit joint efforts to influence public officials through otherwise legal methods).

These cases must be contrasted with cases such as *FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990)*, in which the Court upheld the imposition of an injunction under the Sherman Act against a cadre of court-appointed lawyers that enjoined their concerted refusal to accept further case assignments pending a requested fee increase. *See id.* at 426-36. The Court explained that "the undenied objective of [the] boycott was an economic advantage for those who agreed to participate," *id.* at 426, and that the lawyers' joint activity was aimed at "profit[ing] financially from a lessening of competition in the boycotted market," *id.* at 427 (internal quotation marks omitted). In those circumstances, the Court refused to accept the lawyers' claim that the law, as applied, violated their right to associate for expressive purposes because to do so would be to "exaggerate[ ] the significance of the expressive component in the [lawyers'] boycott." *Id.* at 430. In the absence of anything uniquely expressive about the concerted commercial activity, no First Amendment exception to the enforcement of an otherwise valid antitrust law was warranted. *Id.* at 431 (noting that "[t]he most blatant, naked price-fixing agreement is a product of communication, but that is surely not a reason for viewing it with special solicitude"); *accord Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 697, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)* (upholding, against a First Amendment challenge, an antitrust injunction that prohibited a professional society "from adopting any official opinion, policy statement, or guideline stating or implying that competitive bidding is unethical").

**\*12** Here, it is nose-on-the-face plain that W & S's commercial conduct exhibits nothing that even the most vivid imagination might deem uniquely expressive. Certainly, the mere fact that the joint activities that define the business relationship between the franchisor and its franchisees have some communicative component cannot, in and of itself, establish an entitlement to the prophylaxis of the First Amendment. *See Superior Court Trial Lawyers, 493 U.S. at 430.* Consequently, that conduct does not warrant overriding the State's historic right to regulate market forces in the retail liquor industry. [FN5]

In sum, W & S has not established that the neoteric laws prohibiting the holders of Class A liquor licenses from conducting joint business activities infringe upon any right to advance its beliefs or ideas by engaging in activities protected by the First Amendment. Accordingly, there is scant reason to believe that W & S can succeed on the merits of its freedom of expressive association claim.

## VI. THE EQUAL PROTECTION CLAIM

As a last resort, W & S mounts an equal protection challenge to sections 3- 5-11 and 3-5-11.1. Its complaint is that these statutes apply to package stores but not to other entities licensed to sell alcoholic beverages at retail (such as restaurants and bars). Its contrived attempt to tease an equal protection violation out of this imperfect analogy is unpersuasive.

When economic legislation neither employs suspect classifications nor infringes on fundamental

rights, the legislation need only survive rational basis scrutiny. *Hodel v. Indiana,* 452 U.S. 314, 331, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981). Under that standard, an inquiring court must uphold the legislation as long as the means chosen by the legislature are rationally related to some legitimate government purpose. *Id.* In conducting that analysis, the State's legislative choices "bear[ ] a strong presumption of validity." *Kittery Motorcycle, Inc. v. Rowe,* 320 F.3d 42, 47 (1st Cir.2003) (internal quotation marks omitted). A challenger can overcome this presumption only by "demonstrating that there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals." *Eulitt,* 386 F.3d at 356.

These rules are dispositive here. The legislation at issue is economic in nature. It neither utilizes suspect classifications nor trenches upon fundamental rights. [FN6] Its purpose, as stated by the Rhode Island General Assembly, is to protect consumer choice and ensure the equitable pricing of retail liquor products. *See* R.I. Gen. Laws § 3-5-11.1(a). W & S has not explained why, given the unexceptionable goal of maintaining a competitive retail liquor industry, it is irrational for Rhode Island to enact measures aimed at preventing anticompetitive practices by ensuring that holders of Class A liquor licenses operate independently. By like token, W & S has wholly failed to show that restaurants and bars (which are licensed to sell alcoholic beverages only for consumption on their licensed premises) are similarly situated entities vis-à-vis package stores (which are licensed to sell alcoholic beverages only in sealed containers and for off-premises consumption). [FN7] Finally, it has failed to support its contention that Rhode Island's decision to devise a special regulatory scheme for the retail liquor market is arbitrary; for example, it has not negated the possibility that healthy competition already exists with respect to other sectors of the liquor industry (thus rendering regulation unnecessary).

***13** The short of it is that W & S has not demonstrated that the challenged legislation lacks a rational basis. Accordingly, the district court did not miscalculate in finding it improbable that W & S would prevail on its equal protection claim.

**VII. CONCLUSION**

We need go no further. W & S has not shown that it is likely to succeed on the merits of any of its claims. Since such a showing is a precondition to the securing of a preliminary injunction, *New Comm Wireless Servs.,* 287 F.3d at 9, we need not probe the other components of the applicable four-part test. It suffices to say that the district court acted well within the encincture of its discretion in denying W & S's request for preliminary injunctive relief.

*Affirmed.*

FN* Of the Eleventh Circuit, sitting by designation.

