UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

CIVIL ACTION No. 04-11934-GAO

NOAH GREENBERG,
    Plaintiff

v.

TOWN OF FALMOUTH and
GANNETT FLEMING, INC.,
    Defendants

**PLAINTIFF'S REPLY TO DEFENDANT TOWN OF FALMOUTH'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**I. INTRODUCTION**

In its opposition to the plaintiff's motion for preliminary injunction, the Town of Falmouth contends that the plaintiff, despite his repeated protestations to the contrary, granted the town an implied license to use his preliminary designs for the town's Department of Public Works maintenance facility, effectively surrendering his copyright in the design, given the limited demand for the design beyond this particular project.[1]

Because the town has isolated language from collected authorities, intimating that a licence may be granted even without a copyright owner's consent, the plaintiff here proposes to expose the law of implied license in architectural drawings, to avoid any misapprehension that might result from considering isolated excerpts out of context.

---

[1] In its earlier motion for summary judgment, the town contended that the plaintiff has for so long complained about violations of his copyright that his claims are time barred, which the court accepted, in part. The town's present contention, that the plaintiff never intended to prohibit use of his designs, is at least inconsistent with the town's earlier argument, if not mutually exclusive.

## II. THE EVOLUTION OF IMPLIED LICENSE

Though the law of implied license has received attention from many circuits over the past decade, the First Circuit most recently considered the issue, at some length, in John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F.3d 26 (1st Cir. 2003).

Danielson establishes some basic principles: "Implied licenses are found only in narrow circumstances." Id. at 40. "The burden of proving the existence of such a license is on the party claiming its protection, the licensee." Id. An implied license occurs only in circumstances where a copyright owner actually intends to grant a license; a license does not arise by silence or mistake or inadvertence. See id. at 40 - 41 ("The touchstone for finding an implied license . . . is intent.") (citing Johnson v. Jones, 149 F.3d 494, 502 (6th Cir. 1998) ("Without intent, there can be no implied license") (other citations omitted)). The putative licensee's understanding, if not shared by the copyright owner, is irrelevant in ascertaining the copyright owner's intent. See id. at 42 ("[defendant's] suggestion that the appropriate standard is the effect of the architect's behavior on the subjective perception of the supposed licensee has no basis").

The following discussion summarizes the cases exploring implied license:

**Effects Associates, Inc. v. Cohen**: The earliest case frequently cited in discussions of implied license is Effects Associates, Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990), cert. denied, 498 U.S. 1103 (1991).

In Effects Associates, a movie producer sought the assistance of a special effects firm, Effects Associates, to create special-effects enhancements for his motion picture. Id. at 555. The enhancements were made and incorporated into the film, as the parties intended. Id. and id. at 558 n. 6. When the full purchase price for the special-effects footage was not paid, Effects Associates brought suit, claiming that its copyright was infringed when the footage was incorporated into the film. Id. at 555.

The Effects Associates court began by confirming that transfers of copyright ownership must be in writing. 17 U.S.C. 204. Id. at 556. The court continued: "Section 204 ensures that the creator of a work will not give away his copyright inadvertently. . . . Most importantly, section 204 enhances predictability and certainty of copyright ownership -- 'Congress' paramount goal' when it revised the Act in 1976." Id. at 557. (citations omitted).

The court continued: "we note that there is a narrow exception to the writing requirement that may apply here. Section 204 provides that all transfers of copyright ownership must be in writing; section 101 defines transfers of ownership broadly, but expressly removes from the scope of section 204 a 'nonexclusive license.' The sole issue that remains, then, is whether Cohen had a nonexclusive license to use plaintiff's special effects footage." Id. at 558.

The court concluded: "Effects created a work at defendant's request and handed it over, intending that defendant copy and distribute it. To hold that Effects did not at the same time convey a license to use the footage in [the film] would mean that plaintiff's contribution to the film was 'of minimal value,' a conclusion that can't be squared with the fact that Cohen paid Effects almost $56,000 for this footage. Accordingly, we conclude that Effects impliedly granted a nonexclusive license to Cohen and his production company to incorporate the special effects footage into [the film] and to [the distributor] to distribute the film." Id. at 558 - 559.

