UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| NOAH GREENBERG,<br>    Plaintiff<br>v.<br>TOWN OF FALMOUTH and<br>GANNETT FLEMING, INC.,<br>    Defendants | CIVIL ACTION No. 04-11934-GAO<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

The plaintiff hereby submits this memorandum of law in support of his motion for summary judgment on counts one and two of the Plaintiff's Complaint for Copyright Violation and Request for Trial by Jury.

**I. INTRODUCTION**

In this action, the undisputed facts reveal that in 1994, the plaintiff prepared architectural drawings, at the request of the defendant Town of Falmouth, to renovate and expand its Department of Public Works maintenance service facility. Despite the plaintiff's express reservation of rights in the drawings, in 2002 the town contracted with defendant Gannett Fleming, Inc., expressly instructing Gannett Fleming to modify the plaintiff's drawings in preparing further drawings to complete the project. After having completed the architectural plans, in responding to the plaintiff's complaint, Gannett Fleming sought, by way of a cross-claim, to place blame on the town, contending that it relied on the town's provision of the plaintiff's drawings and on the town's instruction to employ the plaintiff's drawings in its, Gannett Fleming's, subsequent work.

In this motion, the plaintiff contends that no reasonable factfinder, upon a comparison of the respective works, could conclude anything other than that the parties did as they contracted to do, and as Gannett Fleming has admitted in its pleadings, that is, that the defendants merely developed the plaintiff's preliminary drawings into construction drawings for the project, retaining the plaintiff's copyright protected design.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

1. In the early 1990s, the Town of Falmouth sought to improve its antiquated public works service maintenance facility building (Deposition of the Town of Falmouth p. 11) (hereinafter Falmouth).

2. The maintenance facility building included office space, vehicle storage, and equipment maintenance areas (Falmouth 11, 67, Exhibit 2).

3. In 1993, the town solicited design services for the renovation and expansion of the maintenance facility building (Falmouth 10).

4. At that time, the town approved a budget of $8,000 for design services (Falmouth 14).

5. The town's Director of Public Works, Mr. William B. Owen, prepared a "Request for Proposals" soliciting "Architectural Consultant Services to prepare preliminary plans for the expansion and renovation of the existing Public Works Service Maintenance Facility" (Falmouth 9 - 10 & Exhibit 2).

6. The plaintiff, Noah Greenberg, in behalf of the Robert Charles Group, a joint venture consisting of various engineers and architects, submitted a proposal in response to the town's Request for Proposals (Deposition of Noah Greenberg p. 11 - 12 & Exhibit 5) (hereinafter Noah Greenberg).

7. In submitting the proposal, Mr. Greenberg indicated: "Charles Jacobs and Mr. Noah Greenberg, architects in charge of the Falmouth Office will be the principals in direct responsibility for this project" (Noah Greenberg Exhibit 5, second page).

8. After multiple meetings with Mr. Owen and after interviewing Department of Public Works staff (Falmouth 41 - 44, 53, Noah Greenberg 50, 120 - 121, 122 - 123), Mr. Greenberg completed preliminary plans consisting of three drawings, a Site Plan, a Floor Plan Part A, and a Floor Plan Part B (Falmouth 68, 76 & Exhibits 15A - 15C). The design was entirely Mr. Greenberg's (Falmouth 43, 79; Noah Greenberg 14, 16).

9. The Floor Plan Part A (Falmouth Exhibit 15B) depicted new office space to be added to the east of the existing building. While most of this space represented entirely new construction, some of the new office space required demolition of a small part of the existing structure. This area was identified on the plan by the note: "Existing 1 story building to be removed." (Falmouth 84; Deposition of Gannett Fleming, Inc. p. 78, 134 - 136) (hereinafter Gannett Fleming). Mr. Greenberg was instructed that this building was to be removed and incorporated this change into his drawings (Falmouth 90 - 91).

10. Mr. Greenberg's drawings depicted a new parking garage area including an area for vehicle washing. This area was added to the west of the existing structure (Falmouth Exhibits 15A and 15C).

11. Mr. Greenberg's drawings depicted the existing building and additions as the same would sit on the site (Falmouth Exhibit 15A).

12. In late 1994 Mr. Greenberg provided these drawings to Mr. Owen, who approved the drawings (Falmouth 26 - 27, 45 - 46, 62, 135 - 136). Mr. Owen provided the drawings to the Department of Public Works department heads (presumably the Parks Department and Highway Department), who also approved the plans (Falmouth 45, 47 - 48).

13. The 1993 Request for Proposals described in paragraph 5 above provided that "[u]pon finalization of the approved work, the consultant [Architect] shall furnish the Town six (6) copies of the preliminary plans and one (1) reproducible mylar" (Falmouth Exhibit 2 (third page numbered page 2)).

