Page 1

```
 1                                           Volume I
                                             Pages 1-159
 2
                    UNITED STATES DISTRICT COURT
 3                   DISTRICT OF MASSACHUSETTS
                          EASTERN DIVISION
 4
                                       C.A. NO. 04-11934-GAO
 5
 6   NOAH GREENBERG,                        :
          Plaintiff,                        :
 7                                          :
     vs.                                    :
 8                                          :
     GANNETT FLEMING, INC.,                 :
 9        Defendant/                        :
          Cross-claim Plaintiff,            :
10                                          :
     and                                    :
11                                          :
     TOWN OF FALMOUTH,                      :
12        Defendant/                        :
          Cross-claim Defendant.            :
13
14
              DEPOSITION of WILLIAM OWEN, taken on behalf of
15   the Plaintiff, pursuant to the applicable provisions
     of the Massachusetts Rules of Federal Procedure,
16   before Barbara M. Montijo, a Registered Professional
     Reporter and Notary Public within and for the
17   Commonwealth of Massachusetts, at the offices of
     Pierce, Davis & Perritano, LLP, Ten Winthrop Square,
18   Boston, Massachusetts, on November 30, 2005,
     commencing at 10:00 a.m.
19
20
21
                        DUNN & GOUDREAU
22              COURT REPORTING SERVICE, INC.
                       One State Street
23                   Boston, MA   02109
                       (617) 742-6900
24
```

Page 6

1   (DEPOSITION COMMENCED AT 10:30 A.M.)
2   IT IS HEREBY STIPULATED AND AGREED by and
3   between counsel for the respective parties that the
4   Witness will read and sign the deposition transcript
5   under the pains and penalties of perjury; that the
6   reading and signing is deemed waived if not
7   accomplished within 30 days of transcript delivery;
8   and that the sealing, filing, and certification of
9   the deposition transcript are waived.
10   It is further stipulated and agreed that all
11   objections, except objections to the form of the
12   questions, and motions to strike will be reserved
13   until the time of trial or pretrial hearing.
14   ************************
15                WILLIAM OWEN
16   The deponent, having been satisfactorily
17   identified and duly sworn by the Notary Public,
18   deposes and testifies as follows:
19          EXAMINATION BY MR. RUSSELL
20   Q.  Good morning.
21   A.  Good morning, Richard.
22   Q.  Would you identify yourself for the record, please?
23   A.  My name is William Russell Owen. I'm the Director
24       of Public Works for the Town of Falmouth. I live at

Page 7

1    8 Pinehurst Drive, Buzzards Bay, Mass., 02532.
2   Q.  Sir, my name is Richard Russell, and I'm going to be
3       asking you some questions today about litigation with
4       which you're familiar in the Federal District Court.
5       If at any time you don't understand the question I've
6       asked you, please feel free to ask me to repeat the
7       question; or, if you don't hear a question that I've
8       asked, please again feel free to ask me to repeat the
9       question.
10      If at any time you need to take a break, to use
11      the rest room, to make a phone call, to speak to an
12      attorney that's here, that's fine, just let me know
13      and we'll accommodate you. The only qualification to
14      that is, if there's a question pending, I would ask
15      that you answer the question before we take a break.
16      There is a court reporter here today who will be
17      recording the testimony. It makes the court
18      reporter's job easier if we don't speak over each
19      other. So, if you can wait until I've finished
20      asking my question before you start to answer and
21      then I'll wait until you finish your answer before I
22      start the next question, or at least we can both try.
23      Sometimes it's hard to do that. Mr. Owen, primarily,
24      I'm really just going to ask you to comment on a

Page 8

1    number of documents today. I don't have a lot of
2    background questions or questions separate from some
3    documents that have become part of this litigation.
4    I'm going to start by asking the court reporter to
5    mark this Notice of Deposition of the Town of
6    Falmouth as Exhibit 1.
7           (EXHIBIT 1 MARKED FOR IDENTIFICATION)
8   Q.  Mr. Owen, the court reporter has marked a three-page
9    document entitled, "Notice of Deposition of the Town
10    of Falmouth," and I'm going to present this to you
11    and just ask you to take a look at that.
12           (WITNESS PERUSING DOCUMENT)
13   Q.  Mr. Owen, the only question I have about that, and
14    feel free to review it, to the extent you'd like, to
15    make yourself comfortable with that document. The
16    only question I have for you is, does that document
17    look familiar to you?
18   A.  Not this particular document itself. I have never
19    seen this.
20   Q.  Have you seen something similar to that before?
21   A.  Well, there's verbiage here that I believe came from
22    the request for architect services in 1993.
23        MR. SKRIP: We can stipulate that it
24    is.

