Page 66

1  Q. Yes. The second paragraph under background. I'm
2     sorry, I should have identified it that way.
3  A. Yes.
4  Q. "The present facility is a concrete block structure
5     on slab with a flat membrane roof." And I just want
6     to get a sense of exactly what this existing building
7     was, or is. Was, at the time, I guess. And the
8     structure at that time was a concrete block
9     structure; is that correct?
10 A. Yes.
11 Q. Which means it's built with concrete blocks and
12    cement; is that accurate? I'm not a builder or an
13    architect.
14 A. Yes.
15 Q. Is there anything more elaborate to it than that?
16 A. Nothing much.
17 Q. There are doorways and windows?
18 A. Doorways and windows and a flat roof.
19 Q. Can you explain to me what on a slab means? There's
20    no basement; is that what that means? It's just on a
21    concrete slab?
22 A. That's correct.
23 Q. Can you explain to me what flat membrane roof means?
24    I have no idea what that means.

Page 67

1  A. Well, it's not a pitched roof. It's a flat roof as
2     the term states. A membrane is a roof built up of
3     composite materials such as, in layman's terms, tar
4     paper, tar, gravel; that's basically called a
5     membrane roof.
6  Q. What would that rest on? I mean, is there some
7     plywood under it or something?
8  A. It rests on corrugated metal, which is supported by
9     bar joists.
10 Q. What's a bar joist?
11 A. It's a structure member.
12 Q. Where are bar joists located within the structure?
13 A. Throughout.
14 Q. Throughout?
15 A. Throughout the structure.
16 Q. Are they part of a wall, typically?
17 A. No. They rest on walls.
18 Q. Do bar joists rest on walls?
19 A. Yes.
20 Q. Subparagraph 1 says, "The present facility consists
21    of: 1. Approximately 8,240 square feet of unheated
22    garage space"?
23 A. Yes.
24 Q. And that was accurate as of the time of this

Page 68

1     document?
2  A. Yes.
3  Q. Which was May 2001? That's correct?
4  A. Yes.
5  Q. And approximately 12,920 square feet of heated space?
6  A. Yes.
7  Q. Now, there's a Scope of Services and it identifies
8     five items under the Scope of Services. Do you see
9     that?
10 A. Yes.
11 Q. And then it says, "Preliminary plans for this project
12    were prepared in 1994 and may be used as a guide of
13    the Department's intent. These plans are attached
14    hereto as Exhibit A."
15 A. Appendix A.
16 Q. Excuse me. Appendix A, thank you. To your
17    knowledge, were those drawings the drawings that
18    Mr. Greenberg prepared?
19 A. Yes.
20 Q. And at any time prior to May 2001, did you ever
21    discuss with Mr. Greenberg that his plans would
22    be given to other architects for use on this
23    project?
24 A. No.

Page 69

1  Q. Do you recall if Appendix A included any plans that
2     were reproduced in color?
3  A. I can't recall. They may have. I can't recall. I
4     know there were color plans available. I don't know
5     if they were included or not.
6  Q. Would you have a copy of this document that has the
7     original attachments to it, so we might have an idea
8     of whether there was a color copy attached or one or
9     more color copies attached?
10 A. I have this document.
11 Q. What you would consider an original file copy; is
12    that an accurate --
13 A. I believe I would, yes.
14 Q. And that, you think, would answer the question of
15    whether there were color attachments?
16 A. Yes, it would.
17 Q. Have you seen that document recently?
18 A. I don't know what you mean by "recently."
19 Q. That's a fair answer. Have you seen it in the last
20    year?
21 A. Yes.
22 Q. Having seen it in the last year, do you have any
23    better recollection of whether there were color plans
24    attached, or not?

