Page 98

1  it was because of funding, then that's the answer,
2  but if there was some other reason, I'd like to
3  know that as well. And if there isn't, that's fine,
4  too.
5  A. Well, once you have funding, I like to get the job
6  started and that was -- our intent was to move
7  forward.
8       (EXHIBIT 21 MARKED FOR IDENTIFICATION)
9  Q. Mr. Owen, the court reporter has marked a 14-page
10    document as Exhibit 21 and the document is titled,
11    "Gannett Fleming Engineers and Architects, P.C.," and
12    then contact information, and then the title,
13    "Agreement for Architectural Design Services."
14 A. Yes.
15 Q. And I'd like to ask you if you're familiar with that
16    document?
17 A. (Witness perusing document) Yes, I am.
18 Q. How are you familiar with it?
19 A. Well, it's the contract between the Town and Gannett
20    Fleming.
21 Q. On the first page, near the top, there are the
22    handwritten initials WBO, do you see those?
23 A. Yes.
24 Q. Are those your initials?

Page 99

1  A. Yes, it is.
2  Q. Did you write that?
3  A. Yes.
4  Q. And that's indicating that the date of the agreement
5     actually occurred in March, not February; is that
6     correct?
7  A. That's correct.
8  Q. Did you -- well, strike that. The first page of
9     this document apparently bears the signature of
10    Robert L. Whritenour, Jr., Town Administrator, do you
11    see that?
12 A. Yes.
13 Q. Is it your understanding that this document was in
14    fact signed by Mr. Whritenour?
15 A. Yes.
16 Q. Did you have any participation in preparing this
17    document? Let me state that again. Did you in any
18    way participate in preparing this document?
19 A. No.
20 Q. Did you review this document?
21 A. I reviewed it.
22 Q. Did you review it before Mr. Whritenour put his
23    signature to it?
24 A. Yes.

Page 100

1  Q. And what was the purpose of your review?
2  A. To see if it complied with our request for services.
3  Q. And what was the result of that review?
4  A. They met what we were looking for and I recommended
5     Mr. Whritenour to sign it.
6  Q. Was there any particular part of the agreement that
7     you reviewed? Did you focus your review on anything
8     in particular, or did you review the entire document?
9  A. No. I reviewed the entire document, particularly the
10    cost.
11 Q. And did you suggest any changes to the document?
12 A. No, I did not.
13 Q. And after you reviewed it --
14 A. Other than the date that was mentioned earlier, which
15    I made.
16 Q. And you indicated that your review, the conclusion of
17    your review was that the document reflected the
18    Town's understanding about how the project should
19    proceed; is that accurate?
20 A. Yes.
21 Q. I'd like to ask you to turn to page S-1 of this
22    document.
23       THE WITNESS: Page?
24       MR. RUSSELL: S-1.

Page 101

1        THE WITNESS: Frank?
2        MR. RUSSELL: Sam.
3  A. Okay.
4  Q. That page starts with Scope of Services?
5  A. Yes.
6  Q. And identifies Task 1, Review of Existing
7     Information?
8  A. Yes.
9  Q. And I'm going to go over this with you. This Task 1,
10    I'll read sentence by sentence. The first sentence
11    reads, "Review existing preliminary plans prepared
12    for the Falmouth DPW in 1994 to understand the DPW's
13    intent regarding the objectives of the project." My
14    question about that sentence is the preliminary plans
15    that this sentence refers to. Do those refer to
16    Mr. Greenberg's plans that we've identified in this
17    deposition?
18 A. Yes.
19 Q. Do they refer to any other plans?
20 A. I'm not sure if they referred to our existing plans
21    of the facility or not.
22 Q. Well, would those have been prepared in 1994?
23 A. Yes.
24 Q. The facility plans would have been prepared in 1994?