FN1. Posturing this action as one brought by W & S against the State is a harmless oversimplification. In fact, W & S's principal, John Haronian, is also a plaintiff and Jeffrey J. Greer, in his official capacity as associate director of Rhode Island's Department of Business Regulation, is also a defendant. Because their presence is essentially superfluous, we opt for simplicity and proceed as if W & S and the State were the only parties.

FN2. There is no suggestion here that any of W & S's franchisees plan to terminate the franchise relationships for reasons unrelated to the threatened enforcement of the new statutory provisions. Therefore, this is

not a case in which "the injury complained of is 'th[e] result [of] the *independent* action of some third party not before the court.' " *Bennett,* 520 U.S. at 169 (alterations and emphasis in original) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

FN3. A case like this one, in which the statute imposes no burden on the communication between the speaker and the intended audience but has the effect of decreasing the audience's demand for a particular kind of business advice, is distinguishable from cases dealing with the State's direct imposition of financial burdens on the dissemination of particular kinds of speech. *See, e.g., Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 115-18, 123, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (invalidating law requiring publisher to place convicted criminals' income derived from publications about their crimes into escrow for victim compensation); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Rev.,* 460 U.S. 575, 581-83, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) (finding that tax on paper and ink products consumed in newspaper production imposed an unconstitutional burden on freedom of the press). In such cases, the government, not waning market demand, was directly responsible for the financial disincentive to speak.

FN4. In pertinent part, that amendment prohibits "[t]he transportation or importation ... for delivery or use ... of intoxicating liquors [into any state]" in violation of state law. U.S. Const. amend. XXI, § 2.

FN5. The conclusion that otherwise valid regulation of commercial interactions between business entities does not offend the First Amendment merely because such interactions have a communicative component would apply with equal force to our analysis in Part V (A)(1), had we found that the relevant sub-paragraphs of section 3-5-11(b)(1) did in fact impede communications between W & S and the holders of Class A liquor licenses.

FN6. To be sure, W & S contends that the challenged statutes burden its fundamental rights of speech and association. We dismiss that contention out of hand. *See supra* Part V (establishing that the challenged statutes do not impermissibly impinge upon W & S's First Amendment rights).

FN7. Even in the improbable event that the two markets were to be deemed substantially similar, that showing alone would not ensure W & S's success. Regulation must start somewhere. *See FCC v. Beach Commc'ns,*

*Inc.,* 508 U.S. 307, 316, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (explaining that "the legislature must be allowed leeway to approach a perceived problem incrementally").

C.A.1 (R.I.),2005.
Wine and Spirits Retailers, Inc. v. Rhode Island
2005 WL 1876162 (1st Cir.(R.I.))
END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT # 3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

NOAH GREENBERG,                    )
      Plaintiff,                  )
                                  )
v.                                 )                    C.A. NO. 04-11934GAO
                                  )
GANNETT FLEMING, INC.,             )
      Defendant/                  )
      Cross-Claim Plaintiff,      )
and                                )
TOWN OF FALMOUTH                   )
      Defendant/                  )
      Cross-Claim Defendant.      )
_____)

## AFFIDAVIT OF HEATHER HARPER

      I, Heather Harper, hereby depose and state:

1.      I am employed by the Town of Falmouth as the Assistant Town Administrator. I have been so employed for nearly a decade.

2.      Falmouth regularly circulates one entity's preliminary plans to other entities by way of Request for Proposals for final design services. The preliminary plans are regularly done by someone other than the ultimate designer. For example, this scenario occurred regarding the Falmouth Band Shell Project and the Falmouth Animal Control Facility. Never, until now, was their ever a cry from entities that created the preliminary plans claiming that Falmouth had no right to share the preliminary plans with the ultimate designer.

3.      I am over the age of 18 and I understand the obligation of an oath.

4.      The statements in this affidavit are based on my personal knowledge.

      SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 11th DAY OF AUGUST, 2005.

                           Heather Harper, Assistant Town Administrator
                           Town of Falmouth

EXHIBIT # 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NOAH GREENBERG,          )
     Plaintiff,          )
                       )
v.                      )          C.A. NO. 04-11934GAO
                       )
GANNETT FLEMING, INC.,   )
     Defendant/         )
     Cross-Claim Plaintiff,  )
and                   )
TOWN OF FALMOUTH      )
     Defendant/         )
     Cross-Claim Defendant. )
                   )

## **AFFIDAVIT OF CAROL MARTIN**

I, Carol Martin, hereby depose and state:

1.     I am employed by the Town of Falmouth as the Treasurer.

2.     Falmouth financed this 5.425 million dollar project through municipal bonds. Incumbent on municipalities that borrow funds through municipal bonds is a spend down schedule dictated by the Internal Revenue Service. The spend down schedule applicable here could be violated if Falmouth is forced to halt this project. Such violations could result substantial penalties assessed by the IRS.

3.     I am over the age of 18 and I understand the obligation of an oath.

4.     The statements in this affidavit are based on my personal knowledge.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 11th DAY OF AUGUST, 2005.

                                             _____
                                           Carol Martin, Treasurer
                                           Town of Falmouth

                                           ORIGINAL WILL BE FILED AT A
                                           LATER DATE