The Effects Associates case is not especially helpful in analyzing implied nonexclusive licenses in architectural drawings. Effects Associates agreed to produce footage intended to be incorporated into a motion picture that would subsequently be distributed for profit. The case merely confirms that parties may conduct themselves as agreed without risking a copyright violation. Indeed, the court noted that "every objective fact concerning the transaction at issue supports a finding that an implied license existed" id. at 558 n. 6, that is, that the footage was intended to be

incorporated into the film, and then distributed, without additional compensation.

**I.A.E. Incorporated v. Shaver**: The first case to discuss an implied license in architectural drawings is I.A.E. Incorporated v. Shaver, 74 F.3d 768 (7th Cir. 1996).

In Shaver, two construction companies formed a joint venture to design and construct an airport cargo hangar. Id. at 770. The joint venture contracted with Mr. Shaver for Mr. Shaver to prepare schematic design drawings for the hangar. Id. This contract, in the form of a letter agreement, was prepared by Mr. Shaver. Id. Schematic design drawings were prepared, and the airport approved the design. Id. at 771. Roughly a week later, the joint venture hired another architect to complete the architectural work and two days after that, Mr. Shaver wrote the airport: "under the circumstances, [we are] no longer in a position to participate or contribute to the development of the . . . [p]roject . . . . We trust that our ideas and knowledge exhibited in our work will assist the [a]irport in realizing a credible and flexible use Cargo|Hangar facility." Id. This letter included Mr. Shaver's design drawings. Id.

The Seventh Circuit stated the following:

> . . . The contract in this case was a letter written by Mr. Shaver. This letter, apparently in confirmation of an earlier telephone conversation, demonstrates that the relationship of independent contractor for the purpose of creating the preliminary drawings for the Airport Project existed between Mr. Shaver and Joint Venture. It defines his role in the Airport Project and specifically his "understanding of the scope of the work": preparation of the preliminary schematic design drawings, which were 15 - 19 percent of the total design work. . . . Mr. Shaver's statement that "agreed design parameters can be established initially to permit the Project to proceed in a normal development manner," certainly suggests that he considered his contribution to be in furtherance of the entire Project. In short, his letter was clear, to-the-point, and unambiguous. No other work is listed; no expectation of a further role in the Project is mentioned in the contract. . . .
> . . .
> . . . Mr. Shaver's actions and subsequent writing also unequivocally support that conclusion. Mr. Shaver delivered his copyrighted designs without any warning that their further use would constitute copyright infringement. In his March 3, 1993 letter, Mr. Shaver acknowledged that he was no longer a contributor to the Project's development, but that he expected "that our ideas and knowledge exhibited in our

4

>  work will assist the Airport in realizing a credible and flexible use Cargo|Hangar facility." This statement, accompanied by the delivery of copies of his drawings, certainly constitutes a release of those documents to the Airport for its Project and clearly validates a determination that all the objective factors support the existence of an implied license to use Mr. Shaver's drawings in the construction of the air cargo building.

Id. at 776 - 777.

Though the court concludes that Mr. Shaver's letter agreement|contract was unambiguous in granting a license, in the end, Mr. Shaver's unambiguous subsequent conduct removed any ambiguity that might result from a study of the letter agreement and supported the conclusion that Mr. Shaver intended that his designs be put to use without his further involvement. [2]

**Johnson v. Jones**: In Johnson v. Jones, 149 F.3d 494 (6th Cir. 1998), Ms. Jones requested Mr. Johnson's participation in remodeling a home. Id. at 497. While the parties were negotiating the terms of their undertaking, Mr. Johnson prepared a design development program, demolition plans, floor plans, and a site plan. Id. at 498. Although contracts proposed by Mr. Johnson provided that

---

[2] Later cases have diminished some of the Shaver reasoning. Though the Shaver court made much of the fact that a contract limited to preliminary designs was made, later courts indicate that limited-scope contracts or undertakings do not amount to grant of a license. See Nelson Salabes, Inc. v. Morningside Development, LLC, 284 F.3d 505, 516 (4th Cir. 2002) (finding no license even though "[the architect] was not retained to develop plans for the entire [p]roject, and, like the architects in Shaver and Foad Consulting, [] created the [d]rawings pursuant to task specific contracts"). Shaver also makes much of the intent of the purported licensee: "Joint Venture clearly expected to use Mr. Shaver's drawings for the Project," 74 F.3d at 777, though Danielson makes clear that the licensee's expectation does not create a license. The Shaver court also makes much of the fact that the drawings were intended to be used in construction, as evidenced by the certificate of copyright and Mr. Shaver's delivery of the plans expecting that construction would proceed according to his designs. 74 F.3d at 776 & 777 n. 10. Use of the designs in construction, however, is merely a statement of the obvious: these designs were prepared as part of an intended construction project. That designs are intended to be put to use in construction simply is not evidence of a license, because all plans prepared as part of a construction project would fall within this category. Other courts have refined this consideration to read, not whether it was intended that the project would continue, but whether the project would continue without the architect's continued involvement. See Nelson Salabes, Inc. v. Morningside Development, LLC, 284 F.3d 505, 515 (4th Cir. 2002) ("the creator of a protected work must intend that its copyrighted drawings be used on the project for which they were created, independent of the creator's involvement").