14. Both Mr. Owen, who drafted the Request for Proposals (Falmouth 10, 16) and Mr. Greenberg understood that the copies were to be provided to town officials for their consideration and not to others (Falmouth 25 - 26; Noah Greenberg 119). Mr. Owen's testimony, in particular, was the following: Q: And what was the purpose of providing copies of the plans? A. Well, the purpose was for the Department's use, to submit them to the various other departments . . . Q. Was it intended that the plans would be distributed to anybody other than Town representatives? A. Not at that particular time, no. (Falmouth 25 - 26). To this day, Mr. Owen has never had an experience where one architect's preliminary plans were given to another to complete (Falmouth 148). Mr. Greenberg's experience is the same (Noah Greenberg 75 - 76, 111 - 112).

15. Mr. Greenberg provided a proposed construction cost estimate about that time, 1994 (Falmouth 12 - 13, 28 - 29, 46 - 47, 59 - 60, 128).

16. The project then stalled for lack of funding (Falmouth 125 - 128, 131).

17. In 1998, Mr. Greenberg provided Mr. Owen with an updated construction cost estimate that the two discussed (Falmouth 57 - 59).

18. About this time, 1998, Mr. Greenberg provided a color rendering of the building elevations (Falmouth Exhibit 15D).

19. In 1998, the town paid Mr. Greenberg $4,000 for the recent services he had provided (Falmouth 61 - 62).

20. In 2000, Mr. Owen anticipated that he would seek town funding for the project and requested that Mr. Greenberg provide additional copies of his plans to be employed in the request for funding (Falmouth 84 - 85). Mr. Greenberg provided the plans, with the note: "I expect to hear from you when the project is finally funded as we know it must be in the near future" (Falmouth 86).

21. Between 1993 and 2000, Mr. Owen and Mr. Greenberg never discussed that any other architect would complete the project or that Mr. Greenberg's plans would be provided to other architects (Falmouth 44, 68, 131 - 132, 138, 152 - 153).

22. After obtaining funding for additional design services, Mr. Owen, in behalf of the town, in May 2001, prepared and published a Request for Qualifications [for] Architectural Design Services, seeking basically, completion of Mr. Greenberg's preliminary drawings (Falmouth 64 - 65; Gannett Fleming 82).

23. Attached to the Request for Qualifications were Mr. Greenberg's four drawings, Floor Plan Part A, Floor Plan Part B, Site Plan, and the color Elevations (Falmouth 68, 76; Gannett Fleming 43 - 44). This was done without Mr. Greenberg's permission (see following paragraph).

24. Mr. Greenberg learned from other architects who had received the Request for Qualifications that his drawings were attached to the request (Noah Greenberg 76) and promptly notified the town that the Request "has caused us considerable consternation and confusion since it was our understanding that an agreement to perform these services has existed between us since 1998, and that we have performed satisfactorily and within the requirements of our agreement. . . . [I]t is our understanding that you were waiting final funding in order for us to proceed to the Design Development stage of the Project." The letter continued to explain that the Request "contained proprietary design drawings belonging to [Noah Greenberg Associates] and were released without our permission and in direct conflict with AIA [] and DSB rules. [¶] Please be advised that we fully intend to pursue all of our rights and options regarding this unfortunate situation." (Falmouth 94 & Exhibit 18).

25. In June 2001, the town hosted a meeting of architects potentially interested in responding to the Request for Qualifications and at this meeting stated that it did not want plans that were too much different from Mr. Greenberg's plans. See Defendant Gannett Fleming's Response to Plaintiff's First Set of Interrogatories, Answer No. 4 ("At an initial meeting called by the Town with various engineering and architectural firms, on [June 5, 2001], the Town representative indicated that the Town had existing preliminary plans, and although it wanted new ideas, at that time it did not want plans too different from the existing plans.") (Defendant Gannett Fleming's Response to Plaintiff's First Set of Interrogatories is submitted herewith) (The plaintiff suspects that the word "too" was not part of the town's presentation, thought such factual dispute is not relevant to this motion).

26. Between the completion of Mr. Greenberg's preliminary plans in 1994 and the Request for Qualifications in 2001, the town had decided that it desired a second floor over the office space addition (Gannett Fleming 37, 78).

27. On or about January 28, 2002, representatives of Gannett Fleming met with Mr. Owen to discuss the additional work to be performed (Falmouth 141 - 142; Gannett Fleming 63 - 64).

28. Following this meeting (Gannett Fleming 72), Gannett Fleming prepared a Scope of Services that described the work to be performed as follows:

Task 1 - Review Existing Information

Review existing preliminary plans prepared for the Falmouth DPW in 1994 to understand the DPW's intent regarding the objectives of the project. Meet with DPW

4

staff to determine current needs of the facility. Evaluate the preliminary design to determine if the existing preliminary plans meet the current needs of the DPW and prepare recommended modification to the preliminary plans. Prepare an initial construction cost estimate of the proposed work, including recommended modifications. Review the recommended modifications to the preliminary plans and the initial construction cost estimate with the DPW for compatibility with the DPW needs and objectives. Obtain DPW concurrence with the recommended changes to the preliminary plan. Modify the preliminary plan to incorporate the modifications accepted by the DPW (Gannett Fleming Exhibit 8).