Page 9

1   Q.  And what's your -- you have a concern about that
2    language, a comment about that language that's
3    different than what you've seen before?
4   A.  Well, I haven't seen this particular three-page
5    document. This is the first I've seen this.
6   Q.  And my next question was, have you seen something
7    that you think looks similar to that document?
8   A.  Well, I think this document outlines our requests for
9    design services and it's kind of a combination of the
10    Town's request in '93 and in 2001, but I've never
11    seen this particular three pages.
12   Q.  Okay. We can leave it at that.
13   A.  Okay.
14        MR. RUSSELL: Mark this document.
15           (EXHIBIT 2 MARKED FOR IDENTIFICATION)
16   Q.  Mr. Owen, the court reporter has marked a four-page
17    document as Exhibit Number 2. The first page is
18    entitled, "Town of Falmouth, Request for Proposals,"
19    and the second page has a title, "Town of Falmouth,
20    Department of Public Works, Requests for
21    Architectural Consultant Services, Municipal Service
22    Maintenance Facility." I ask you to look at that
23    document and let me know if you recognize that
24    document?

Page 10

1  A. (Witness perusing document) Yes. I recognize this as
2     the request for services back in '93.
3  Q. You recognize it as a request for services back in
4     1993. Can you elaborate on, you know, what you
5     believe the documents represent?
6  A. Well, it was a scope of work that I drew up for
7     preparing preliminary plans for the public works
8     maintenance facility on Gifford Street. Basically,
9     the Scope of Services included the architect to meet
10    with myself and staff to determine our future space
11    requirements, study various existing areas such as
12    bathroom facilities, lockers, storage rooms, lunch
13    rooms, et cetera, and have the architect, from all
14    the information collected, determine the building
15    size, general floor plan, et cetera, do a site plan,
16    provide a cost estimate, and to furnish the Town with
17    a report to include recommendations for upgrading our
18    mechanical and electrical systems.
19         Another service was for the consultant or
20    architect to inspect our existing roof areas in the
21    present building and give us a brief report on any
22    problems and an estimated cost of repair. That was
23    put in there because at the time, we were having
24    major leaks in our existing roof. That's basically

Page 11

1     pretty much what this document is.
2  Q. You indicated that it was for services related to the
3     public works service maintenance facility, did I
4     characterize your testimony accurately?
5  A. Public works maintenance facility, yes.
6  Q. How did the project of making repairs and renovations
7     to that facility come about, if you know?
8         MR. BARKER: Objection.
9  A. Well, this goes back into some history. When I first
10    came to Falmouth in 1983, we had a Board of Public
11    Works at the time. It was a three-person elected
12    Board and I served as director at the pleasure of the
13    Board. They're the ones that hired me; they're the
14    people that could have fired me.
15        It was talked about starting in -- probably even
16    before my time, I'm not sure, but at least in '83, of
17    adding on to the facility and bringing it into the
18    1980s, to 2000 (sic). The offices there were
19    Post-it-sized offices, no heat in some of them, and
20    the Board and myself discussed the idea of hiring an
21    architect to at least give us a preliminary start
22    on the facility. That's pretty much how it came
23    about.
24  Q. Do you know who initiated this meeting that you

Page 12

1     talked about where you discussed, you know, obtaining
2     an architect?
3  A. Well, there was no initiation of meetings. The Board
4     met twice a month. I'm not sure if there was any
5     formal agenda, but at least it was informally talked
6     about.
7  Q. So, it came up at Board meetings?
8  A. At Board meetings.
9  Q. And you have summarized kind of the objectives and
10    requirements of this document. Did you have an
11    expectation as to how the project would proceed after
12    all of these items were completed?
13 A. Well, upon the Town receiving the preliminary plans,
14    reports, et cetera, cost estimates, I think around
15    that time the Board of Public Works became
16    nonexistent. The Town of Falmouth changed its former
17    government from full-time Selectmen to part-time
18    Selectmen and Town Administrator. At that time, I
19    came under the Town Administrator, because it was --
20    and the Board of Selectmen also served as Board of
21    Public Works.
22        Once this information was received -- and the
23    cost estimate, I recall, at that time, was about
24    $2.2 million -- it was presented to the Board of