Page 70

1  A. Not really.
2  Q. I have some questions about the language of this
3     document. The final paragraph says, "The designer
4     shall review the facility needs program previously
5     completed," do you see that?
6  A. Uh-huh. Yes.
7       MR. BARKER: Are you talking about page --
8       MR. RUSSELL: Page 2.
9  Q. Can you tell me what the language "facility needs
10    program" refers to?
11 A. It probably refers to some of the information I had
12    put together on equipment inventories, the number of
13    people there; that's what I would say.
14 Q. Then the next sentence says, "The designer shall
15    review the design with the building user for
16    compatibility with the final determined needs." Can
17    you tell me what the design refers to in that
18    sentence?
19      THE WITNESS: The designer, did you say?
20      MR. RUSSELL: No, the design. It says,
21    "The design."
22      THE WITNESS: Shall review the design?
23      MR. RUSSELL: The design.
24 A. Well, when whoever was going to be selected for this

Page 71

1     project, whatever design they would come up with,
2     they're to review it with myself and the people
3     housed at this facility.
4  Q. So, it must mean the designer's proposed design.
5     This is something that the selected designer was
6     going to prepare. That's what the word "design"
7     refers to?
8  A. The designer means whoever is going to be selected
9     for this project will review his design in its
10    working stage with the building user, meaning the
11    Department of Public Works.
12 Q. On page 3 there's kind of a bullet list of items and
13    then there's a sentence that says, "No construction
14    administrative services are to be included in this
15    proposal and will be considered at a later date."
16 A. Yes.
17 Q. Can you tell me what that language is intended to
18    convey?
19 A. It's to include services during the construction
20    phase of the project.
21 Q. Now, when it says, "considered at a later date," what
22    exactly did that mean?
23 A. Well, it means that when the Town goes for an
24    appropriation for the final project, "X" amount of

Page 72

1     dollars, "X" millions, that is the time we would put
2     in the construction administration services; that's
3     usually the way projects are usually handled.
4  Q. And the designer would expect that the designer would
5     perform construction administration services?
6  A. That would be the intent, yes.
7  Q. The same designer?
8  A. The same designer.
9  Q. I don't have any more questions about this document
10    right now. I'm going to refer back to it in a
11    minute; so, if you want to keep it separate, it might
12    help.
13      (EXHIBIT 13 MARKED FOR IDENTIFICATION)
14 Q. Mr. Owen, Exhibit 13 is a photograph. Can you tell
15    me if you have an understanding of what's reflected
16    in that photograph?
17 A. (Witness perusing document) Well, it's the exterior
18    of one side of our facility; mainly, the mechanics
19    area and garage area to the back.
20 Q. And to the far right, does this depict, not well, but
21    to some extent, the concrete block structure of the
22    building?
23 A. Yes.
24 Q. That's really all I'm trying to get at. This would

Page 73

1     carry all the way through, it just hasn't reproduced,
2     well, in a sense?
3  A. Yes.
4  Q. And it also reflects there's no picture above the
5     building. This would be consistent with the
6     description you gave earlier?
7  A. Right. Yes.
8       (EXHIBIT 14 MARKED FOR IDENTIFICATION)
9  Q. Mr. Owen, the court reporter has marked as Exhibit 14
10    a document entitled, "Town of Stoughton,
11    Massachusetts, Request for Proposals, Architectural
12    Design," and I'd like to ask you if that looks
13    familiar to you?
14 A. (Witness perusing document) I believe it does.
15 Q. And how does that look familiar to you?
16 A. It's probably one of the communities that responded
17    to my request to give me some information on their
18    format for proposals.
19 Q. Do you recall whether you relied heavily on any one
20    of those documents than any other?
21 A. No, I don't recall.
22 Q. This looks familiar to you, however, this document?
23 A. Yes.
24 Q. I'd like to direct your attention to the third page

Page 74

1    under paragraph 6, Scope of Services.
2  A. Uh-huh.
3  Q. There's language that says, "Review the facility
4    needs program previously completed and obtain a
5    working knowledge of the facility needs of the Police
6    Department."
7  A. Uh-huh.
8  Q. Did you borrow language from exhibit -- excuse me,
9    borrow language from Exhibit Number 14 for use in
10   Exhibit Number 12?
11 A. Possibly.
12 Q. It would be on what's numbered page 2, it would be
13   the last full paragraph above the first bullet. It's
14   numbered 2 on the bottom?
15 A. The language is similar, but presented in a different
16   format.
17 Q. You think it's from this document that's been marked
18   Exhibit 14?
19 A. I don't recall if it's from this one or others, or
20   something that I developed on my own.
21 Q. Some of the language -- you'll agree with me that
22   some of the language is almost identical?
23 A. Some of the language is close. I won't say
24   identical.