Page 102

1   A.  No, they were prepared in '67.
2   Q.  So, the 1994 plans most likely refer strictly to
3       Mr. Greenberg's plans?
4   A.  I would say yes.
5   Q.  And the next sentence says, "Meet with DPW staff to
6       determine current needs of the facility."
7   A.  Yes.
8   Q.  The third sentence says, "Evaluate the preliminary
9       design to determine if the existing preliminary plans
10      meet the current needs of the DPW and prepare
11      recommended modifications to the preliminary plans."
12  A.  Yes.
13  Q.  And the concluding words of that sentence, "The
14      preliminary plans," do those refer to the same
15      preliminary plans identified in the first sentence?
16  A.  Yes.
17  Q.  The next sentence says, "Prepare an initial
18      construction cost estimate of the proposed work,
19      including recommended modifications." Do those
20      recommended modifications refer to the plans that are
21      identified in the first sentence?
22          MR. BARKER: Objection.
23  A.  The modifications would refer to Gannett Fleming's
24      proposed work.

Page 103

1   Q.  Let's go back to the sentence before that, "Evaluate
2       the preliminary design to determine if the existing
3       preliminary plans meet the current needs of the DPW
4       and prepare recommended modifications to the
5       preliminary plans." And you've indicated that those
6       preliminary plans are Mr. Greenberg's plans; is that
7       correct?
8   A.  They're Mr. Greenberg's plans.
9   Q.  And the next sentence uses the same words,
10      "recommended modifications," the last two words of
11      the next sentence are, "recommended modifications,"
12      do you see that?
13  A.  Yes.
14  Q.  So, that entire sentence reads, "Prepare an initial
15      construction cost estimate of the proposed work,
16      including recommended modifications." Is it your
17      understanding that recommended modifications refers
18      to something different than the modifications
19      identified in the proceeding sentence?
20          MR. BARKER: Objection.
21  A.  No. The modifications in the two sentences are the
22      same. The modifications would be to Mr. Greenberg's
23      plans, the modifications made by Gannett Fleming.
24  Q.  I understand. "Review the recommended modifications

Page 104

1       to the preliminary plans and the initial construction
2       cost estimate with the DPW for compatibility with the
3       DPW needs and objectives." The next sentence,
4       "Obtain DPW concurrence with the recommended changes
5       to the preliminary plan." And again, we're talking
6       about recommended changes to Mr. Greenberg's plans;
7       is that correct?
8   A.  Correct.
9   Q.  The last sentence says, "Modify the preliminary plan
10      to incorporate the modifications accepted by the
11      DPW." And in that sentence we're talking about
12      modifying Mr. Greenberg's preliminary plans; is that
13      correct?
14  A.  Correct.
15  Q.  I'd like to go to Task 3, "Design Specifications and
16      Cost Estimates," item 3.1, are you with me?
17  A.  Yes.
18  Q.  "Prepare plans, specifications, and cost estimates
19      for the following elements of the project," then
20      there's a bullet. "Design of a 29,000 plus or minus
21      square foot pre-engineered metal building structure
22      with a concrete knee wall up to 4 feet high around
23      perimeter of building." Will you agree with me that
24      Mr. Greenberg's plans included design of a 29,000

Page 105

1       plus or minus square foot metal building structure
2       with a concrete knee wall up to 4 feet high around
3       the perimeter of the building?
4           MR. BARKER: Objection.
5   A.  I won't agree that Mr. Greenberg's indicated a
6       pre-engineered metal building.
7   Q.  Will you agree with the remainder of that? And I'll
8       restate it. That his plans reflect a 29,000 plus or
9       minus square foot structure with a concrete knee wall
10      up to 4 feet high around the perimeter of the
11      building?
12          MR. BARKER: Objection.
13  A.  Square footage is approximate.
14  Q.  And that's what we went over earlier when we did the
15      25,500 square feet and the 3,700 square feet; is that
16      your understanding?
17  A.  That's correct.
18  Q.  The next bullet, "Design of a new 3,000 plus or
19      minus square foot addition to the existing building
20      for offices, a lunch room, administration area toilet
21      facilities, and reception area." I'm going to ask
22      you about that. What I would like to ask you about
23      that is, when this document was signed by
24      Mr. Whritenour, was it the Town's understanding that