5

his drawings could not be used without his permission, the contracts were never signed. Id. at 498 - 499. When the parties reached an impasse, Mr. Johnson was terminated, but his plans were put to use by others in completing the project. Id. at 499.

> The court stated:
>
> Johnson submitted two AIA contracts, both of which contained express provisions that he would retain ownership of his drawings, and that those drawings would not be used for completion of the Jones house by others, except by written agreement with appropriate compensation. Those contract provisions, although never signed by Jones, speak to Johnson's intent; they demonstrate that Johnson created the drawings with the understanding that he would be the architect in charge of the project. They further demonstrate that Johnson would not have allowed [others] to finish the project using his drawings without a written agreement, and additional compensation.
> . . .
> . . . It is one thing for an architect to allow the owner to hire someone else to build a house from the architect's [completed] plans. It is quite another for the architect to allow a competitor to come in and claim the architect's work as his own.

Id. at 500 - 501.

Johnson recognizes that ordinarily an architect does not design a project with the expectation that another will complete the architectural services (primarily, preparation of the construction documents, which provide instruction as to how to construct the design) and presumably this conclusion would prevail even had Mr. Johnson not proposed contracts reserving his rights.

**Foad Consulting Group, Inc. v. Azzalino**: The third court to consider an implied license in architectural drawings was the Ninth Circuit in Foad Consulting Group, Inc. v. Azzalino, 270 F.3d 821 (9th Cir. 2001).

In Foad Consulting, engineers (Foad) contracted to provide "final engineering documents" for a proposed 45 acre shopping center project in Arroyo Grande, California. Id. at 824. The contract provided for the preparation of multiple maps, drawings, and plans for the project and provided that the engineers would process these documents with the city. Id. and id. at 828. Foad was to be paid $175,000 for these services. Id. at 828. After the engineering plans were approved, the owner hired

6

a contractor to construct the project, and the contractor in turn hired a firm to provide architectural and engineering services for the project. Id. at 824. The architect obtained various project documents from Foad and used those documents to prepare construction documents. Id. Foad claimed that its copyright in the drawings was violated. Id. at 824 - 825.

The court concluded that "the contract [between the parties] gives [the owner] an implied license to use the . . . plot plan to build project" and "to hire others to create derivative works using the . . . plot plan for the purpose of completing the project . . . . Id. at 829 and 830.

In reaching this conclusion, the court stated: "Given the amount of money [the owner] paid for Foad's services and because part of the agreement was for Foad to help [the owner] with its application to the city [for approval of the project], it would be surprising if the parties had intended for [the owner] to seek Foad's permission before using the plans to build the [approved] project." Id. at 828.

Regarding the owner's opportunity to adapt Foad's drawings, the court concluded that the contract between the parties permitted the owner's adaptation of the drawings. The contract provided: "In the event that any changes are made in the plans and specifications by client or persons other than consultant, any and all liability arising out of such changes is waived as against consultant and client assumes full responsibility for such changes unless client has given consultant prior notice and has received from consultant written consent for such changes." Id. at 830 n. 14. The court concluded that the contract language, expressly permitting changes, "indicates that the contract granted [the owner] an implied license to hire others to create derivative works using the revised plot plan for the purpose of completing the project." Id. at 830.

In Foad, like Cohen, the copyright owner was well paid for its contribution to a larger project, and each completed its component contribution (that is, the artist's work was not to be completed by others, though the work was to be incorporated into a larger project). The parties simply could not have understood that despite payment, use of the component parts (without permission) was prohibited.