29. Mr. Owen and Gannett Fleming understood that the preliminary plans to be modified, identified in Task 1, referred to Mr. Greenberg's plans (Falmouth 100 - 104 Gannett Fleming 73 - 76). Gannett Fleming understood that this Scope of Services described the services the town requested in its June 2001 Request for Qualifications, which attached Mr. Greenberg's plans as an addendum (Gannett Fleming 82).

30. The Scope of Services continued (Gannett Fleming Exhibit 8):
. . .
Task 3 - Design, Specification, and Cost Estimates

[After modifying preliminary plans p]repare plans, specifications, and cost estimates for the following elements of the project:

Design of a ± 29,000 S[quare] F[oot] pre-engineered metal building structure with a concrete knee wall up to 4' - 0" high around perimeter of building. This building will be used for indoor storage of vehicles and for washing of vehicles.

Design of a new ± 3,000 S[quare] F[oot] addition to the existing building for offices, a lunch room, administration area toilet facilities, and reception area.
. . .
Administration Building Addition: The administration shall consist of the following elements:

The design shall be based on an addition that is structurally isolated from the existing building such that no part of the structural system of the existing building is modified as a result of the new construction . . .

31. Mr. Owen and Gannett Fleming understood that Mr. Greenberg's plans provided for a 29,000± square foot storage area, as reflected in Task 3 (Falmouth 104 - 105; Gannett Fleming 76 - 77, 142). Mr. Owen understood that Mr. Greenberg's office space addition, as also reflected in Task 3, included offices, a lunch room, administration toilet facilities, and a reception area (Falmouth 107 - 108). Gannett Fleming, which prepared the scope of services (Gannett Fleming 71 - 72), understood that Mr. Greenberg's office space addition amounted to roughly 3,000 square feet (Gannett Fleming 77, 79, 142)

32. These very same terms were included in the contract executed between the town and Gannett Fleming in March 2002 (Falmouth 98 - 104, 107 - 108 & Exhibit 21; Gannett Fleming 98 - 99).

33. On or about June 7, 2002, Gannett Fleming received a letter from Mr. Greenberg in which he reserved all rights in the drawings the town had distributed without his permission (Gannett Fleming 128 & Exhibit 19). It is perhaps significant that this letter did not demand compensation or threaten litigation but merely requested that Mr. Greenberg's plans not be put to use.

34. Mr. Greenberg registered Floor Plan A, Floor Plan B, and the Site Plan with the Copyright Office effective February 2, 2003, and registered the Elevations effective April 11, 2003. Affidavit of Thomas A. Kahrl, submitted herewith.

35. Sometime after 2001 it was determined that the office space addition would not include demolition of the existing building (Falmouth 109 - 110, Gannett Fleming 134). As a result, the office space design would need to be relocated on the site, because the parties had concluded that the office space addition was to be "structurally isolated from the existing building such that no part of the structural system of the existing building is modified as a result of the new construction," as provided in the Scope of Services described above.

36. On March 31, 2003, the town approved a preliminary hand-drawn floor plan as the final floor plan (Gannett Fleming 196 - 197 & Exhibit 27). This plan was the plan upon which construction drawings were based, though Gannett Fleming explained that the plans were subject to "minor modifications" inevitable in the design process (Gannett Fleming 171, 197). These floor plans are the basis of the plaintiff's claim of copyright infringement.

37. The day after the final floor plans were approved, on April 1, 2003, Gannett Fleming requested, and subsequently obtained, the town's agreement to indemnify Gannett Fleming for any losses resulting from its infringement of Mr. Greenberg's copyright protected drawings (Falmouth 121 & Exhibit 25; Answer by Defendant Gannett Fleming, to Complaint for Copyright Infringement, and Cross-Claim Against Co-Defendant, The Town of Falmouth, Exhibit A).

38. The subject floor plan was created sometime after November 2002, months after Gannett Fleming received notice of Mr. Greenberg's reservation of rights in his plans (Gannett Fleming 191 - 192).

39. Though Gannett Fleming prepared the hand-drawn preliminary floor plan, it requested that other architects prepare the formal architectural drawings of the floor plans (Gannett Fleming 160, 170).

40. Gannett Fleming's final construction drawings for the project were completed in June 2004 (Defendant Gannett Fleming's Response to Plaintiff's First Set of Interrogatories, Answer No. 10).