Page 13

1     Selectmen more or less for information at one of
2     their meetings. I can't recall what date that
3     meeting was.
4         The Selectmen really took no action on it
5     because there were so many other building projects
6     ahead of this in the Town, schools, fire station.
7     Several schools, in fact. So, I kind of took a back
8     seat to pursue to this project to let other projects
9     come forward.
10 Q. The document is dated -- well, there's a date on it
11    of November 9, 1993?
12 A. Right.
13 Q. Is it your understanding that this document would
14    have been created either that date or before that
15    date, sometime before that date?
16 A. Well, that was the date it was advertised in the
17    local paper, the "Falmouth Enterprise."
18 Q. You indicated there was a change of the form of
19    government about this time?
20 A. Well, it was prior to '93. It was prior to '93.
21 Q. The change of government was?
22 A. That's right.
23 Q. So, this document was created after that change
24    occurred?

Page 14

1  A.  After the -- that's correct.
2  Q.  And the intent was that the budget would be submitted
3      to the Board of Selectmen?
4  A.  I'm not sure if I understand your question.
5  Q.  Well, I'm just trying to make sure I understand your
6      answer.
7  A.  Okay.
8  Q.  I thought you said that once you had a budget, your
9      recollection was it was 2.2 million, that that was
10     presented to the Selectmen?
11 A.  No. We did not have a budget for this project.
12 Q.  I'm sorry, I misspoke. I meant a cost estimate.
13 A.  We had a cost estimate, not a budget. We needed a
14     figure to take to the Town meeting. And the size of
15     this project, just to explain a little bit --
16         MR. SKRIP: Just answer the question.
17         THE WITNESS: Sorry.
18         MR. SKRIP: Just answer the question.
19         THE WITNESS: Okay.
20 Q.  Did you have a budget for architectural consultant
21     services in 1993 when this document was prepared?
22 A.  Yes. It was approved at a Town meeting.
23 Q.  What was that budget?
24 A.  I believe it was -- I think it was around $8,000.

Page 15

1  Q.  Did you have any input from anybody else in creating
2      this document?
3  A.  No, not really.
4  Q.  The last paragraph of the first page -- well, it's
5      two sentences. I'd like to direct your attention to
6      the first sentence of the last paragraph. And that
7      reads, "The Town of Falmouth reserves the right to
8      waive any informalities in the proposals and to
9      reject any and all proposals and the right to award
10     the bid, and parts thereof, as may be determined by
11     the funds available, in the best interest of the Town
12     of Falmouth." My question about that paragraph is,
13     what was intended by the words "funds available"?
14 A.  What was --
15 Q.  The sentence talks about, the bid may be awarded as
16     determined by the funds available. Do you see that
17     language?
18 A.  Right.
19 Q.  I'd like to understand what that language "funds
20     available" -- what those words "funds available"
21     mean? Can you help me understand that? What were
22     the funds available that that refers to?
23         MR. BARKER: Objection.
24 A.  If the proposals, cost proposals came in over the

Page 16

1      available funds, then, obviously, we cannot award the
2      bid project or award the bid for the project.
3  Q.  And the available funds, is that the $8,000 you told
4      me about before?
5  A.  I believe it was $8,000. I'm not positive. I think
6      it was in that range.
7  Q.  The second page -- and what you said before about you
8      drafted this document without any input from anybody
9      else, that would apply to the remaining three pages
10     of this document; is that correct?
11 A.  Pretty much, yes.
12 Q.  This describes the Scope of Services. Do you see
13     that on the second page?
14 A.  Yes.
15 Q.  Does this document describe the entire Scope of
16     Services that were to be undertaken as part of this
17     Request for Proposals?
18 A.  Well, it's more than this second page. It's the
19     second, third, and fourth page.
20 Q.  My question was, does the document reflect the full
21     Scope of Services?
22 A.  The entire document does, yes.
23 Q.  The first paragraph is entitled, "General" --
24     actually, it's not really a paragraph, it's a