Page 75

1  Q. That's all I have about that. Mr. Owen, I have some
2    plans that I'd like to show you and I'll explain to
3    you what I have. I have a set of four drawings
4    numbered 1, 2, 3, and 4. They're on paper that is 11
5    by 17 and each of them contains a Noah Greenberg
6    Associates Architects block, title block. What I
7    also have is a color version of Drawing Number 4, and
8    then I have, what I will represent to you are, the
9    same four black and white documents. The only reason
10   I presented these is because these have GF numbers on
11   them, which in your Answers to Interrogatories, you
12   indicated were the documents that were attached to
13   Exhibit Number 12. Are you with me so far?
14 A. GF is for Gannett Fleming.
15 Q. Your Answers to Interrogatories, which are in there
16   somewhere, Number 3, it says, "Describe fully all
17   attachments to the May 30, 2001 Request for
18   Qualifications for Architectural Design Services to
19   which reference is made in paragraph 2 of Affidavit
20   of William B. Owen attached to the Defendant Town of
21   Falmouth's Motion for Summary Judgment on Plaintiff's
22   Claims. Identify specifically any attachments
23   prepared by the plaintiff and/or reflecting the
24   plaintiff's name or the name Noah Greenberg

Page 76

1    Associates." Response Number 3, "GF-00254-257." So,
2    that's why those are here. I will represent to you
3    that this set is the same as this set for purposes of
4    this deposition. I'd like to mark this set as an
5    exhibit, but you can refer to whatever you'd like to
6    refer to in answering a couple of questions that I
7    would have about the plans. Is that fair?
8  A. Okay.
9  Q. I'm just going to take this back and give this to the
10   court reporter so she can mark them. We'll mark
11   these 15-A, B, C, and D.
12       (EXHIBIT 15-A, 15-B, 15-C, AND 15-D MARKED
13       FOR IDENTIFICATION)
14       (LUNCH BREAK FROM 12:45 TO 1:15 P.M.)
15 Q. Mr. Owen, we've marked four of the plans, the plans
16   numbered 1, 2, 3, and 4 as Exhibits 15-A, 15-B, 15-C,
17   and 15-D and I have a couple of questions about those
18   plans. My first question is, do those appear to be
19   the plans that were attached to Exhibit Number 12?
20 A. Yes.
21 Q. And Exhibit Number 12 is the Request for
22   Qualifications for Architectural Design Services from
23   May 2001?
24 A. Yes.

Page 77

1  Q. I'd like to ask you about Drawing Number 4, which is
2    this one, the color one. I just ask you, if looking
3    at that, whether you can tell what the construction
4    materials are of the facade of the proposed
5    building?
6  A. It appears to be brick.
7  Q. Can you tell what the roof materials are?
8  A. Metal, green metal.
9  Q. And there's an area here. There's a middle drawing,
10   and in the middle of the middle drawing there are
11   three bays and the middle bay of the three bays is
12   drawn as open with apparently a car, an automobile
13   in the bay. Do you see that area that I'm pointing
14   to?
15 A. Yes.
16 Q. And I've described it fairly accurately, have I not?
17 A. Yes.
18 Q. Would this be the same area that is reflected on the
19   photograph that's been marked as Exhibit Number 13?
20     MR. BARKER: Objection.
21 A. Approximately. I'd say approximately. The
22   photograph depicts these two doors here. The one
23   that's open and the one to the left.
24 Q. There's not three doors in the photograph?