Page 106

```
 1      3,000 square feet would be sufficient to meet its
 2      space needs for these items for offices, for a lunch
 3      room, and administration area toilet facilities, and
 4      a reception area?
 5   A. I won't say the square footage is exact. I believe
 6      the square footages came from previous documents of
 7      Mr. Greenberg's; and that's the best available
 8      information we had at the time.
 9   Q. So, that item came from a review, or resulted from a
10      review of Mr. Greenberg's plans?
11   A. The square footage did.
12   Q. The square footage?
13   A. That's the best information we had available because
14      we had no new design.
15   Q. However, your purpose in reviewing the document was
16      to make certain that the Town's objectives in the
17      project would be satisfied; is that correct?
18   A. Correct.
19   Q. And your conclusion was that the Town's objectives
20      would be satisfied with a 3,000 plus or minus square
21      foot addition for office and related spaces?
22         MR. BARKER: Objection.
23   A. I don't agree that 3,000 square feet was a cast in
24      concrete square foot figure at this point.
```

Page 107

```
 1   Q. Well, it says plus or minus?
 2   A. It could be plus or minus 2 or 3,000 square feet,
 3      too.
 4   Q. And you didn't point that out to anybody after you
 5      reviewed this document to make sure that it was
 6      consistent with the Town's objectives?
 7         MR. BARKER: Objection.
 8         MR. RUSSELL: You can answer.
 9   A. I didn't point it out, no.
10   Q. And Mr. Greenberg's plans included all of these items
11      in this bullet point, offices, a lunch room,
12      administration area toilet facilities, and reception
13      area?
14         THE WITNESS: Did his plans include these
15      items?
16         MR. RUSSELL: Yes.
17   A. To a certain extent they did, but they were changed
18      when we got into actual design. He mentions lunch
19      room; we ended up with two lunch rooms. The
20      reception area changed immensely. The toilet
21      facilities changed. The existing building that was
22      going to be demolished, we decided not to demolish,
23      because if you did, it kicks in the earthquake code
24      for existing buildings which is very, very
```

Page 108

```
 1      expensive. So, we decided to leave that existing
 2      building that's crosshatched in Mr. Greenberg's plans
 3      and not touch it.
 4   Q. My question was, did Mr. Greenberg's plans reflect
 5      all of these items, offices, lunch room,
 6      administration area toilet facilities, and reception
 7      area?
 8   A. They reflected some.
 9   Q. Well, you indicated that there was a reception area,
10      and that changed. You indicated that there was a
11      lunch room, and that changed. Were there offices
12      reflected in these plans?
13   A. The basic four offices were in the plan. We added
14      conference rooms in the Gannett Fleming plan, which
15      were not in Mr. Greenberg's plan.
16   Q. You added those to his plans?
17         MR. BARKER: Objection.
18   A. Pardon?
19   Q. You added those to his plans? You said you added the
20      things that weren't in his plans?
21   A. Yes.
22   Q. You added them to his plans?
23         MR. BARKER: Objection.
24         MR. SKRIP: Objection.
```

Page 109

```
 1   A. They were added in the final design.
 2   Q. But the starting design was his design; is that
 3      correct?
 4         MR. BARKER: Objection.
 5   A. No, I wouldn't say that. The final design was
 6      Gannett Fleming's design.
 7   Q. Well, the original design was his design, I said.
 8   A. The original preliminary plan was Mr. Greenberg's.
 9   Q. And that's what we've been referring to in this Scope
10      of Services in this document?
11   A. Because that was the best available information.
12   Q. I didn't ask you why. I just asked you what it was.
13         MR. SKRIP: There's no question pending,
14      Bill. Don't answer a question that's not being
15      asked.
16   Q. Page S-3, do you have that?
17   A. Uh-huh.
18   Q. At the top, "Administration Building Addition," do
19      you see that?
20   A. Yes.
21   Q. The first bullet point, "Selective demolition of the
22      existing building at the main entrance." Is that
23      what you were just talking about?
24   A. Yes.
```