**Nelson-Salabes, Inc. v. Morningside Development, LLC**: The Fourth Circuit recently considered the issue of an implied license in architectural drawings in Nelson Salabes, Inc. v. Morningside Development, LLC, 284 F.3d 505 (4th Cir. 2002).

In Nelson-Salabes, an owner sought an architect's assistance in developing an assisted living facility. Id. at 509. By letter agreement, which was never executed, the architect agreed to develop a schematic building footprint. Id. This undertaking was successful. Id.

The project proceeded and the architect proposed a second letter agreement, again unsigned, whereby the architect would provide additional architectural services, develop exterior elevations, and attend a zoning hearing. Id. This undertaking too was successful. Id. Thereafter the architect created four architectural drawings depicting building footprints, floor plans, and exterior elevations. Id. These drawings were incorporated into a development plan that was submitted to the local zoning authority, and zoning approval was granted. Id.

Thereafter, the architect proposed a further letter agreement whereby it offered to created the design and working drawings for the remaining development of the project. Id. The letter agreement contemplated that the standard AIA contract, prohibiting the owner's use of the plans without the architect's consent, would be executed. Id. at 509 - 510. Neither the letter agreement nor the AIA contract was executed. Id. at 510.

The owner then instructed the architect to cease work, as the owner's financial circumstances had deteriorated. Id. At the owner's request, the architect sought potential buyers for the property and the project. Id. The architect located a buyer that ultimately purchased the property. Id. The buyer, Morningside Development, LLC, hired another to complete the architectural services for the assisted living facility. Id. at 510 - 511.

The court made the following observations:

> Unlike the architect in Johnson, [the architect] was not retained to develop plans for the entire [p]roject and, like the architects in Shaver and Foad Consulting, [the architect] created the [d]rawings pursuant to task-specific contracts. Moreover, as in Shaver and Foad Consulting, neither of those task-specific contracts contained language prohibiting future use of the architectural drawings without [the architect's] involvement or consent . . . [The architect, however,] never expressed to [the owner] by its representations or conduct that [the owner] could utilize [its] plans without [its] future involvement or express consent . . . [¶] Although the project was performed in component parts, the facts . . . demonstrate that [the architect] created the [d]rawings with the understanding that it would participate in the further development of [the project].

Id. 516.

Although the project was performed in component parts and none of the drawings or associated writings prohibited the owner's use of the architect's drawings, the court nevertheless found lacking evidence of the architect's intent to surrender any of its copyrights, and the court found that no implied license was granted. Id. at 516 - 517.

**John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.**: In John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F.3d 26 (1st Cir. 2003), an owner sought to develop seven acres into a 70-unit condominium. Id. at 31. The property, however, was not zoned for residential use and was subject to a restrictive covenant preventing development as a condominium. Id.

The owner sought to obtain amendments to both the zoning requirements and the restrictive covenant, and in 1987 Danielson prepared a building footprint, a site plan, and elevations depicting

9

the proposed condominium, which were to be used in seeking the necessary amendments. Id. The drawings were in fact employed in seeking the amendments and the owner was successful in obtaining the amendments, and the plans became a public record. Id. These plans were prepared without a contract and without a copyright notice and without any indication that their future use was prohibited. Id. After site plans were prepared and employed in obtaining approval, the architect and owner signed a contract reserving all rights in the architect, and the architect prepared a modified layout and some engineering detail. Id. at 31 - 32.

Construction began but was halted. Id. at 32. The property sold at foreclosure, and the purchaser used the exiting plans to build the condominium project. Id. Twelve years after the drawings were prepared, the architect registered the drawings with the copyright office. Id. at 33.

Despite the fact that the site plan was prepared and delivered without any reservation of rights, without any contract limiting their use, and were permitted to be made a public record, no license was found. Id. at 42. Although a contract was later negotiated, id. at 31, this fact is of little moment: had the owner terminated the architect's participation before a contract was proposed or negotiated, the outcome cannot change--the owner's conduct cannot create in the architect an intent to grant a license. Because there was no evidence from which to find intent, no license was found.

A review of the cases reveals two instances in which a license may be implied. In the first instance, the copyright owner's contribution to a larger project includes the right to use the completed copyright protected materials in the larger project. In Effects Associates, the special effects the owner prepared and delivered, at a cost of more than $50,000, had value only if they were to be incorporated into a completed motion picture; the effects were delivered intending to be incorporated. It was unquestionably the intent of the parties that the special effects be used as they were.