41. As the project proceeded from completed construction drawings to construction, the town and Gannett Fleming undertook to extend their relationship, to allow Gannett Fleming to supervise the upcoming construction. The town described the work that had been provided until that time,

6

Gannett Fleming's preparation of construction drawings, as "reconfiguration of the building, of the [plaintiff's] original preliminary plans" (Falmouth 115 - 117).

42. The town had paid Gannett Fleming hundreds of thousands of dollars for the plans it has manufactured (Defendant Gannett Fleming's Response to Plaintiff's Second Set of Interrogatories, Answer No. 23), and as mentioned above, has agreed to indemnify Gannett Fleming from any losses resulting from its infringing activity.

43. Mr. Greenberg commenced this action in September 2004, contending, among other things, that "Gannett Fleming, Inc., created blue prints that were a derivative of the plaintiff's original drawings, in violation of the plaintiff's copyright." Complaint for Copyright Infringement and Demand for Trial by Jury ¶ 17.

44. In responding to Mr. Greenberg's complaint, Gannett Fleming advanced a cross claim against the Town of Falmouth and in the cross claim stated: "Gannett Fleming and Falmouth also have a special relationship as to this particular project, based upon Gannett Fleming's reliance on Falmouth's provisions of the Plaintiff's plans and on statements that Plaintiff's plans should be reviewed in making new plans for the subject job." Answer by Defendant Gannett Fleming, to Complaint for Copyright Infringement, and Cross-Claim Against Co-Defendant, The Town of Falmouth, Cross-Claim ¶ 4.

45. In discovery, when asked to "[i]dentify the persons most knowledgeable of the defendant Gannett Fleming's conception, development, preparation and completion of plans and|or design drawings for the public works maintenance facility," (emphasis supplied) Gannett Fleming included in its answer ". . . Noah Greenberg . . ." Defendant Gannett Fleming's Response to Plaintiff's First Set of Interrogatories, No. 2 (attached). Gannett Fleming reviewed its interrogatory answers to confirm their accuracy before putting an authorized signature to the document (Gannett Fleming 12).

**III. STANDARD OF REVIEW**

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, show that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A party responding to a properly supported motion for summary judgment must present evidence demonstrating a genuine issue for trial. Serrano-Cruz v. DFI Puerto Rico, Inc., 109 F.3d 23, 25 (1st Cir. 1997); LeBlanc v. Great American Insurance Company, 6 F.3d 836, 841 - 842 (1st Cir. 1993). "[N]either conclusory allegations [nor] improbable inferences" are sufficient to defeat summary judgment. J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1251 (1st Cir.

1996) (internal quotation marks omitted). Rather, the opposing party must present "enough competent evidence" to enable a factfinder to decide the disputed claims in its favor. Goldman v. First National Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). Evidence that is "merely colorable or is not significantly probative" cannot defeat summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (citations omitted).

In cases alleging copyright infringement, summary judgment is proper "if reasonable minds could not differ as to the presence or absence of substantial similarity of expression." Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 n. 3 (9th Cir. 1994). The same standard has been applied in this Circuit. See Segrets, Inc. v. Gillman Knitwear Company, Inc., 207 F.3d 56 (1st Cir. 1999) (summary judgment may be appropriate even as to items that are not identical); Lipton v. Nature Company, 71 F.3d 464, 471 (2nd Cir. 1995) (summary judgment on issue of substantial similarity); Pivot Point International v. Charlene Products, Inc., 1994 U.S.Dist Lexis 8993 at * 13 (N.D. Ill. 1994) (summary judgment granted after finding that substantial similarity was such that no reasonable ordinary observer could find to the contrary).

### IV. ARGUMENT

In copyright law, "[a]n 'architectural work' is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. 101. Copyright protection attaches upon creation. John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F. 3d 26, 35 n. 4 (1st Cir. 2003).

In an action claiming copyright infringement, a party must establish (1) ownership of a valid copyright and (2) copying of the protected work. Concrete Machinery Company, Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 605 (1st Cir. 1988) (citations omitted).

**Ownership:** Presentation of a certificate of copyright registration constitutes prima facie evidence of the plaintiff's ownership of a valid copyright. 17 U.S.C. § 410(c).[1]

**Copying:** Copying "is generally established by showing that the defendant had access to the copyrighted work and that the offending and copyrighted articles are substantially similar." Concrete Machinery Company, Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 606 (1st Cir. 1988) (internal quotation marks and citations omitted).