Page 17

1      heading. It's a heading that says, "General," do you
2      see that?
3  A.  Uh-huh.
4  Q.  The second paragraph under that, I'd like to direct
5      your attention to that. That paragraph reads, "The
6      consultant must exhibit to the Town the firm has
7      experience and the technical knowledge to work with
8      older building components and to introduce new design
9      elements and efficient building materials into the
10     existing facility." Could you explain to me what
11     is meant by the words "efficient building
12     materials"?
13 A.  Well, if there are energy-efficient materials that
14     can be used in this project, we were looking to use
15     them. I just want to say, this Scope of Services
16     does not encompass or go into final design where you
17     really get into construction.
18 Q.  In this Scope of Services, where would the efficient
19     building materials be reflected in the finished
20     product?
21 A.  Well, in the finished product for this service. I
22     don't recall that they were reflected.
23 Q.  Where would they have been reflected?
24         MR. BARKER: Objection.

Page 18

```
 1   A.  Well, they could have been reflected in using solar
 2       heating.  I've seen other DPW facilities where there
 3       have been double walls with solar panels on the
 4       exterior with fans at the lower end to bring in and
 5       push the heat into the building.  That was not looked
 6       into in this project.
 7   Q.  On what piece of paper would you expect to see that
 8       information?
 9           MR. BARKER:  Objection.
10   Q.  I'll rephrase it.  On what piece of paper that was
11       the result of this project would you expect to see
12       efficient building materials reflected?
13   A.  Well, I would expect that to be in the report that we
14       requested.
15   Q.  What report exactly?
16   A.  Well, where we -- it's somewhere in here.  Where
17       we requested a brief report under C, preliminary
18       plan.
19   Q.  Paragraph 4?
20   A.  Paragraph 4.
21   Q.  This solar system that you spoke about; is that a
22       mechanical or electrical system?
23   A.  That would have to do with the mechanical system,
24       yes.
```

Page 19

```
 1   Q.  The next paragraph in the document states, "The
 2       consultant must listen and communicate with the Town
 3       to determine the specific objectives of the project,"
 4       do you see where I am?
 5           THE WITNESS:  Still under general?
 6           MR. RUSSELL:  Yes.
 7   A.  Yes.
 8   Q.  "And have the ability to translate these goals into a
 9       design program which respects existing conditions,
10       new space requirements, aesthetic features and budget
11       considerations."  At the time this document was
12       written, did the Town have specified new space
13       requirements?
14   A.  Could you repeat the question?
15   Q.  At the time that this document was created, did the
16       Town have specified any new space requirements for
17       this project?
18   A.  Not in any technical terms, but just in a general
19       aspect.  We needed more room, more space.
20   Q.  Is there any written document that reflects that
21       other than this document itself?
22   A.  Not to my knowledge.
23   Q.  The paragraph goes on to speak of aesthetic features.
24   A.  Excuse me?
```

Page 20

```
 1   Q.  The paragraph after new space requirements references
 2       aesthetic features.  Can you tell me what that
 3       language means?
 4   A.  The -- which one?  The space requirements or the
 5       aesthetic features?
 6   Q.  The aesthetic features.
 7   A.  The aesthetic features is we wanted to have a
 8       structure that got away from the typical concrete
 9       block square structure and present a more pleasing
10       look from the street.
11   Q.  Did the Town have any specific aesthetic features
12       that it communicated to -- well, strike that.  Did
13       the Town have any specific aesthetic features in mind
14       at the time this document was created?
15   A.  No.
16   Q.  Did it have any specific aesthetic features in mind
17       after this document was created?
18   A.  No.
19   Q.  The last item in that third paragraph that I read
20       from indicates budget considerations.  Can you tell
21       me what the budget considerations were at the time
22       this document was created?
23   A.  Well, at the time the document was created, we had no
24       budget.  We had no idea of what this facility may
```