Page 78

1   A. This -- these doors are the proposed addition by
2      Noah Greenberg.
3   Q. The photograph only has two bays in it?
4   A. No, there's another door here.
5   Q. So, this is not a bay right here?
6   A. That's a bay. This is a bay.
7   Q. What's this over here?
8   A. That's the existing parking garage.
9   Q. Is that a doorway to the parking garage?
10  A. Yes.
11  Q. And that's the smaller open area to the far left of
12     the building that's reflected here?
13  A. Yes.
14  Q. You've identified that to the left of this area on
15     Mr. Greenberg's plan his proposed addition; is that
16     accurate?
17  A. Yes.
18  Q. And on the bottom of this proposed addition there's
19     an area that's not red, but it's white. Do you see
20     that?
21  A. Yes.
22  Q. Do you have an understanding of what that reflects?
23  A. Most likely it's concrete, poured concrete.
24  Q. And that would be the white area that we're talking

Page 79

1      about?
2   A. Right.
3   Q. Now, when Mr. Greenberg was preparing this design,
4      was he instructed that the facade should be made
5      brick?
6   A. I don't recall whether he was instructed or not.
7   Q. Was he instructed that the roof should be metal?
8   A. Yes.
9   Q. Was he instructed that the additions should be
10     constructed with a poured concrete footing?
11  A. No.
12  Q. That's not a footing. What would you characterize
13     that as, a short wall?
14  A. Yeah.
15  Q. So, my question to express it correctly, was he
16     instructed that the addition should be constructed
17     with a short concrete wall?
18  A. No.
19  Q. Was there any particular reason why he was instructed
20     to use a metal roof?
21  A. That was my idea to use metal roof, color green.
22  Q. Even the color?
23  A. Yes.
24  Q. Why was that?

Page 80

1   A. I liked it.
2   Q. On Drawing Number 1 that's been marked as Exhibit
3      15-A, do you recognize an area to the left that's
4      indicated with hatch marks, to the far left that's
5      indicated with hatch marks that appears to be a
6      drive-through garage area?
7   A. Yes.
8   Q. By looking at the plan, can you tell the square
9      footage of that garage area?
10  A. Not offhand.
11  Q. There's a number. If you can read it, if that helps
12     you. The dimensions are there. I have a calculator
13     if you want to calculate it based on the dimensions.
14  A. It looks like 25,000 plus square feet --
15  Q. I have a calculator.
16  A. -- for the main garage.
17         MR. SKRIP: I object just to the extent
18     these aren't his plans. These are your client's
19     plan.
20         MR. RUSSELL: I understand.
21  Q. Do you have an ability to interpret these plans given
22     your education and your experience?
23         MR. BARKER: Objection.
24  A. Well, the dimensions are 170 on one and about 158 on

Page 81

1      the other.
2   Q. These both say 75?
3   A. It looks like 79 -- it could be, yeah, 75. I believe
4      you're right. So, the dimension of that garage area
5      would be 170 by 150.
6   Q. And there's a smaller garage area next to that?
7   A. There's a small addition to the existing garage area,
8      yes.
9   Q. Can you get an idea of what the square footage of
10     that is?
11  A. It's hard to read. It looks like it's 4,000 plus
12     square feet. 71 by 52 foot.
13  Q. It looks like 3,700 to me. Can we do the math?
14     3,692, 3,700?
15  A. 3,692 square feet.
16  Q. And the other one, the 170 by 150 comes out to 2,500,
17     can we agree on that, 2505?
18  A. Yes.
19  Q. You agree with me on that?
20  A. Yes.
21  Q. And that's what's reflected on the plan?
22  A. Pardon me?
23  Q. And that is what is reflected on that plan, Number 1?
24  A. Yes.