Page 110

1  Q. Mr. Greenberg's plans indicated that that should be
2     demolished?
3  A. Yes.
4  Q. And that was the remaining plan in this Scope of
5     Services and -- yes, in this Scope of Services?
6         MR. BARKER: What was the question?
7         MR. RUSSELL: Can you read that back?
8         (PENDING QUESTION READ BACK)
9  Q. Strike that. This selective demolition, you
10    indicated that ultimately you elected not to
11    proceed with the demolition because of the earthquake
12    code?
13 A. Yes.
14 Q. Do you have a better description of the earthquake
15    code? Is it title something, or section something,
16    or chapter something?
17 A. No, I don't. It's part of the State Building Code,
18    that's all I know.
19 Q. When was it decided -- well, as of the date of this
20    document, March 2002, it was still the intent to
21    demolish that part of the existing structure?
22 A. Yes.
23 Q. When did that intent change?
24 A. I think as more information became available from

Page 111

1     Gannett Fleming on what to do with that part of the
2     building.
3  Q. The third bullet point, "The design will be based on
4     an addition that is structurally isolated from the
5     existing building such that no part of the structural
6     system of the existing building is modified as a
7     result of the new construction." Do you know where
8     that language -- or the purpose behind that language?
9  A. I think at that time Gannett Fleming did not want to
10    attach either the front or the rear addition to the
11    existing building.
12 Q. Was that part of the earthquake code?
13 A. It could be, but I was not aware of the earthquake
14    code at this point.
15 Q. The next area that's identified for services to
16    be performed are building renovations, do you see
17    that?
18 A. Yes.
19 Q. The first bullet point, "Provide new
20    locker/shower/toilet facilities," and these
21    facilities would be in the existing building; is that
22    accurate?
23 A. No. They were to be in the new addition.
24 Q. It says, "Building renovations: The proposed

Page 112

1     building renovations shall consist of the following
2     elements," am I misreading that?
3  A. No.
4  Q. So, the first bullet point, "Provide new
5     locker/shower/toilet facilities," new
6     locker/shower/toilet facilities will be included in
7     existing building; is that accurate?
8  A. I would say.
9  Q. Do you recall that Mr. Greenberg's plans included
10    new locker/shower/toilet facilities in the existing
11    building?
12 A. Yes.
13    (EXHIBITS 22 AND 23 MARKED FOR IDENTIFICATION)
14 Q. Mr. Owen, I'm going to hand you two documents that
15    have been marked as Deposition Exhibits 22 and 23 and
16    I have two questions about these collective
17    documents, or one question about these collective
18    documents, which would be 21, 22, and 23, and then
19    one question about Document Number 22. One of the
20    reasons you were asked to come to this deposition, in
21    representation of the Town, was to indicate the
22    contractual relationship between the Town and Gannett
23    Fleming. And my question is, do those three
24    documents, Exhibits 21, 22, and 23, represent the

Page 113

1     contractual undertaking, to your knowledge? I
2     understand you're not a lawyer, but the contractual
3     undertaking between the Town and Gannett Fleming?
4  A. (Witness perusing document) Yes.
5  Q. Is there any additional written contractual terms
6     that are not included in those three exhibits, to
7     your knowledge?
8         MR. BARKER: Objection.
9  A. No.
10 Q. Are there any other contract terms at all between the
11    Town and Gannett Fleming that are not reflected in
12    those documents?
13        MR. BARKER: Objection.
14 A. Not at this date.
15 Q. And the only reason I ask is I want to make sure I
16    have all the documents. It's not a trick question
17    about, you know, whether they're contracts or not. I
18    just want to know if there are any other documents
19    that exist that define the scope of the undertaking
20    and your understand is there aren't?
21 A. To date.
22 Q. Are you anticipating additional contractual terms?
23 A. Possibly.
24 Q. And what would those be?