Foad Consulting is to the same effect. There, engineers were paid $175,000 to prepare complete engineering documents relative to an anticipated construction project. The contract between the parties addressed--without prohibiting--that those constructing the project might alter the completed drawings without the engineer's involvement. The realities of the relationship, that is, the almost inconceivability that the owner could incur a $175,000 expense without rights to use the completed drawings to construct the project, coupled with the contract language contemplating others' use of the drawings, lead to the inevitable conclusion that the owner could put the drawings to use in construction. As in Effects Associates, the copyright owner's contribution to the project contemplated the owner's use of the copyright protected materials in completing the project. In both instances, the copyright owner's work is complete, and it is not anticipated that other artists will complete the preliminary work of the owner.

The second instance in which a license will be implied is where there exists unquestionable evidence of intent to grant a license, even if the artist's work requires completion by others. In Shaver, the architect, having contracted to prepare a schematic design, delivered the design while recognizing that his role had concluded and endorsing the further use of his design. The facts of Shaver fit neatly fit within the "narrow circumstances" under which an implied license might be found. See Johnson v. Jones, 149 F.3d 494, 502 (6th Cir. 1998) ("the facts in [Effects and Shaver] amply demonstrate that the copyright owners intended that their copyrighted works be used in the manner in which they were eventually used").

In all other instances, Johnson, Nelson-Salabes, and Danielson, in the absence of concrete evidence of intent to grant a license, none is found.

Much like the present matter, in Nelson-Salabes, an architect prepared floor plans and elevations without any reservation of rights and without any contract confirming the architect's

11

continued involvement in the project. Without, however, any evidence that the architect intended that another would finish his work, no license was found.

So too in Danielson. There an architect prepared preliminary drawings without any reservation of rights and without a contract confirming the architect's continued involvement in the project. Those plans became a public record. All this occurred before any discussion of the architect's completion of the project. Because the circumstances were devoid of evidence of intent to grant a license, none was found.

Given that delivery of a copy of an item "does not of itself convey any rights in the copyrighted work," 17 U.S.C. 202, a matter very relevant in the preparation of architectural drawings for an owner, and given that the overall statutory scheme is to avoid inadvertent loss of copyrights and that the "paramount goal" of the Copyright Act is to promote predictability and certainty in copyright matters, Effects Associates, Inc. v. Cohen, 908 F.2d 555, 557 (9th Cir. 1990), cert. denied, 498 U.S. 1103 (1991), the law of implied license should be, and has been, similarly interpreted, finding an implied license only in the most clear of cases. In all other cases, all copyright remains in the creator.[3]

### III. THE FACTS OF THE PRESENT MATTER DEMONSTRATE THAT NO LICENSE WAS INTENDED

The facts of the present matter do not present a difficult analysis, primarily because they involve a public construction contract.

---

[3] It is perhaps significant that in every case in which a license was found to have been granted, written evidence existed, in the form of writings created by the copyright owner, from which the intent of the owner could be gleaned. In Effects Associates, a letter agreement; in Shaver, a letter agreement and subsequent correspondence; in Foad Consulting, a lengthy contract. In the present action, every writing of the plaintiff is contrary to the grant of a license.

In 1993, the town, desiring renovations to its aging public works maintenance facility, was budgeted $10,000 to obtain preliminary architectural plans for a possible renovation project.[4] The town was without a budget for complete architectural services and, more importantly, was without a budget to complete, or even begin, the construction project. Nevertheless, the town sought preliminary plans, presumably to lobby for funding for the larger project.

Thereafter, the town solicited proposals for preliminary plans, and awarded the project to the plaintiff (or his predecessor in interest). The town prepared the writing defining the scope of services and made no mention of its obtaining any of the plaintiff's copyright. (The contract is included at Exhibit A hereto.) Significantly, the contract provided for various services to be performed after the preliminary plans were prepared.

The limited scope of the undertaking, rather than reflect the plaintiff's intent that the town own his designs, merely reflects the realities of the circumstances: that the town was without a budget for larger architectural services and without a budget for the larger project. The contract merely identified a commitment the town had the ability to honor, payment of services for preliminary plans, and was careful to avoid commitment for the payment of larger services for which it had no budget. The contract makes no mention of transfer of copyright or any interest in copyright. See Barresi, Inspector General of the Commonwealth, Designing and Constructing Municipal Facilities, published by the Secretary of the Commonwealth (1989) (selected portions attached at Exhibit C), p. 19, where the Inspector General advises municipalities to include in design contracts "[a] provision giving ownership of the design documents to the awarding authority." It defies credulity that the town could draft a contract, without mention of copyright either in the contract or

---

[4] This information is obtained from documents the plaintiff has been permitted to review, but which have yet to be provided to the plaintiff.

in other communication,[5] and in the same breath claim that it has usurped the plaintiff's copyright, as the town does here.