> Under traditional analysis, whether there is substantial similarity between copyrightable expressions is determined by the "ordinary observer" test. See, e.g., Walker v. Time Life Films, Inc., 784 F.2d 44, 51 (2nd Cir.), cert. denied, 476 U.S. 1159 (1986); O'Neill v. Dell Publishing Co., Inc., 630 F.2d 685, 687 (1st Cir. 1980). "The test is whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." Educational Testing Services v. Katzman, 793 F.2d 533, 541 (3rd Cir. 1986) (quoting Atari, Inc. v. North American Philips Consumer Electronics Corp., 672 F.2d 607, 614 (7th Cir.), cert. denied, 459 U.S. 880 (1982). . . . see also Ideal Toy Corporation v. Fab-Lu Limited., 360 F.2d 1021, 1022 (2nd Cir. 1966) (test stated as "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work") [¶] . . . [I]t is only when "the points of dissimilarity not only exceed the points of similarity, but indicate that the remaining points of similarity are (within the context of plaintiff's work) of minimal importance either quantitatively or qualitatively, [that] no infringement results." 3 NIMMER § 13.03[B], at 13- 43.

---

[1] The defendants may argue that the plaintiff's drawings were prepared as part of a contract between the Town of Falmouth and the Robert Charles Group. In 1993, Mr. Greenberg described himself as a "principal" of the Robert Charles Group. Statement of Undisputed Material Facts ¶ 7. In deposition Mr. Greenberg testified that participants in the Robert Charles Group retained whatever copyright he authored (Deposition of Noah Greenberg 71 - 72). Because the plaintiff's work could not have been a work for hire of the Robert Charles Group, the only defense available to the defendants would be that the plaintiff made a written transfer of his copyright, of which the defendants lack any evidence. There is no dispute that Mr. Greenberg is the person that actually authored the preliminary drawings. Statement of Undisputed Material Facts ¶ 8.

Id. at 607 - 608.

Substantial similarity is found when an accused work has captured the "total concept and feel" of the copyrighted work. Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 120 - 121 (8th Cir. 1987); Roth Greeting Cards v. United Card Company, 429 F.2d 1106, 1110 (9th Cir. 1970). "The existence of differences will not negate infringement unless they so outweigh similarities that the similarities can only be deemed inconsequential within the total context of the copyrighted work." Arthur Ruttenberg Homes, Inc. v. Maloney, 891 F. Supp. 1560, 1565 (M.D. Fla. 1995) (citations omitted).

**Derivative Work:** The statutory rights of a copyright owner include the exclusive right "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). The Copyright Act defines a derivative work as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101(a). The "right [to create derivative works] often can be more valuable than the right to the original work itself." Atari, Inc. v. North American Philips Consumer Electronics Corp., 672 F.2d 607, 618 n. 12 (7th Cir.), cert. denied, 459 U.S. 880 (1982). Borrowing a small amount of the original, if it is qualitatively significant, may be sufficient to constitute an infringement, even if the full original could not be recreated from the excerpt. Horgan v. Macmillan, Inc., 789 F. 2d 157, Part III (2nd Cir. 1986).

"[T]he derivative work issue . . . should turn on 'the qualitative nature of the taking.' Harper & Row Publishers v. Nation Enters, 471 U.S. 539, 565 (1985). Thus, a work may be found to be a derivative even if it has 'a different total concept and feel from the original work.' Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., 150 F.3d 132, 140 (2nd Cir. 1998)." Mulcahy v. Cheetah Learning, LLC, 836 F.3d 89 * 11 - 12 (8th Cir. 2004).

### A. GANNETT FLEMING'S DRAWINGS ARE SUBSTANTIALLY SIMILAR, IF NOT STRIKINGLY SIMILAR, TO THE PLAINTIFF'S DRAWINGS

The plaintiff's claim rests primarily on the impermissible copying of his floor plans, a sufficient basis upon which to base a claim of copyright infringement: <u>Robert R. Jones Associates, Inc. v. Nino Homes</u>, 858 F.2d 274, 275 - 276, 280 (6th Cir. 1988) (abridged floor plans); <u>Donald Frederick Evans & Associates v. Continental Homes, Inc.</u>, 785 F.2d 897, 904 (11th Cir. 1986) (abbreviated floor plans); <u>Imperial Homes Corporation v. Lamont</u>, 485 F.2d 895, 899 (5th Cir. 1972) ("if copyrighted architectural drawings of the originator of such plans are imitated or transcribed in whole or in part, infringement occurs").

Comparing the defendant's floor plans to the plaintiff's floor plan design, without any modification of the drawings, as the defendants contracted, reveals certain, obvious, similarities:



defendants' drawing                    plaintiff's drawing

The east-most portion of the plaintiff's design is retained in the defendants' plans.[2] These areas are of the same north-to-south dimension, contain three offices separated by corridors. The north most office designed with traditional 90" angle walls[3] and the southern two offices designed with less common 45" walls.

The next configuration, to the west, is the largest in both drawings and is of a 28-foot west-to-east dimension. The north-most area is a large open area of the same dimensions and door openings.[4] The southern-most area consists of two relatively smaller office spaces, designed without 45" angle walls. The smaller of the two offices reflected on the defendants' drawing is of the same interior dimensions as the offices reflected on the plaintiff's drawing (though the defendants added a closet to this office).