Page 21

```
 1       cost.  So, that's why we were requesting later on in
 2       the document the cost estimates, so they could be
 3       presented for budgeting.
 4   Q.  Was there any guidance provided to anybody about the
 5       budget within which the project should remain?
 6   A.  No.
 7   Q.  How would somebody that's responding to this document
 8       know what the budget considerations were?
 9   A.  I'm not sure if I understand the question.
10   Q.  Well, the paragraph says that the consultant must
11       consider budget considerations, would you agree with
12       that?
13   A.  Yes.  I agree with that, yes.
14   Q.  How would the consultant know what those budget
15       considerations were?
16   A.  Well, I think it was public knowledge.  I'm sure this
17       is referring to the fee for the budget, the
18       architect's fee.  So, it was public knowledge how
19       much money the Town had available.  I believe there
20       was a Town meeting article on this.
21   Q.  It wasn't related to the anticipated construction
22       costs of the project?
23   A.  No.  It was just related to the costs to prepare the
24       preliminary plans with no cost of construction or
```

Page 22

1   total project cost.
2   Q. Was there any discussion during this project in 1993
3      or 1994 about the budget for the project?
4         THE WITNESS: Discussion with who?
5         MR. RUSSELL: Anybody.
6   A. Well, we had the funds to do the preliminary plans;
7      and that was about the end of it, as far as we could
8      go in talking about costs. That's why we requested a
9      cost estimate in this Scope of Services. So, we knew
10     where we would be going with the project.
11  Q. We can go on to the next paragraph, Scope of
12     Services, paragraph A, and there's a subparagraph
13     number 3. "The Town will supply the consultant with
14     a list of all equipment that is garaged at this
15     facility." Do you know if the Town ever furnished a
16     list of equipment?
17  A. Yes, we did.
18  Q. And when did that happen?
19  A. Well, it happened during the course of this
20     preliminary project.
21  Q. Who was it supplied to?
22  A. Who was it supplied to? It was supplied to the
23     architect that we contracted.
24  Q. Does that list continue to exist today?

Page 23

1         THE WITNESS: Does it exist today?
2         MR. RUSSELL: Yes.
3   A. Yes.
4   Q. The same list that was given to the consultant that
5      was performing this project?
6   A. That's correct.
7   Q. In paragraph 5 the paragraph reads, "Determine from
8      the collected information what the future space plan
9      should include in terms of building size, general
10     floor plan, parking and access, and support
11     facilities." Can you just explain to me what support
12     facilities means?
13  A. Support facilities would be areas for mechanics to
14     work in, storage of parts, tires, lubricants, storage
15     of our sanders.
16  Q. Support for the people that were working in that
17     facility?
18  A. That's correct.
19  Q. In paragraph 1, the third line from the bottom to the
20     far right are the words, "update mechanic repair
21     areas," do you see those?
22  A. Uh-huh.
23  Q. Can you tell me what those words mean?
24  A. It meant to provide more storage for parts. To put

Page 24

1      in up-to-date facilities for changing oil,
2      lubricating vehicles and equipment, provide lifts,
3      mechanical lifts.
4   Q. Where would that information be reflected on the
5      results of this project?
6   A. On the Noah Greenberg submission.
7   Q. Well, was it intended somebody was going to produce
8      some documents in response to this?
9   A. Right, or a plan.
10  Q. Or a plan. Where would the updated mechanic repair
11     areas be reflected in the finish product?
12  A. Well, they'd be reflected in the plan. And possibly
13     in the report, too.
14  Q. I'm going to move on to the next page, paragraph C,
15     subparagraph 1, and rather than read that, I'm just
16     going to ask you whether those services were
17     ultimately performed in response to this Request for
18     Proposals?
19        THE WITNESS: The paragraph under site
20     planning?
21        MR. RUSSELL: No, I'm sorry, paragraph C.
22        THE WITNESS: Paragraph C?
23        MR. RUSSELL: Yes.
24        MR. SKRIP: Starting with the words

Page 25

1      "prepare preliminary architectural plans"?
2         MR. RUSSELL: That's correct.
3   A. They were completed.
4   Q. Paragraph 2 says, "Upon finalization of the proposed
5      work." Can you tell me what that language means?
6   A. Well, it means when the architect has completed his
7      planning, his results are approved by the Town and he
8      will furnish us with the requested copies of plans.
9   Q. And what was the purpose of providing copies of
10     plans?
11  A. Well, the purpose was for the Department's use, to
12     submit them to the various other departments; mainly,
13     the Board of Selectmen, the Town Administrator at
14     that time.
15  Q. Returning to the initial language in this sentence,
16     "Upon finalization of proposed work and following
17     approval," whose approval does that refer to, does
18     the word "approval" refer to?
19  A. It refers to my approval.
20  Q. And the copies were intended to be distributed to
21     other Town representatives?
22  A. Uh-huh. Yes.
23  Q. And what was the intent of providing it -- thank
24     you. What was the intent in providing copies to