Page 82

1     MR. SKRIP: I'll just note again my
2  objection to asking Bill to interpret documents, and
3  that objection will run through this entire line of
4  questioning, but ask as much as you like.
5  Q. When you received these plans -- you did receive them
6     at some point?
7  A. Right.
8  Q. Were you capable -- let me ask you this: What were
9     the dimensions of the plans that you received?
10 A. The dimensions that are on here.
11 Q. Of the paper that the plans were drawn on, what were
12    the dimensions? What was the paper size? Was it
13    bigger than that?
14 A. No, I don't believe they were the same.
15 Q. 11 by 17?
16 A. Yes.
17 Q. When you received those, did you consider that you
18    were capable of figuring out some of the square
19    footage areas that were reflected on the plans?
20 A. Yes.
21 Q. And you could do that a couple of ways, by looking at
22    the square footage areas that are indicated on the
23    plans; is that right?
24 A. Yes.

Page 83

1  Q. And you could also confirm those numbers by actually
2     performing the calculations?
3  A. Yes.
4  Q. That would be reflected by the dimensions that are
5     indicated on the plans?
6  A. Yes.
7  Q. And to the right of the plan, there's a parking area
8     and then there's another area with hatch marks?
9  A. Yes.
10 Q. Do you see those?
11 A. Yes.
12 Q. Do you see where it indicates, "new building 4,800
13    square feet"?
14 A. Yes.
15 Q. Actually, now, I'd like to direct your attention to
16    Drawing Number 2, which has been marked as Exhibit
17    15-B, and this reflects the 4,800 square feet that we
18    were just referring to. Would you agree with that?
19 A. The 4,800 square feet, I believe, is included in part
20    of the existing building, which are these two areas.
21 Q. The plan marked Number 2 does reflect, however, the
22    area on Plan Number 1 that is indicated with hatch
23    marks and identified as consisting of 4,800 square
24    feet; is that correct?

Page 84

1  A. Yes.
2  Q. Do you see on Drawing 2 an indication -- this is
3     harder to read -- existing structure, existing
4     one-story building to be removed?
5  A. Yes.
6  Q. Do you see that there?
7  A. Yes.
8        (EXHIBIT 16 MARKED FOR IDENTIFICATION)
9  Q. Mr. Owen, the court reporter has marked as Exhibit 16
10    a letter on Noah Greenberg Associates Architects
11    letterhead dated February 7, 2000 under the signature
12    of Noah Greenberg and addressed to Mr. Bill Owen.
13    I'd ask you to look at that and let me know if you're
14    familiar with that?
15 A. (Witness perusing document) Yes, I'm familiar with
16    it.
17 Q. How are you familiar with it?
18 A. Well, he delivered to me these drawings marked
19    Exhibits 15-A, B, C, and D.
20 Q. And so, you received this letter with the drawings;
21    is that accurate?
22 A. Yes.
23 Q. Did this letter to your recollection follow a
24    conversation with Mr. Greenberg?

Page 85

1  A. Probably. I believe I did have a conversation with
2     him, but I can't recall exactly when.
3  Q. You can't recall exactly?
4  A. What date.
5  Q. Do you recall the substance of the conversation?
6  A. Well, I think I requested what he delivered to me.
7  Q. Do you recall why you would have requested that he
8     deliver those plans to you?
9  A. I can't recall why.
10 Q. The second sentence of the letter says, "I hope these
11    drawings, along with the color rendering that I just
12    prepared, will be of help to you in your quest for
13    funding for the project." Do you recall discussing
14    funding with Mr. Greenberg?
15 A. No, I don't recall discussing funding.
16 Q. Did you intend to use the plans for the purpose of
17    obtaining funding for the project?
18 A. I believe I did with the Board of Selectmen.
19 Q. Can you give me more detail on how you were going to
20    use the plans and what your intent was?
21 A. Well, the intent was to show the Board what our
22    proposed addition would consist of and look like.
23 Q. And for the most part, these were the same plans that
24    had been presented to the Selectmen some years

Page 86

1  before?
2  A. That's correct.
3  Q. Is it safe that the difference in the two sets of
4     plans that were presented are probably the color
5     drawings?
6  A. Yes.
7  Q. And if your intent was to use these drawings for
8     funding and Mr. Greenberg wrote to you and said that
9     I hope these drawings along with the color drawings
10    are helpful in seeking funding, do you think you
11    might have discussed with him that you were going to
12    use the plans for funding?
13 A. I don't recall discussing that with him.
14 Q. The second paragraph says, "There is no charge for
15    these drawings, but I expect to hear from you
16    when the project is finally funded as we know it must
17    be in the near future." Did you have an
18    understanding of what Mr. Greenberg meant by that
19    language?
20 A. No, I do not.
21    MR. BARKER: Objection.
22 Q. Did you respond to this letter in any way?
23    THE WITNESS: Did I respond to it?
24    MR. RUSSELL: Yes.