Page 114

1   A. Good question. I don't know what they'd be at this
2       point. There could be.
3   Q. You don't anticipate any at this time?
4   A. Not at this time.
5   Q. Mr. Owen, you just kind of perused them, you're
6       welcome to look at them as carefully as you'd like.
7       I don't want anybody to feel rushed, or you to do
8       anything other than what's going to allow you to be
9       satisfied with your answers. Number 22, I do have a
10      question about Number 22. There is a line in the
11      second paragraph that I would just like to indicate
12      to you, and I'll read it into the record, and then
13      I'll ask you about it. It would be on the first page
14      and it begins with, "These additional design
15      services," do you see that?
16  A. Yes.
17  Q. I'm going to read that into the record, "These
18      additional design services are associated with the
19      significant changes in the project including size,
20      quality, and complexity as originally specified in
21      Task 3 of the Scope of Services to address the Town's
22      program requirements." Do you have an understanding
23      about the increased size of this project as those
24      terms are used in this document?

Page 115

1   A. This is an amendment that came about after the
2       building was designed. So, obviously, it has changed
3       in size and scope. Amendment Number 1 are the
4       construction services cost.
5   Q. You think that that is a -- that size refers to the
6       size of the architect's undertaking, rather than the
7       actual size of the DPW maintenance facility project?
8   A. I think it refers to both.
9   Q. And in what way does it refer to the size of the
10      project?
11          THE WITNESS: By "size," you mean square
12      footage?
13          MR. RUSSELL: Well, I don't know. It's the
14      Town's contract. I'm trying to understand what it
15      means. I know you're not a lawyer and you can talk
16      to your attorney, or Mr. Skrip about this. If you
17      answered it enough, that's fine, too.
18  A. Well, one thing that did change significantly was
19      Greenberg's plans showed a significant amount of
20      columns in the garage parking area. I didn't want
21      any columns because sometimes we don't have very good
22      drivers.
23  Q. I understand. That's the reason for the concrete
24      wall as well?

Page 116

1   A. That's why we put up a four foot concrete wall. I
2       charged Gannett Fleming to come up with what's called
3       a taper truss design, which is a clear span in the
4       parking garage area.
5   Q. Is this the newly designed area or the existing
6       parking area?
7   A. No. This is the newly designed area.
8   Q. Can you think of anything else in this language
9       discussing significant changes in project including
10      size? Can you think of anything else that the word
11      "size" might be referring to in this document?
12          MR. BARKER: Objection.
13  A. Not offhand, no. There were reconfigurations of the
14      building, the original preliminary plans.
15  Q. I understand that. Wouldn't the original undertaking
16      to draw the design include to draw the design however
17      big it is without extra compensation to the
18      architect?
19  A. This is really not extra compensation.
20          MR. BARKER: Objection.
21  A. This is for the architect to oversee the project as
22      Amendment Number 1.
23  Q. You mentioned, when we looked at the Request for
24      Proposals, I think it's Exhibit 12, there's a

Page 117

1       paragraph in there that talks about construction
2       supervision services; is that accurate?
3   A. That's correct.
4   Q. And as you indicated, the architect would expect to
5       supervise the construction once the project was ready
6       to proceed to construction?
7   A. That's correct.
8   Q. And you indicate that that's typically the
9       construction process?
10  A. Yes.
11  Q. Does this document reflect that construction was
12      about to begin and they were being awarded the
13      construction supervision --
14  A. Yes.
15  Q. -- task and not much else than that, for lack of a
16      better question? I mean, I'm trying to understand
17      that that language has any meaning other than we're
18      ready to proceed with construction now. Do you
19      understand it to have any meaning other than we're
20      ready to proceed with construction now?
21          MR. BARKER: Objection.
22  A. That's my understanding.
23  Q. It's just the construction services award?
24  A. It's a construction services contract.