Significantly, the contract provided for various services to be performed after the preliminary plans were prepared and thus contemplates the plaintiff's continued involvement in the project after preparing the preliminary plans. See John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F.3d 26, 42 (1st Cir. 2003) ("outward signs of expecting to continue involvement with the larger project" is inconsistent with grant of implied license). After the plans were submitted, the plaintiff was thereafter to prepare a comprehensive cost estimate; to present two reports, one relating to mechanical and electrical system upgrades and other relating to roof repairs; and was to seek sources of government grants to fund the project. The additional services confirm the plaintiff's continued involvement in the project and belie an implied license. The suggestion that the contract required the plaintiff to seek government funding to compensate another to complete his preliminary drawings is beyond reason. See infra note seven (discussing role of designer in public construction project.)

### IV. THE IMPLIED LICENSE IN ARCHITECTURAL DRAWINGS ANALYTICAL FRAMEWORK

While the cases all undertake to evaluate the overall circumstances to ascertain whether the copyright owner intended to grant a license, see Nelson Salabes, Inc. v. Morningside Development, LLC, 284 F.3d 505, 515 (4th Cir. 2002) (after reviewing prior circuits' treatment, noting that court "should examine the totality of the circumstances surrounding [the architect's] conduct"), some courts suggest an analytical framework within which to consider the determinative element of intent. The cases make clear that the framework is just that, an analytical framework, and not elements to the grant of a license. The framework identifies a nonexhaustive list of considerations:

---

[5] See Defendant Town of Falmouth's Opposition to Plaintiff's Motion for Preliminary Injunction, page 5, text corresponding to note 12 (no discussion of copyright).

14

The framework is discussed in Danielson:

> The most recent of the four cases distilled its predecessors to yield this succinct summary:
>
>> Our analysis of these decisions . . . suggests that the existence of an implied nonexclusive license in a particular situation turns on at least three factors: (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts, such as the standard AIA contract, providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.
>
> Nelson-Salabes, 284 F.3d at 516. This is not an exhaustive list of factors to consider, but it provides useful guidance in determining the crucial question of intent.

John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F.3d 26, 41 (1st Cir. 2003).

As to the first factor--the nature of the relationship--even according to the town, some six years after the plaintiff delivered preliminary plans, he continued to assist the town in seeking funding for the project.[6] Without question, the relationship was ongoing.

As to the second factor--conduct evidencing that the drawings could be used only with permission--none of the cases actually require use of an AIA contract (which the framework references), because had a contract been employed, the issue of license would be resolved. Instead, the cases look to contract terms or proposed contract terms as reflecting intent. See John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F.3d 26, 41 (1st Cir. 2003) ("we are looking to the contract for evidence of overall intent, not for an interpretation of its binding terms").

---

[6] See Defendant Town of Falmouth's Opposition to Plaintiff's Motion for Preliminary Injunction, note 18 (by letter dated February 7, 2000, plaintiff provided additional copies of drawings to assist town in obtaining funding) and page 5 ("Plaintiff give his plans to Falmouth on March 15, 1994."). The February 7, 2000, letter is attached hereto as Exhibit B. See also Defendant Town of Falmouth's First Amended Answer with Jury Claim, ¶ 14 (project suffered from funding set backs).

15

In the cases where an implied license was found, the <u>copyright owner</u> drafted a contract that evidenced intent to grant a license. Here, however, the town prepared the subject contract. Because the town prepared the contract and because the contract is silent as to copyright, the contract presents no evidence of the plaintiff's intent to grant a license. Whatever rights the town might have believed it obtained (or more accurately, what rights it claims after the fact) is not evidence of the plaintiff's intent. See <u>Donoghue v. IBC USA, Inc.</u>, 70 F.3d, 206, 212 (1st Cir. 1995) ("When a court looks to the words of a document to consider the meaning of those words in the context of the agreement, the search is for manifested meaning, not a privately held belief or intent of one party, not communicated to other parties to the bargain.") (citing Massachusetts law) and <u>McCoy v. Mitsuboshi Cutlery, Inc.</u>, 67 F.3d 917, 920 (Fed. Cir. 1995) ("[w]hether express or implied, a license is a contract governed by ordinarily principles of state contract law") (discussing trademark) (internal quotation marks and citations omitted). In any event, as mentioned above, the contract contemplates the plaintiff's continued participation following the delivery of his designs, and for this reason is inconsistent with grant of a license.