The third area to the west is of the same north-to-south dimension and contains one office space and smaller toilet and mechanical spaces. The offices in this area are of the same west-to-east dimensions, though the defendants' is longer. Additional similarities are discussed below.

---

[2] Gannett Fleming testified that the west-to-east dimension of its parks maintenance shop was 28 feet (Gannett Fleming 153). This dimension is confirmed on Gannett Fleming Exhibit 21. This is the same dimension as the plaintiff's lunch room (Town of Falmouth Exhibit 15A (site plan)). For this motion, the plans have been reduced to share that dimension, and thus are both to the same scale. The dimensions discussed herein result from a comparison of the drawings, which were confirmed by the dimensions identified on Gannett Fleming's final floor plans (Gannett Fleming Exhibit 21). Given the standard for copyright infringement, substantial similarity, precision in these measurements is not necessary. In any event, Gannett Fleming's preliminary drawing cannot contend to be precise, so a visual comparison of the two drawings at the same scale, perhaps with the aid of a ruler, is the most precise comparison available.

[3] The defendants did borrow the 45" angle wall design for the east wall of this area, which on the plaintiff's design was an exterior wall|partition and as a practical matter not capable of such a design. The comparison here is of the interior walls.

[4] In the defendants' drawing, this area actually has no interior access. According to the drawing, access would require that workers leave the building to enter this area from an exterior garage. The lack of any pedestrian doorway to this area is difficult to understand, unless it was an oversight that occurred in tracing the plaintiff's drawings. The defendants' final plans reflect an interior pedestrian doorway, in the same location as the plaintiff's (Gannett Fleming Exhibit 21).

Though the similarities are substantial, the fairest comparison is to employ the plaintiff's drawings exactly as the contract between the town and Gannett Fleming provides, that is, to relocate the design so that no part of the existing structure is affected: In preparing his drawings, the plaintiff was instructed that part of the existing structure was to be demolished, and the plaintiff created his design accordingly. Statement of Undisputed Material Facts ¶ 9.Several years later, it was decided that the building was not to be demolished, requiring that the office space design be relocated, to account or adjust for this building. Id. ¶ 35. When the plaintiff's drawings are modified, as the defendants contracted, so that the design would not affect the existing structure, it becomes apparent that the plaintiff's design was retained in its entirety, almost inviolate.

Some explanation may assist: The existing structure is 117 from north-to-south, though the entire length is not one wall. This 117 feet runs north-to-south 67 feet, then is set back 28 feet, than runs the remaining 50 feet north-to-south, [5] as roughly depicted below:



When the plaintiff's design was relocated so as not to affect the existing structure, as the defendants contracted, the design fit roughly like this:



---

[5] These dimensions are obtained from Gannett Fleming's final floor plan (Gannett Fleming Exhibit 21).

When the plaintiff's design is enlarged so as to meet the dimensions of the existing structure, eight feet are necessary to attach the south-most dimension and 25 feet are added to the north-to-south dimension so that this dimension will match the existing dimension--these lager dimensions, of course, are the dimensions of the defendants' plans, which retained the plaintiff's other dimensions.

One final observation that will assist in comparing the drawings is that in the plaintiff's drawings, the pedestrian walkways are entryways to the building. In the defendants' drawings, these entryways were converted to narrower interior corridors. The consequences of this adjustment will be explained below.

Modifying the plaintiff's drawings as required in the contract results in the following design (the defendants' plan is included for comparison):



Even a cursory visual inspection reveals that the plaintiff's design was retained in its entirety, and was modified only slightly, not as an improvement, but to adjust for the slightly larger area that resulted when the design was relocated. The similarities are the following:

The east-most area is a north-to-south dimension of 85± feet. This area consists of three office spaces, two of which are designed with 45" angle walls. The northern most office spaces are of the same north-to-south dimension (though the defendants added a stairwell here). In both drawings, this office is not designed with 45" angle walls. Immediately below this area is a pedestrian way.

Below the pedestrian way is a second office, designed with 45" angle walls, again of the same north-to-south dimension. In the defendants' drawing, this office was moved slightly north (two feet or so) when the plaintiff's wider entryway was converted to a narrower interior corridor.

Below the second office is a second pedestrian way, followed by a third office designed with 45" angle walls. If the space that became available when the entryways were reduced to corridors is added to the plaintiff's design of this third office space, the north-to-south dimension of these offices is the same. With this one adjustment (accounting for the space added when the entryways were reduced to corridors), all three offices are of the same north-south dimension. In both drawings, this area can be described as an 85-foot dimension, with a large office to the north, designed without 45" angle walls, followed by a corridor, followed by another office designed with 45" angle walls, followed by a corridor, followed by a third office designed with 45" angle walls. The descriptions are identical. Only the west-to-east dimension of each office was reduced slightly (and even this reduction is explained as the width of a north-to-south corridor the defendants added to the west of this space).