Page 26

1    other Town representatives?
2 A. Well, to familiarize them with the project and what
3    the Department was looking for in the future.
4 Q. Was it intended that the plans would be distributed
5    to anybody other than Town representatives?
6 A. Not at that particular time, no.
7 Q. The third paragraph states, "The consultants shall
8    also furnish the Town a conceptual site plan
9    indicating proposed additions." Did that happen?
10 A. Yes.
11 Q. And the fourth paragraph, "As part of the preliminary
12    plan task, the consultant shall prepare a brief
13    report to include recommendations for upgrading
14    mechanical and electrical systems." Did that happen?
15 A. We did get a report, a brief report, but I can't
16    recall if it went into detail on the mechanical and
17    electrical systems.
18 Q. Just going back to paragraph 2. Where you indicated
19    that word "approval," that means your approval?
20 A. Yes.
21 Q. In this instance, were plans prepared that met with
22    your approval?
23 A. Obviously they were, because we paid the final
24    bill.

Page 27

1 Q. Is that a yes?
2 A. Yes.
3 Q. Do you know who prepared those plans?
4 A. Noah Greenberg.
5 Q. Moving on to paragraph D, cost estimate. That reads,
6    "Using the plans prepared in the above tasks, the
7    consultant shall prepare an estimate of probable
8    construction cost. The cost estimate is to reflect
9    current construction costs." This is a little bit of
10    a convoluted question, but can you tell me how the
11    second sentence in any way is different than the
12    first sentence?
13 A. Well...
14       MR. BARKER: Objection.
15 Q. I'm just going to ask you -- thank you. I'm just
16    going to ask you -- what I mean by that is, not the
17    actual words, but by the meaning of the sentences?
18 A. The meaning of?
19 Q. Well, we can do it differently. The first sentence
20    talks about preparing an estimate of probable
21    construction costs. I think I understand that. The
22    second sentence says, "The cost estimate is to
23    reflect current construction costs." How is the
24    request for current construction costs different than

Page 28

1    the request for probable construction costs in the
2    first sentence?
3 A. Well, I didn't want the architect to be using costs
4    from, let's say, a similar project he might have
5    worked on three or four years ago. There are
6    different publications put out by companies and
7    estimating books and I wanted to make sure we had the
8    costs at the time this project was being developed.
9 Q. Was there any particular reason for that?
10 A. Well, the reason is to give us a true and accurate
11    cross picture instead of a false picture.
12 Q. What was to happen with this true and accurate
13    figure?
14 A. As I said earlier, it was taken to the Board of
15    Selectmen for consideration.
16 Q. To your knowledge, was it taken to the Board of
17    Selectmen?
18 A. Yes, it was presented to them.
19 Q. I think you already answered that question.
20 A. Yes.
21 Q. Did this happen in response to this Request for
22    Proposals, that the Town receive a current
23    construction cost estimate?
24 A. Yes.

Page 29

1 Q. Paragraph E, other services -- well, actually, I'm
2    going to go back to the cost estimate. Was there a
3    discussion with the architect about the cost estimate
4    that was prepared?
5 A. I'm sure there was, but I can't recall in detail
6    what.
7 Q. Was there any range --
8 A. I recall it being increased at one point. So, there
9    must have been some discussion with the architect,
10    but I can't recall.
11 Q. Do you recall, was there any anticipated construction
12    costs range that you were working with?
13 A. We didn't have any anticipated construction costs at
14    this time other than what the architect was
15    supplying.
16 Q. What I'm trying to get at is this, did you have in
17    your mind that if the project was too expensive, you
18    were going to have a hard time selling it to the
19    Town?
20 A. That's really not what I had in mind.
21 Q. Well, that's a fair question. That wasn't anything
22    that was part of the consideration in trying to put
23    this plan together?
24 A. No. No.