Page 87

1  A. I don't recall if I did or not. I don't believe I
2     did.
3  Q. Did you think it had any meaning at all?
4  A. Not really.
5     (EXHIBIT 17 MARKED FOR IDENTIFICATION)
6  Q. Mr. Owen, Exhibit 12, which is the Request for
7     Qualifications, you don't have to look at it right
8     now, but you're welcome to. On the third page it
9     states, "There will be a pre-proposal meeting held on
10    Tuesday, June 5, 2001 at 10:00 a.m." And my question
11    is, do you remember if there actually was a
12    pre-proposal meeting held on Tuesday, June 5, 2001?
13    I apologize if I went into that question before you
14    had the document in front of you.
15 A. Yes. I'm sure there was a pre-proposal meeting
16    held.
17 Q. Do you know who was present representing the Town at
18    this meeting?
19 A. Well, it was myself, Ron Neilson, and John Lyons were
20    highway supervisors.
21 Q. Now, are you looking at any document in answering
22    that question?
23 A. Yes. I'm looking at a Gannett Fleming document.
24 Q. And that document's been marked Exhibit 17?

Page 88

1  A. Yes.
2  Q. Does that refresh your recollection of who was
3     present representing the Town at that meeting?
4  A. Myself, Ron Neilson, and John Lyons.
5  Q. Did you remember that without looking at the
6     document, or did the document --
7  A. No. I don't recall who was present, or even the
8     date, when the meeting was held, other than what I
9     see in front of me.
10 Q. Do you have any understanding of who created this
11    document?
12 A. No, I don't.
13 Q. Have you seen it before?
14 A. No, I don't believe I have.
15 Q. But so far, you're comfortable in indicating that it
16    helps you to recall who was present at a pre-proposal
17    meeting that was identified on the Request for
18    Qualifications that we've marked as Exhibit 12?
19 A. Yes.
20 Q. I don't know who prepared these, either, but I'm
21    going to ask you some questions about what's on these
22    notes and see if you can help me understand what
23    might have taken place at this meeting. Was there
24    one person in charge of the presentation on behalf of

Page 89

1     the Town?
2  A. I can't recall. It might have been myself.
3     Obviously, it was me because I called the meeting.
4  Q. Were you the person most knowledgeable about the
5     project and the Town's intents with respect to the
6     project?
7  A. I would say at the time, yes.
8  Q. And on the first page, after identifying Mr. --
9     is it Neilson? Is that what you said?
10 A. Neilson.
11 Q. Mr. Neilson and Mr. Lyons, there's an indication that
12    says, "Preliminary plans were completed"?
13 A. Yes.
14 Q. Do you see that?
15 A. Yes.
16 Q. Do you remember providing information at this meeting
17    that preliminary plans had been completed?
18 A. We didn't -- I don't recall we provided preliminary
19    plans at this meeting.
20 Q. Do you recall discussing that preliminary plans had
21    been completed?
22 A. If the notes say so. I guess it was discussed, but I
23    don't recall. I didn't take these notes.
24 Q. I understand that. And I would prefer that you don't