Page 118

1  Q. And that makes their undertaking bigger. Now, they
2     have to do more than just the design; now, they have
3     to do whatever this contract requires of them, that's
4     a bigger undertaking?
5  A. That's correct.
6        (EXHIBIT 24 MARKED FOR IDENTIFICATION)
7  Q. Mr. Owen, the court reporter has marked the next
8     document as Exhibit Number 24 and it's a handwritten
9     note. I'd like to ask you to review that and let me
10    know if you're familiar with it?
11 A. (Witness perusing document) Yes, I am.
12 Q. How are you familiar with it?
13 A. It's from George C., who is George Calise, the Town
14    Engineer, on the evaluation of the proposal for the
15    project.
16 Q. How would this document have come to your attention?
17 A. Well, there was a Review Committee and these were
18    George's comments to me.
19 Q. Who was involved in the Review Committee?
20 A. Well, it was Mr. Calise, myself, I believe the Town
21    Planner, and I think that was it. There was supposed
22    to be a member of the Public Buildings Committee, but
23    they bowed out.
24 Q. And you suspect you received this about the date of

Page 119

1     the document, February 4th, it must be, 2002?
2  A. Yes.
3  Q. Paragraph 2, "Prior to award the 'scope of work'
4     detailed by the consultants should be reviewed as to
5     understanding of requirements." Do you see that?
6  A. Uh-huh.
7  Q. Is that the review that you discussed previously that
8     you made of the contract?
9  A. I think what Mr. Calise is referring to is some of
10    the things we omitted from the contract, such as a
11    septic system.
12 Q. Was a septic system added to the contract?
13 A. Was it added to Gannett Fleming's contract? Yes.
14    They did design the septic system, a few septic
15    systems. It was excluded from our construction bid,
16    though.
17 Q. Is that in any of the contracts that we've looked at,
18    that they were compensated for doing that?
19 A. Yes.
20 Q. Was that in one of the contracts that we looked at?
21 A. I'm sure it was. Mr. Calise is just pointing out
22    that there may not be a need for a new septic system;
23    however, we found out there is.
24 Q. So, these comments were helpful to you as part of

Page 120

1     your review of the contract; is that accurately
2     put?
3  A. As part of the fee proposal, yes.
4  Q. Did anybody else for the Town review that document
5     before Mr. Whritenour signed it? Exhibit 21, I'm
6     referring to.
7  A. No.
8  Q. Nobody else reviewed it?
9  A. Probably the Town counsel did. I can't recall.
10 Q. Mr. Whritenour, did he review it or did he accept
11    your recommendation?
12 A. Most likely, he accepted my recommendation.
13       (EXHIBIT 25 MARKED FOR IDENTIFICATION)
14 Q. I had asked you about the columns that Mr. Greenberg
15    had in his plans and you indicated that you had a
16    suggestion for removing the columns; is that what you
17    said?
18 A. For eliminating them.
19 Q. Is that different than removing them? That's what
20    your testimony was.
21 A. No columns.
22 Q. I asked you what your testimony was; so, you know, if
23    that's what it was, I was wrong. And what was the
24    solution to eliminate them?

Page 121

1  A. Structurally, the solution was to provide a clear
2     span between walls by means of a tapered steel truss,
3     which is used frequently in bridges and in buildings.
4  Q. Is that something that also could work in office
5     space as well as garage space, or is it too
6     unsightly?
7  A. To work in any building design.
8  Q. There would have to be walls for these to be attached
9     to; is that accurate?
10 A. Eventually, yeah, at each end you need some support.
11 Q. How far can the support span, do you know?
12 A. Design it for what you want.
13 Q. Mr. Owen, I've presented you with what the court
14    reporter has marked for identification as Exhibit
15    Number 25 and this is a document on Gannett Fleming
16    stationery dated April 01, 2003 addressed to
17    Mr. William B. Owen, P.E. I'd like to ask you if
18    you're familiar with that document?
19 A. (Witness perusing document) Yes.
20 Q. Does your signature appear on that document?
21 A. Yes.
22 Q. Did you discuss this letter with anybody before you
23    signed it?
24 A. I can't recall. I don't believe I did.