    As to the third factor--owner's conduct evidencing intent--in every instance that the plaintiff commented on his copyright, he reserved rights in his designs, without equivocation (including only days after the town's first act inconsistent with his copyright). His conduct is entirely unambiguous. The most the town can point to is that the plaintiff satisfactorily prepared the designs the town requested, without reference anywhere that the town had acquired any rights in the plaintiff's copyright. Consistent with <u>Nelson-Salabes</u> and <u>Danielson</u>, the plaintiff engaged in no conduct indicating grant of a license and no license was granted.

## V. THE MASSACHUSETTS DESIGNER SELECTION STATUTE

The town's argument that the designer selection statute, Massachusetts General Laws, chapter 7, §38A½ et seq., results in grant of a license is also misplaced. Defendant Town of Falmouth's Opposition to Plaintiff's Motion for Preliminary Injunction, page 5. Initially, unless the evidence established that the plaintiff understood that the statute applied and understood that the statute prohibited the plaintiff's further involvement, the statute is irrelevant. The most the town points to, however, is that there was no discussion of the statute. Defendant Town of Falmouth's Opposition to Plaintiff's Motion for Preliminary Injunction, page 5, text corresponding to note 12.

Further, the cited statute, Massachusetts General Laws, chapter 7, § 38H(i), is inapplicable. The town's argument, that because the plaintiff prepared a "feasability study" he is disqualified, because one preparing a feasability study cannot perform design services, is off the mark. What the plaintiff prepared were "drawings, plans, or specifications," see § 38A½(b) defining "[d]esign services," and not a feasibility study, see § 39A, defining feasibility study as a "study to identify and evaluate alternative solutions to and recommend a solution to the needs and requirements defined by the public agency proposing a capital facility project" (emphasis supplied). The plaintiff's work was not a study, but drawings, and are not subject to sec. 38H(i), as the town contends. See Barresi, Inspector General of the Commonwealth, Designing and Constructing Municipal Facilities, published by the Secretary of the Commonwealth (1989) (selected portions attached at Exhibit C), p. 26 et seq. (discussing "study phase" of public construction project).

Finally, to the extent the designer selection statute is relevant, it confirms the plaintiff's expectation that he would remain on the project. Section 38G discusses the award of design services to one designer, not successive designers. The suggestion that a municipality would contract with one designer to prepare preliminary drawings, entailing whatever preliminary investigation and

17

knowledge gathering as necessary, then, once satisfied with the design provided, would incur the delay and expense of locating another designer to complete the chosen design, while forfeiting the preliminary knowledge gained by the designer and forfeiting the further services of the designer with which it is satisfied, all with underlying unresolved copyright issues, is beyond tolerance. See Massachusetts General Laws, chapter 7, § 38A½(a) (the designer selection statute is intended to "provide for increased confidence in the procedures followed in the procurement of design and design related services"). Rather, typical construction procedures establish that the creator of the preliminary design proceeds to prepare the final construction documents. [7]

---

[7] See Barresi, Inspector General of the Commonwealth, Designing and Constructing Municipal Facilities, published by the Secretary of the Commonwealth (1989) (selected portions attached at Exhibit C), p. 26:

> During the design phase, the functional requirements established during the study phase are translated into an acceptable architectural and engineering design. Typical tasks included in the design phase include the following:
>
> Surveys and field tests to provide additional information about the condition of the site. The extent of this items will depend in part on the amount of field work done during the study phase.
>
> Additional consultations with the project's users, with abutters, and with other affected individuals and groups.
>
> Preparation of sketches and schematic drawings, including site plans, floor plans, and facade drawings, which present a clear idea of what the proposed project will look like.
>
> Analysis of major building components, including foundations, structures, electrical systems, and heating, ventilating, and air conditioning (HVAC) systems.
>
> Preparation of final plans, specifications, and other bid documents. The plans are the construction drawings, and the specifications are the written materials which describe such things as the construction techniques to be used and the quality of materials to be furnished.
>
> Updated project cost estimates, based on the final plans and specifications.
>
> On major projects, the preparation of the final plans and specifications requires a significant amount of time and effort. As a result, the design phase on major projects is often divided into three sub-phases: schematic design; design development; and preparation of final plans and specifications. The schematic phase provides a time for <u>the</u> designer to develop, and for the awarding authority to review and approve, the various architectural and engineering concepts. Once the major decisions have been made, <u>the</u> designer can the proceed into the detailed design development and the preparation of the final plans and specifications. (emph. suppl.).