The second larger area, to the west, is virtually identical: To the far north of this area is a large open space of the same dimensions, with the same doorway openings (<u>see</u> note four). To the far south are two comparatively smaller offices designed without 45" angle walls. On both drawings, one of the offices is of the same interior dimensions (the defendants added a small closet) with the same doorway entrance. The defendants enlarged the other office to occupy some of the additional eight feet (west-to-east) that were added when the plaintiff's design was relocated. In the 25-foot

15

enlarged area (north-to-south), the defendants added three identical rectangular rooms. The defendants also partitioned an area that was an open reception area in the plaintiff's drawings. Other than taking advantage of some of the additional eight foot west-to-east dimension, the only difference in these areas is that the defendants partitioned the additional 25-foot north-to-south area (an area that did not exist in the plaintiff's design) and partitioned an open area in the plaintiff's design. In other respects the designs are identical On both drawings, the west-to-east dimension of this second area, when combined with the first area, is 50 feet.

The final area, to the west in both drawings, consists of one office, rest rooms, and mechanical|storage space. The north-to-south dimension of this (entire) area is the same. The west-to-east dimensions of the office spaces are the same. Here the defendants enlarge one dimension of the office space (north-to-south), to take advantage of additional space that was made available when the plaintiff's design was relocated.

The visual comparison, even without explanation, reveals that the plaintiff's design was retained in its entirety, modified slightly to account for some enlarged dimensions. In the additional 25 feet added to the north-to-south dimensions, the defendants demonstrated almost no creativity, by adding three identical rectangular spaces. No reasonable factfinder could conclude that the defendants did anything other than what they contracted to do, that is, modify the plaintiff's drawings, and that that modification represents an impermissible derivative work.

The similarities explain Gannett Fleming's following interrogatory answer: Interrogatory No. 2: "Identify the persons most knowledgeable of the defendant Gannett Fleming's conception, development, preparation and completion of plans and|or design drawings for the public works maintenance facility." Answer No. 2: ". . . Noah Greenberg . . ." Statement of Undisputed Material Facts ¶ 45.

The defendants arguments to date are unavailing. Almost exclusively the defendants have pointed to the larger area their plans represent. The additions the defendants made to the plaintiff's design, however, do not defeat the fact that the defendants' plans incorporate the plaintiff's design, the very definition of an infringing derivative work. [6] Even "differences requiring considerable ink to describe, do little to lessen a viewer's overwhelming impression that [defendants' plans] are appropriations of the [plaintiff's design]." Knitwaves, Inc. v. Lollytogs Ltd, 71 F.3d 996, 1004 (2nd Cir. 1995). Compare Eden Toys, Inc. v. Florelee Undergarment Company, 697 F.2d 27, 34 (2nd Cir. 1982) ("A work which makes non-trivial contributions to an existing one may be copyrighted as a derivative work and yet, because it retains the 'same aesthetic appeal' as the original work, render the holder liable for infringement of the original copyright if the derivative work were to be published without permission from the owner of the original copyright.").

### B. THE TOWN OF FALMOUTH IS LIABLE EITHER AS A DIRECT INFRINGER OR AS A CONTRIBUTORY INFRINGER

**Direct Infringement**: "All persons and corporations who participate in, exercise control over, or benefit from the infringement are jointly and severally liable as copyright infringers." Sygma Photo News, Inc. v. High Society Magazine, Inc., 778 F.2d 89, 92 (2nd Cir. 1985). See Arthur Rutenberg Homes, Inc. v. Maloney, 891 F. Supp. 1560, 1568 (M.D. Fla. 1995) (homeowner who participates in infringement for own benefit is a "direct infringer").

**Contributory Infringement**: "The acknowledged standard for imposing contributory liability was articulated by the Second Circuit in Gershwin Publishing Corp. v. Columbia Artists

---

[6] While in a typical case the defendants might attempt, despite a demonstration of substantial similarity, to establish independent creation, here, Gannett Fleming's judicial admission, that it employed the plaintiff's drawings in preparing its own, Statement of Undisputed Material Facts ¶44, precludes such contention. Schott Motorcycle Supply, Inc. v. American Honda Motor Company, 976 F.2d 58, 61 (1st Cir. 1992) (assertion of fact in pleading binds party).

Management, Inc., 443 F.2d 1159 (2nd Cir. 1971): [O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer. 443 F.2d at 1162. This statement of the test for contributory liability has been widely followed. See, e.g., Casella v. Morris, 820 F.2d 362, 365 (11th Cir. 1987); Demetriades v. Kaufmann, 690 F. Supp. 289, 294 (S.D.N.Y.1988)." Polygram International Publishing, Inc. v. Nevada|TIG, Inc., 855 F. Supp. 1314, 1333 - 1334 (D. Mass. 1994).