Page 30

1   Q.  Paragraph E, "Other Services. The consultant shall
2       inspect the existing roof areas of the present
3       building and present a brief report and details for
4       correcting the present roof problems along with an
5       estimated cost for such repairs." To your
6       recollection did that happen?
7   A.  I can't really recall. I can't really recall unless
8       it was in the report that was supplied to us. I
9       guess that's my answer.
10  Q.  What report was supplied to you?
11  A.  Well, we had a -- I don't know how many pages, but a
12      very brief report submitted to the Town by Noah
13      Greenberg on the project, and I can't really recall
14      the contents of that report because it's been so long
15      ago.
16  Q.  You haven't seen that report recently?
17  A.  Not recently. It's in the Town's files.
18  Q.  What file would it be in, do you think?
19  A.  A file in my office or in our archives.
20  Q.  And you haven't looked for that document as part of
21      this litigation?
22  A.  No, I haven't.
23  Q.  Is there any reason why you haven't looked for it?
24  A.  I guess I just have too many other things to do.

Page 31

1   Q.  Paragraph 2, "The consultant shall explore the
2       availability of any Federal and State grants that may
3       be available for construction." Do you know if that
4       happened?
5   A.  I don't recall that any grants were presented to the
6       Town by the architect, available grants.
7   Q.  Did you ever comment on that?
8   A.  Pardon me?
9   Q.  Did you ever comment on the failure to identify
10      grants?
11  A.  No. I don't have any comment on it.
12  Q.  Did you ever comment on it?
13  A.  I didn't comment on this; however, I did myself do
14      some grant exploring with the State on the project
15      and there was nothing available. It was primarily
16      focusing on a PWED, P-W-E-D grant, Public Works
17      Economic Development.
18  Q.  If it was a bike path, you would have been all set?
19  A.  Well, yeah. Or a swimming pool, probably.
20  Q.  Public Works -- PWED was --
21  A.  It's called PWED, P-W-E-D, Public Works Economic
22      Development, primarily to create jobs.
23  Q.  Not buildings, but jobs?
24  A.  Well, the buildings are what create the jobs, yeah.

Page 32

1       There were no PWED funds available during this time
2       frame.
3   Q.  They would create jobs for people in private
4       industry?
5   A.  Yes, that's the purpose of the grant.
6           MR. RUSSELL: Mark that, please.
7           (EXHIBIT 3 MARKED FOR IDENTIFICATION)
8   Q.  Mr. Owen, the court reporter has marked the next
9       document as Exhibit Number 3. And I just ask you if
10      you're familiar with that?
11  A.  (Witness perusing document) Yes, I am.
12  Q.  What do you recognize it to be?
13  A.  It's an advertisement that I placed in the "Falmouth
14      Enterprise," an invitation to bid on this facility
15      in 1993. And basically, it's the same verbiage as
16      page 1 of the previous document.
17  Q.  And this photocopy is as it was appearing in the
18      newspaper?
19  A.  Yes.
20  Q.  And that's the "Falmouth Enterprise"?
21  A.  Yes.
22  Q.  And it would have appeared in the "Falmouth
23      Enterprise" on November 9, 1993?
24  A.  Yes.

Page 33

1           (EXHIBIT 4 MARKED FOR IDENTIFICATION)
2   Q.  Mr. Owen, the court reporter has marked the next
3       document Exhibit 4. This is a document that's dated
4       January 20th, 1994 from William B. Owen, Director.
5       Are you familiar with this document?
6   A.  (Witness perusing document) Yes.
7   Q.  Did you write this document?
8   A.  Yes.
9   Q.  Are those your initials that appear next to the line
10      William B. Owen, Director?
11  A.  Yes.
12  Q.  Do you understand what the handwritten item on the
13      letter is?
14          THE WITNESS: At the bottom of the page?
15          MR. RUSSELL: Yes. Other than the
16      initials, I only see one area of handwriting.
17          THE WITNESS: (Witness indicating)?
18          MR. RUSSELL: That's right.
19  A.  Yes.
20  Q.  And what is that? Do you have an understanding of
21      what that is?
22  A.  That's a circle.
23  Q.  Thank you.
24  A.  Approved by the BOS, meaning the Board of Selectmen,