Page 90

```
 1      adopt the notes if they're not consistent with your
 2      recollection. So, you don't recall whether you made
 3      the comment that preliminary plans were completed for
 4      the project?
 5  A.  No, I don't.
 6  Q.  On the second page there's a line, I'll point it out
 7      to you, it says, "Want to demolish low area in front,
 8      then build." Do you have a recollection of making a
 9      comment that the Town wanted to demolish some part of
10      this existing structure?
11  A.  I don't recall making that comment, demolish. The
12      Town's intent was to demolish that area referred to
13      here, though.
14  Q.  What area is that? Is that the same area we
15      discussed on one of the exhibits marked as 15?
16  A.  Yes.
17  Q.  And it's your recollection that that was the intent
18      at the time?
19  A.  At the time, yes.
20  Q.  Do you know why the Town decided to demolish part of
21      the structure?
22  A.  At that time this structure that is being referred to
23      demolish, it had some very severe cracking in the
24      exterior walls.
```

Page 91

```
 1  Q.  And Mr. Greenberg's plan indicates that that part of
 2      the structure would be removed?
 3  A.  Correct.
 4  Q.  Was he instructed to include that in his plans?
 5  A.  I believe he was.
 6  Q.  Because earlier I asked you about the brick facade,
 7      and about the green metal roof, and about the poured
 8      concrete wall, and you indicated some of those he was
 9      instructed to do and some of those he wasn't. You
10      think he was instructed to demolish the building --
11  A.  I believe he was.
12  Q.  -- as part of the plans, okay. Above that line that
13      we were just referring to, it says, "Improve front
14      facade with gable/hip-type roof." Do you recall at
15      that meeting that somebody from the Town indicated
16      that the Town desired that the facade be improved
17      with a gable/hip-type roof?
18  A.  Yes.
19  Q.  You recall that?
20  A.  Yes.
21  Q.  What do you recall about that?
22  A.  Gable. I wanted to improve the exterior of the
23      building as you view it from Gifford Street and take
24      away the flat '60s look.
```

Page 92

```
 1  Q.  Can you describe a gable/hip-type roof?
 2  A.  Well, it's a sloped roof. If you know what a hip
 3      roof is, it's a hip roof. It's a sloped roof that
 4      comes up from all three or four corners.
 5  Q.  So, instead of kind of having two sides, it would
 6      have more than two sides; is that accurate?
 7  A.  Yes.
 8  Q.  You're sure?
 9  A.  I think I am.
10  Q.  There's an item down at the bottom that says,
11      "Estimated construction cost 2.3 million." Do you
12      remember discussing the estimated construction cost
13      at this meeting?
14  A.  I probably did discuss it, but I can't recall.
15  Q.  And if you discussed it, do you have an idea of where
16      you would have obtained an estimated construction
17      cost from?
18  A.  Well, the 2.3 million came from Greenberg's previous
19      cost estimate, preliminary cost estimate.
20  Q.  After that it says, "New estimate is required." Do
21      you remember making that type of comment or anybody
22      representing the Town making that type of comment at
23      this meeting?
24  A.  I don't recall making it, but with the difference in
```

Page 93

```
 1      time frame, it's obvious that the cost is going to go
 2      up.
 3  Q.  Why is that?
 4  A.  Increasing construction materials and labor.
 5  Q.  On the next page, the first line says, "Would like
 6      'some' new ideas, but not too much different than
 7      current designs." Do you see that? It would be at
 8      the very top. And if yours have GF numbers on it, it
 9      would be GF 263.
10  A.  Okay, I see it.
11  Q.  Do you recall someone from the Town making a
12      statement to that effect?
13  A.  I don't recall. I'm not saying it wasn't made,
14      though, but we were looking for new ideas from other
15      architects, too.
16  Q.  What about the rest of the line that says, "but not
17      too much different than current designs." Did you
18      want to also remain true to the current design?
19          MR. BARKER: Objection.
20  A.  That was to basically keep the offices in the front
21      and the parking in the rear, the concept.
22  Q.  And your earlier testimony was that was pretty much
23      the way it had to be laid out on the site; is that
24      correct?
```