Page 122

1  Q. Did you discuss it with anybody at Gannett Fleming
2     before you signed it?
3  A. I don't think I did.
4  Q. Did you discuss it with anybody at the Town before
5     you signed it?
6  A. I can't recall. I may have discussed it with Town
7     counsel.
8  Q. The third paragraph of the letter reads, "Any
9     potential similarities between Gannett Fleming's
10    final design documents and Noah Greenberg Associates'
11    preliminary design documents may be a result of
12    industry standard space programming and design
13    development for a facility of this nature." My
14    question is, before you signed this, or even after
15    you signed this, did you conduct any review to
16    determine whether there were in fact any similarities
17    between Gannett Fleming's final design documents and
18    Noah Greenberg Associates' preliminary design
19    documents?
20 A. I didn't conduct any study. It was my opinion that
21    they were two totally different design documents.
22 Q. Did you take them out and compare them to each
23    other?
24 A. Yes.

Page 123

1  Q. When did you do that?
2  A. I can't recall the date. I had been working with
3     this project continuously. I knew what Noah
4     Greenberg submitted and I knew what Gannett Fleming
5     submitted; so, I kind of lived with this project.
6  Q. You still thought it was necessary to review both
7     sets of plans before you signed this?
8        MR. BARKER: Objection.
9  A. The question again.
10 Q. Despite the familiarity that you've just expressed,
11    you still thought it was necessary to take the plans
12    out and review them before signing this letter?
13       MR. BARKER: Objection.
14 A. No, I did not.
15 Q. Well, did you review them -- did you compare them, or
16    not? I don't understand whether you did or you
17    didn't.
18 A. I knew what Noah Greenberg submitted. I had it up
19    here in my head (Gesturing). I knew what Gannett
20    Fleming submitted. I had the plans constantly on my
21    table in my office. I felt the two were not similar;
22    that's why I signed it.
23 Q. You said you had the plans on your desk. Just
24    Gannett Fleming's plans or both sets of plans?

Page 124

1  A. No. I had both sets of plans in my office.
2  Q. Did you review both sets of plans before you signed
3     this?
4        MR. BARKER: Objection.
5  A. I knew what Noah Greenberg submitted. I didn't have
6     to pull the plans out of the file. I knew what they
7     were like.
8  Q. Okay, that's all I wanted to know. And you didn't
9     ask Gannett Fleming if they identified any
10    similarities between the two sets of plans?
11 A. No. I didn't talk to Gannett Fleming about this.
12       (EXHIBIT 26 MARKED FOR IDENTIFICATION)
13 Q. Mr. Owen, I have just presented to you what's been
14    marked as Deposition Exhibit Number 26 and this is a
15    document, it's an unsigned document on the stationery
16    of the Town of Falmouth, Office of Selectmen and
17    Administrator dated April 27, 2004. It's stamped
18    "Draft" and there's an undesignated re: line. It
19    says, "An open letter to the residents of the Town of
20    Falmouth regarding the need for an upgraded DPW
21    facility." And I would ask you are you familiar with
22    that document?
23 A. (Witness perusing document) Yes, I've seen it before.
24 Q. And there's some handwriting on the document, do you

Page 125

1     recognize that?
2        THE WITNESS: At the right top?
3        MR. RUSSELL: Yes, at the right top.
4  A. That's a comment I made to one of the Selectmen.
5  Q. And?
6  A. The comment was good.
7  Q. To Gary, to the Selectman called Gary?
8  A. Gary Murphy.
9  Q. The fourth paragraph --
10 A. Yes.
11 Q. -- the first sentence begins, "This project has been
12    in the Town's Capital Improvement Program for several
13    years." Is that your understanding?
14 A. Yes.
15 Q. Is that anything more than what you've talked to me
16    about already with respect to, since even before
17    1993, there was a desire to improve this facility and
18    it kind of sputtered along over time? And I don't
19    mean to characterize your words. Was there something
20    more to it than that or was that what was meant by
21    that language?
22       MR. BARKER: Objection.
23 A. No, that's pretty much it.
24       MR. RUSSELL: What was wrong with that