18

## VI. THE TOWN'S REMAINING ARGUMENTS

The town also argues: "Plaintiff submitted his work to Falmouth without express limitations. Plaintiff gave his plans to Falmouth on March 14, 1994. He did so without mention of a prohibition of sharing those plans. Even more, he did so with no written statement to that effect. Nowhere in the record is there evidence that when Plaintiff handed over his plans, he intended Falmouth never to use them." Defendant Town of Falmouth's Opposition to Plaintiff's Motion for Preliminary Injunction, pages 5 - 6.

This argument attempts to shift to the plaintiff the burden of retaining his copyright. As the creator of the design, however, the plaintiff is the owner of the copyright therein. He need not take any action to retain that copyright. Instead, the burden is on the town to demonstrate that the plaintiff intended to grant a license. As Nelson-Salabes and Danielson point out, however, a copyright owner's failure to reiterate that he owns and retains his copyright is not evidence of intent to grant a license. Something more is required.

The town further argues: "If Plaintiff were to make such an argument, then it would beg this question: What value would Plaintiff's preliminary plans have if not to aid Falmouth in completing the ultimate project? In this case, even in [sic] Plaintiff's plans were copied, it was only to complete the project for which Falmouth retained Plaintiff's services (for nearly $8,000). It stands to reason that Falmouth could use the plans to consummate the subject project." Defendant Town of Falmouth's Opposition to Plaintiff's Motion for Preliminary Injunction, page 6.

This argument misses the point. As Danielson establishes, the town's expectations are irrelevant--the town's expectations do not create in the copyright owner an intent to surrender his copyright, in whole or in part. See John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F.3d 26, 42 (1st Cir. 2003) ("[defendant's] suggestion that the appropriate standard is the effect

19

of the architect's behavior on the subjective perception of the supposed licensee has no basis"). The answer to the question begged is: if the town were satisfied with the plaintiff's design, it could expect that the plaintiff would complete the design and architectural services; if it were not satisfied, it could look elsewhere for design services and a different design. The suggestion that the contract amounted to a surrender of the plaintiff's copyright, permitting another to complete the plaintiff's design, in the complete absence of any contract language, or even discussion of the subject, is contrary to reason. See Johnson v. Jones, 149 F.3d 494, 501 (6th Cir. 1998) ("It is one thing for an architect to allow the owner to hire someone else to build a house from the architect's [completed] plans. It is quite another for the architect to allow a competitor to come in and claim the architect's work as his own. Put simply, Johnson's drawings were used in a way he never intended, i.e., a rival architect claimed them as his own work and completed the Jones house without Johnson's involvement.").

For all the reasons set forth herein, the plaintiff respectfully requests that this Court order the defendants to cease use of the construction drawings prepared for the Falmouth Department of Public Works maintenance facility renovation project.

Respectfully submitted,
the plaintiff,
Noah Greenberg,
by his attorney,

_____
Richard M. Russell, Esquire
Heritage Place Condominium
205 Worcester Court
Unit B 2
Falmouth, Massachusetts 02540
Telephone No. 508.457.7557
BBO No. 561997
Dated: November 15, 2005

---

**Certificate of Service**

I, Richard M. Russell, hereby certify that I this day made service of the within document by mailing a true photocopy of same, first class mail, postage prepaid, to counsel of record for the Town of Falmouth, John Davis, Esquire, Pierce, Davis & Perritano, LLP, Ten Winthrop Square, Boston, Massachusetts 02110, and counsel of record for Gannett Fleming, Inc., Paul Michienzie, Esquire, Michienzie & Sawin, LLC, 745 Boylston Street, 5th Floor, Boston, Massachusetts 02116.

_____
Richard M. Russell
Dated: November 15, 2005