The conduct of the Town of Falmouth fits neatly within the elements of either direct or contributory infringement: with knowledge of the plaintiff's reservation of rights, the Town of Falmouth "materially contribute[d] to the infringing conduct of another" by instructing another to modify the plaintiff's drawings in preparing derivative drawings, by paying handsomely for derivative drawings, Defendant Gannett Fleming's Response to Plaintiff's Second Set of Interrogatories, No. 23 (attached), by agreeing to indemnify those preparing derivative drawings, and by putting those derivative plans to use in construction.

### C. DEFENDANTS' AFFIRMATIVE DEFENSES

**License**: "A copyright owner may grant [a] nonexclusive license[] orally, or they may be implied from the conduct which indicates the owner's intent to allow a licensee to use the work . . . . The burden of proving the existence of such a license is on the party claiming its protection, the licensee. Implied licenses are found only in narrow circumstances. . . . The touchstone for finding an implied license is intent." John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F. 3d 26, 40 (1st Cir. 2003). The plaintiff did not orally grant a license and neither did his conduct evidence intent to create such license. At the time the plaintiff's drawings were delivered to the town, neither the plaintiff nor the town expected that the plaintiff's drawings would be shared with others. Statement of Undisputed Material Facts ¶¶ 14 and 21. Neither had had any experience where one

18

architect's drawings were given to another architect to complete, Id., and neither expected this occasion to be the first. Instead, the plaintiff early put both defendants on notice of his reservation of rights in his copyright protected drawings. Statement of Undisputed Material Facts ¶¶ 24 and 33. The plaintiff additionally refers this court to the Plaintiff's Reply to Defendant Town of Falmouth's Opposition to Plaintiff's Motion for Preliminary Injunction.

**Estoppel and Waiver**: For the reasons described above, the plaintiff is not estopped from advancing his claim and neither has he waived the claim. See Precious Metals Associates, Inc. v. Commodity Futures Trading Commission, 620 F.2d 900, 908 (1st Cir. 1980) (to constitute an estoppel, plaintiff's actions must "induce another to change his position in good faith.") and Alan Corp. v. International Surplus Lines Insurance Company., 823 F. Supp. 33, 42 (D. Mass. 1993) (waiver is the voluntary and intentional relinquishment of a known right). The party relying upon the alleged waiver carries the burden of proof. Brennan v. Carvel Corp., 929 F.2d 801, 810 (1st Cir. 1991). The defendants can point to no evidence that will carry this burden.

**Laches**: The defendant Gannett Fleming's plans were completed in mid-June 2004. Statement of Undisputed Material Facts ¶ 40. The plaintiff filed suit in early September 2004. The plaintiff is not guilty of laches.

**Merger:** "The [merger] doctrine aims to prevent the monopolization of facts or ideas that are present in nature; where ownership of the expression would remove such facts or ideas from the public domain, the doctrine disallows copyright. See Yankee Candle Company v. Bridgewater Candle Company, 259 F.3d 25, 35 (1st Cir. 2001) ("In general, the merger doctrine is most applicable where the idea and the expression are of items found in nature, or are found commonly in everyday life.")." John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F. 3d 26, 43 (1st Cir. 2003). One of multiple building designs does not fall within this scope of the merger doctrine. Id.

Gannett Fleming acknowledges that many variations were possible. Defendant Gannett Fleming's Response to Plaintiff's First Set of Interrogatories, Answer Nos. 6 and 10 ( "several . . . building alternatives for the additions" were possible).

**Work for Hire**: A work for hire is defined by statute and the plaintiff's work was not a work for hire. 17 U.S.C. §101.

**Publication**: Even if a publication may affect the plaintiff's rights, the plaintiff merely provided drawings to the owner of the land sought to be developed. No publication occurred. 17 U.S.C. § 101.

## V. CONCLUSION

In this action, there is no dispute that the plaintiff's copyright protected drawings were employed in creating construction drawings for the subject project-- defendant Gannett Fleming has admitted as much. The question then is, did Gannett Fleming "appropriate material of substance and value." The plaintiff suggests that, given the striking similarity of the drawings, and given that virtually all differences are explainable as due to a decision to relocate the plaintiff's design on the subject site, that no reasonable factfinder could conclude that the defendants did not appropriate material of substance and value, and thus summary judgment is proper.

## VI. REQUEST FOR HEARING

The plaintiff requests that the court grant a hearing to present this motion.

Respectfully submitted,
the plaintiff,
Noah Greenberg,
by his attorney,

_____
Richard M. Russell
Heritage Place Condominium
205 Worcester Court • Unit B 2
Falmouth, Massachusetts 02540
Telephone No. 508.457.7557
BBO No. 561997

Dated: January 17, 2006