Page 94

1  A. That's correct.
2     (EXHIBIT 18 MARKED FOR IDENTIFICATION)
3  Q. Mr. Owen, the court reporter has marked the next
4    document as Exhibit 18 and it is a letter on Noah
5    Greenberg Associates Architects letterhead dated
6    June 18, 2001 under the signature of Noah Greenberg
7    and addressed to Mr. William B. Owen. I'd ask you to
8    take a look at that and let me know if you're
9    familiar with that?
10  A. (Witness perusing document) Yes.
11  Q. How are you familiar with this document?
12  A. How am I familiar with it? Well, I received it from
13    Mr. Greenberg.
14  Q. What did you do with the letter, if anything, after
15    you received it?
16  A. I don't recall I did anything with it.
17  Q. You didn't turn it over to any other Town personnel,
18    to your recollection?
19  A. No, because a copy went to the Town Manager's office.
20  Q. Did you speak to Mr. Greenberg about this letter?
21  A. I can't recall if I did or not.
22  Q. Did you let anybody else know about the contents of
23    this letter, including other architects that
24    expressed an interest in working on this job?

Page 95

1  A. No. It was not distributed to other architects.
2  Q. Did you make other architects aware that
3    Mr. Greenberg had expressed dissatisfaction that his
4    plans had been attached to the Town's Request for
5    Qualifications?
6  A. No, I don't recall that I did.
7     (EXHIBIT 19 MARKED FOR IDENTIFICATION)
8  Q. Mr. Owen, I presented to you what's been marked as
9    Exhibit Number 19, and this is a letter on the
10    stationery of the Town of Falmouth under the
11    signature of Heather Harper, Assistant Town Manager.
12    Excuse me, Assistant Town Administrator. I would ask
13    you if you're familiar with that document?
14  A. (Witness perusing document) I have seen it.
15  Q. And you're indicated under the notation cc, William
16    B. Owen, Director of Public Works?
17  A. Yes.
18  Q. Do you believe you received a carbon copy of this
19    letter?
20  A. Yes.
21  Q. Did you participate in drafting this letter?
22  A. No, I did not.
23  Q. Were you asked to approve the letter before?
24  A. No, I did not.

Page 96

1  Q. Were you asked to comment on the letter?
2  A. No, I did not.
3  Q. As you look at the letter today, do you notice
4    anything about the letter that might be inaccurate?
5     THE WITNESS: That might be inaccurate?
6     MR. RUSSELL: Yes, you're here representing
7    the Town today.
8  A. I don't see anything inaccurate in this letter.
9  Q. After you received the carbon copy, did you comment
10    to anybody on the letter?
11  A. No, I did not.
12  Q. Did you take any action at all in response to
13    receiving the carbon copy?
14  A. No, I did not.
15     (EXHIBIT 20 MARKED FOR IDENTIFICATION)
16  Q. Mr. Owen, marked as Deposition Exhibit 20 is a
17    document on Department of Public Works letterhead
18    dated January 11, 2002 under the signature of William
19    B. Owen. I would ask you if you're familiar with
20    that document?
21  A. (Witness perusing document) Yes, I am.
22  Q. How are you familiar with it?
23  A. We had -- or, I should say, the Town short-listed
24    architectural firms following our review of the

Page 97

1    Request for Qualifications. I think we short-listed
2    it to three firms, but I'm not positive, and at that
3    point we asked each firm for a cost proposal.
4  Q. The third paragraph says, "I apologize for the delay
5    in getting this project started, but I feel we are
6    now in a position to get it moving more rapidly."
7    Was there some delay in proceeding with this project
8    that was unanticipated?
9  A. I think the delay was in getting the funding for
10    design services.
11  Q. What delay was encountered in obtaining funding for
12    design services?
13  A. Well, it has to go to a Town meeting.
14  Q. Well, did you expect to have it by a certain date and
15    it didn't happen that way?
16  A. I can't recall exactly when we received the funding
17    for design, but probably at the fall of 2001 Town
18    meeting.
19  Q. And the letter says, "I feel we are now in a position
20    to get moving more rapidly." Other than having
21    funding approved, was there any other reason why the
22    project was in a position to proceed more rapidly?
23  A. No, I don't recall.
24  Q. I don't want to put words in your mouth. I mean, if