Page 126

1  question?
2  MR. BARKER: I think it mischaracterizes
3  his testimony.
4  Q. But that's your understanding of what that language
5  means?
6  A. Yes.
7  Q. When you were asked to review this letter, did you
8  feel that you were capable of reviewing this letter
9  for the purposes of determining the accuracy of that
10 language?
11 A. Yes. I felt I was capable of reviewing it, yes.
12 Q. And you felt that that was accurate?
13 A. Yes.
14 Q. And for the reasons you discussed; it's accurate for
15 the reasons you discussed earlier?
16 MR. BARKER: Objection.
17 MR. RUSSELL: I'm not mischaracterizing
18 anything. I'm saying for the reasons he discussed
19 earlier.
20 MR. BARKER: Objection.
21 Q. Is that your understanding?
22 A. It was time to move forward.
23 Q. What happened with the project between 1994, when you
24 received Mr. Greenberg's plans, and 2001, when the

Page 127

1  Town submitted the Request for Qualifications that's
2  been marked as Exhibit 12, I believe? What happened?
3  A. Well, the project kept getting more attention.
4  Q. It kept getting more attention?
5  A. Yes.
6  Q. Whose attention was it receiving?
7  A. Well, the Town had many projects going on, schools, a
8  fire station, and the schools were two schools alone
9  and I believe there was a library design in there.
10 So, there probably were other projects in the capital
11 expenditures. So, we just kept getting moved back,
12 so that's what happened timewise.
13 Q. Was there anybody at the Town that was responsible
14 for trying to advocate for this project?
15 A. I don't understand the question as to who was
16 responsible.
17 Q. Was there anybody at the Town that took the lead in
18 advocating for this project for completing the
19 renovations?
20 A. Not until that time.
21 Q. What time do you refer to?
22 A. The time that the Selectmen said it was time to move
23 forward.
24 Q. Which we think was -- well, when was that, 2004?

Page 128

1  A. 2004. And I believe in the previous year, it was
2  put to referendum and defeated and this was the year
3  it passed, in the May of '04 election.
4  Q. Did you participate in securing funding for the
5  construction project?
6  A. Did I?
7  Q. Participate in securing funding for the actual
8  construction?
9  A. Well, I participated in the fact of making a
10 presentation at a Town meeting.
11 Q. When did you do that?
12 A. Well, I did it two years, really. I did it in April
13 of '03 and April of '04 at the spring Town meetings.
14 Q. In 1994, after you received Mr. Greenberg's plans and
15 his cost estimate that we don't have a copy of right
16 now, but we think was 2.2 million, what steps did you
17 take personally to see this project advance beyond
18 the preparation of preliminary architectural
19 drawings?
20 A. My involvement was with the Town Administrator, who
21 was my boss, and with the Board of Selectmen. I
22 don't believe it ever went -- it never went to a Town
23 meeting after '94 until '03.
24 Q. What did you do -- did you do anything in 1994 to

Page 129

1  present this issue to other Town officials?
2  A. I can't recall what I did. There were Selectmen's
3  meetings, but I don't know how many, or -- it kept
4  being included in my capital plan, which is a secure
5  capital plan for the DPW. And let's say it's
6  included in '95 and it's not recommended by the
7  Administrator, the Selectmen, or the Finance
8  Committee, it moves up. It kept getting moved up
9  because, as I mentioned earlier of other projects,
10 there's only so much the Town can bond.
11 Q. You recall that you made a presentation at two Town
12 meetings?
13 A. Yes.
14 Q. And you made presentations to the Selectmen?
15 A. Correct.
16 Q. Can you recall roughly how many presentations to the
17 Selectmen that you made?
18 A. I don't recall.
19 Q. Can you tell me if you made presentations annually to
20 the Selectmen?
21 A. I don't believe I did.
22 Q. Can you, with any confidence, identify any year in
23 which you made a presentation to the Selectmen? I
24 understand you're dealing with your memory.