Page 130

1    A.  I don't know what year it was.
2    Q.  How many meetings do you think you appeared at?
3    A.  Too many.  I don't know.  I attend Selectmen's
4        meetings when they put a DPW item on the agenda.  I
5        don't know how many times this may have been on the
6        agenda or may not have.
7    Q.  Do you know who would be responsible for putting the
8        DPW items on the agenda?
9    A.  The Town Administrator and the Chairman of the
10       Selectmen.
11   Q.  How does this information come to their attention?
12   A.  I don't understand your question.
13   Q.  Well, how do they know DPW matters need attention?
14       How do those come to their attention?
15   A.  Well, as a standard rule, the DPW reports to the
16       Selectmen on a quarterly basis and we give the status
17       of any major projects.
18   Q.  Is it you personally making that presentation or
19       have other people made that presentation for the
20       DPW?
21   A.  When we appear before the Selectmen, I appear in
22       addition to the division supervisors, which are about
23       five or six.
24   Q.  Was there any reason, other than inability to

Page 131

1        convince the Selectmen, that this project didn't
2        proceed after 1994?
3    A.  Repeat the question, Richard.
4    Q.  Was there any reason, other than lack of funding,
5        that this project didn't proceed from 1994 to 2001?
6    A.  No, I would say there wasn't.
7    Q.  The reason was funding?
8    A.  Funding and other projects.
9    Q.  Other projects had a higher priority to the Town?
10   A.  That's right.  They had a bigger voice.
11   Q.  The other projects had a bigger voice?
12   A.  They had a bigger voice than the DPW.
13              (BRIEF RECESS)
14       (EXHIBIT 27 MARKED FOR IDENTIFICATION)
15   Q.  Mr. Owen, marked as Exhibit Number 27 is a document
16       entitled, "Affidavit of William B. Owen."  Do you
17       recognize that document?
18   A.  (Witness perusing document) Yes.
19   Q.  I'd like to ask you about paragraph 3.  It says,
20       "While dealing with Robert Charles Group and Noah
21       Greenberg in the midst of the creation of the
22       conceptual plans for the subject project, we never
23       discussed commissioning an independent review of
24       Mr. Greenberg's plans so that we could eventually

Page 132

1        award him the final project.  Commissioning such a
2        review of a project of this magnitude would have been
3        superfluous."  Can you tell me that that means?
4    A.  I never had any conversations with the Robert
5        Charles Group and/or Noah Greenberg about awarding
6        any final design contract.
7    Q.  Did you -- that's what that means?
8    A.  That's what I intended.
9    Q.  That you didn't have any conversation about that at
10       all?
11   A.  No.
12   Q.  One way or the other?
13   A.  No.
14   Q.  Had this project proceeded in 1994 to -- strike
15       that.  Had it been approved in 1994 to proceed, would
16       you have anticipated what the procedure would have
17       been at that point with respect to completing that
18       project?
19           MR. SKRIP:  Objection.
20   A.  With respect to final design?
21   Q.  Well, where would you go from where you were at,
22       which is, you had the preliminary plans, what would
23       be the --
24   A.  Well, the next step would be to develop final design

Page 133

1        plans and specifications for construction.
2    Q.  And how would that have taken place?
3    A.  It would only take place once we had funding.
4    Q.  Do you have an idea of who would have performed those
5        services?
6    A.  I had no idea at the time.
7    Q.  Did you have an idea that there was a procedure that
8        needed to be followed in order for those services to
9        be secured?
10   A.  I knew we had to follow the designer selection
11       process for contracts over -- and I can't recall the
12       figure -- a million dollars of construction, projects
13       over a million dollars; and that's through
14       advertisement following certain rules and regs.
15   Q.  And was that your understanding in 2001 as well?
16   A.  Yes.
17   Q.  Where did you obtain that understanding from?
18   A.  Well, there are manuals put out on the designer
19       selection process and I believe there is a state
20       statute on it.  It's in the procurement laws of the
21       state.
22   Q.  Did you review the statute?
23   A.  Well, I have that in my office, yes, the procurement
24       methods.

WILLIAM OWEN

NOVEMBER 30, 2005

Page 134

| | |
|---|---|
| 1 | Q. Are those statutes or manuals? |
| 2 | A. I believe they're statutes also, but I can't cite |
| 3 | which one. |
| 4 | Q. And you mentioned a manual as well? |
| 5 | A. Yes. |
| 6 | Q. Can you describe that any better? |
| 7 | A. All I can say is it's put out by the Attorney |
| 8 | General's Office. |
| 9 | Q. Is it the Attorney General or the Inspector General? |
| 10 | A. No, it's the Attorney General. |
| 11 | Q. What's the content of that manual? |
| 12 | A. It's very, very thick. |
| 13 | Q. How many inches thick? |
| 14 | A. (Witness Indicating) Four. |
| 15 | Q. And the entire purpose of that manual is designer |
| 16 | selection? |
| 17 | A. Part of it is other procurement methods. |
| 18 | Q. It's a procedures manual on procuring all different |
| 19 | types of services and there's language in that that |
| 20 | refers to procuring designer services? |
| 21 | A. Yes. |
| 22 | Q. Did you review that in 1993 when you sought |
| 23 | preliminary plans? |
| 24 | A. Well, we follow that manual on any large project. |

Page 135

| | |
|---|---|
| 1 | Q. So, that's a yes? |
| 2 | A. Yes. |
| 3 | Q. And when, with respect to this project, would have |
| 4 | been the next time you looked at that manual? |
| 5 | A. I don't recall the date I looked at it. |
| 6 | Q. Paragraph 4 says, "Mr. Greenberg submitted his work |
| 7 | to Falmouth on March 15, 1994, without express |
| 8 | limitations. He never mentioned a written statement |
| 9 | to that effect." Earlier today, we looked at some |
| 10 | notes that had an August 1994 date, and then kind of |
| 11 | a memo that had the next date on it, August 25th, |
| 12 | 1994, and those were addressing preliminary plans and |
| 13 | changes to preliminary plans, do you recall that? |
| 14 | THE WITNESS: Changes to preliminary |
| 15 | plans? |
| 16 | MR. RUSSELL: Your handwritten memos said |
| 17 | notes on preliminary plans. |
| 18 | A. Yes. |
| 19 | Q. I'm just trying to get the time frame accurate. |
| 20 | That's dated August, is that right, August 24th? |
| 21 | A. The comments are August 24th. |
| 22 | Q. And the affidavit that's been marked as Exhibit 27 |
| 23 | says that the plans were provided on March 15th? |
| 24 | A. Correct. |

Page 136

| | |
|---|---|
| 1 | Q. Were the final plans provided on March 15th, 1994? |
| 2 | MR. BARKER: Objection. |
| 3 | A. The dates don't seem to jive. March 15th and -- it |
| 4 | appears on August 24th we were still working with |
| 5 | Noah Greenberg on these plans. So, obviously, he did |
| 6 | not submit the plans on March 15th. |
| 7 | Q. It's a letter from him -- |
| 8 | A. He may have submitted them, but it may not have been |
| 9 | final. I can't recall. |
| 10 | (EXHIBIT 28 MARKED FOR IDENTIFICATION) |
| 11 | Q. Mr. Owen, the next exhibit is an Affidavit of Heather |
| 12 | Harper, Assistant Town Administrator, Town of |
| 13 | Falmouth. I want to ask you about the second |
| 14 | paragraph of that affidavit, if you have any |
| 15 | knowledge that's relevant to that. The paragraph |
| 16 | reads, "Falmouth regularly circulates one entity's |
| 17 | preliminary plans to other entities by way of Request |
| 18 | for Proposals for final design services. The |
| 19 | preliminary plans are regularly done by someone other |
| 20 | than the ultimate designer. For example, this |
| 21 | scenario occurred regarding the Falmouth Band Shell |
| 22 | Project and the Falmouth Animal Control Facility. |
| 23 | Never, until now, was there ever a cry from entities |
| 24 | that created the preliminary plans claiming that |

Page 137

| | |
|---|---|
| 1 | Falmouth had no right to share the preliminary plans |
| 2 | with the ultimate designer." Do you have any |
| 3 | familiarity with the Falmouth Band Shell Project? |
| 4 | A. I was not involved in either project. |
| 5 | Q. You weren't involved in either project? |
| 6 | A. No. |
| 7 | Q. Have you reviewed any documents relevant to either of |
| 8 | those projects? |
| 9 | A. No. |
| 10 | Q. Do you know what year those projects were? |
| 11 | A. No. I can't recall what year they were done. |
| 12 | Q. I want to ask you again about this designer selection |
| 13 | statute and refer to Exhibit 27 again. Paragraph 3 |
| 14 | says, "While dealing with Robert Charles Group and |
| 15 | Noah Greenberg in the midst of the creation of the |
| 16 | conceptual plans for the subject project, we never |
| 17 | discussed commissioning an independent review of |
| 18 | Mr. Greenberg's plans so that we could eventually |
| 19 | award him the final project." And you told me what |
| 20 | that means is, you never discussed with him or |
| 21 | awarded him the final project. What's the |
| 22 | significance of an independent review? |
| 23 | A. Independent review? |
| 24 | Q. Yes. How is that significant? |

Page 138

1   A.  Well, the intent of this statement is there was never
2       any discussion with Noah Greenberg that the Town
3       would automatically give him the final design
4       contract.
5   Q.  The language about the independent review, does that
6       have any significance at all?
7   A.  Well, we didn't commission any board or committee to
8       review his plans to make a decision to award it to
9       him.  There was no committee commissioned to review
10      his plans.
11  Q.  Now, this independent review would have been
12      performed by who, people within the Town?
13  A.  Could have been.
14  Q.  Who else could have performed an independent review?
15  A.  Maybe a committee.
16  Q.  What kind of committee?
17  A.  Public Buildings Committee, for one.
18  Q.  Those aren't people within the Town?
19  A.  Well, they're not Town employees.
20  Q.  But they have capacities and authorities within the
21      Town; is that correct?
22  A.  I don't know that they have much authority.  They
23      have a lot to say, but not much authority.
24  Q.  You never discussed commissioning an independent

Page 139

1       review of Mr. Greenberg's plans and your
2       understanding of an independent review is by either
3       people within the Town or committees affiliated with
4       the Town?
5   A.  That's right.
6   Q.  Anybody else?
7   A.  No.
8   Q.  Does that language have any significance with respect
9       to the designer selection statute that you referred
10      to?
11  A.  I don't believe it does.
12          (EXHIBIT 30 MARKED FOR IDENTIFICATION)
13  Q.  Mr. Owen, the next document that I present to you
14      has been marked Deposition Exhibit 30.  It has a
15      title, "Public Works Maintenance Facility - Addition
16      and Renovation, Architectural Design Services,
17      and I've seen that document a lot.  Actually, my
18      chair has rolled over it on the floor a couple of
19      times.  Despite how many times I've seen it, I have
20      no idea what it means, and I was wondering if you
21      could help me understand it.
22  A.  These are firms that received the scope of work --
23      not the scope of work, the Request for Proposals.
24  Q.  The Request for Qualifications?

Page 140

1   A.  The Request for Qualifications, pardon me.
2   Q.  And is the number significant?  I mean, did they
3       receive their requests in that order?  Or, excuse me,
4       did they request their requests in that order?
5   A.  I'm not sure if the number is significant.  We had
6       inquiries from these companies sending us Requests
7       for Qualifications.
8   Q.  And you keep a record of who requests them?
9   A.  Yes.
10  Q.  Mr. Owen, I just have a couple of final questions,
11      referring to your interrogatory answers, which are
12      Exhibit Number 6.  I'd like to ask you specifically
13      about Response Number 6.
14  A.  Response number?
15  Q.  6.  Just let me know when you've had a chance to
16      read that?
17  A.  (Witness perusing document) Okay.
18  Q.  I'm going to break this down and ask you some
19      questions about the different sentences.  Response
20      Number 6, "No one from Falmouth can recall each and
21      every communication between Defendant, Gannett
22      Fleming, Inc. and Falmouth related to the use of
23      Plaintiff's plans.  That said, on January 28, 2000
24      during a meeting regarding" --

Page 141

1           MR. BARKER:  2002.
2   Q.  Excuse me, 2002.  "I told Jeff Alberti (of Gannett
3       Fleming) that it was not necessary for them to use
4       Plaintiff's preliminary plans in the creation of
5       their final plans."  Can you tell me exactly what you
6       remember about that conversation?
7   A.  Well, I didn't want to handcuff Gannett Fleming into
8       using Noah Greenberg's plans.  I wanted them to use a
9       little ingenuity and brain power on their own to
10      develop the project.  I think that's what an
11      architect should do.  They have their own ideas.
12  Q.  Did Jeff Alberti or anybody at Gannett Fleming make
13      any comments about use of the plans that you were
14      responding to?
15  A.  Mr. Alberti indicated they weren't going to use
16      them.  They weren't going to use Noah Greenberg's
17      plans.
18  Q.  How did they indicate that?
19  A.  They wanted to conduct interviews on their own.
20      They wanted to study space requirements on their
21      own.
22  Q.  Did they express any other reason for not wanting to
23      use Mr. Greenberg's plans?
24  A.  I can't recall.

WILLIAM OWEN                                                                NOVEMBER 30, 2005

Page 142

1    Q.   What you can recall is they wanted to do their own
2         space means analysis?
3    A.   That's correct.
4    Q.   And you're comfortable that that's the gist of the
5         conversation that took place on January 28th, 2002?
6    A.   Yes.
7    Q.   There's no more to it than that?
8              MR. BARKER:  Objection.
9    A.   There would have been other things discussed.  I
10        don't know.
11   Q.   I'm talking about use of the plans specifically,
12        though, not anything else?
13   A.   That's right, yes.
14   Q.   That's your recollection of the extent of the
15        conversation regarding use of the plans?
16             MR. BARKER:  Objection.
17   A.   That's correct.
18   Q.   The next sentence in Response Number 6, "And during a
19        September 12, 2002, meeting between me and
20        Mr. Alberti, he declared he did not want to use
21        Plaintiff's plans."  What do you recall about that
22        conversation?
23   A.   Well, it could have been at a point when Gannett
24        Fleming had interviewed our staff, interviewed me,

Page 143

1         and they determined that the design -- their design
2         -- Greenberg's design would not suit our needs.  They
3         expanded and, you know, they interviewed my
4         supervisors, mechanics, all the mechanics that were
5         working in the building.  And like I said, they came
6         up with their own ideas.
7    Q.   Did they state anything about Mr. Greenberg's plans
8         that was a cause for them not wanting to use those
9         plans?
10   A.   No.  I don't recall.
11   Q.   Do you recall other than January 28th, 2002 and
12        September 12th, 2002, any other discussion about use
13        of the plaintiff's plans?
14   A.   I don't recall.
15   Q.   Do you recall any other discussion about the
16        plaintiff's plans?
17   A.   I don't recall.
18   Q.   Your recollection then is what we just talked about,
19        the conversation on January 28th, 2002 and the
20        conversation on September 12th, 2002?
21   A.   Yeah.  There were meetings in between, too.
22   Q.   Discussing the plaintiff's plans?
23   A.   No.  Not discussing the plaintiff's plans, discussing
24        the project as a whole.

Page 144

1    Q.   And have you described your conversations with
2         Gannett Fleming or representatives of Gannett Fleming
3         regarding the plaintiff's plans as fully as you can?
4    A.   I believe I have.
5              MR. RUSSELL:  I don't have any more
6         questions.
7              MR. BARKER:  I have a few follow-ups.  Do
8         you want to take a break?
9              THE WITNESS:  No, go right ahead.
10             EXAMINATION BY MR. BARKER
11   Q.   I'm John Barker, we've met before.  I represent
12        Gannett Fleming.  I'm going to ask you a few
13        follow-up questions.  If you could just look at
14        Exhibit 5, which is the February 1st, 1994 letter,
15        that purports to be from you to Mr. Greenberg.  I'm
16        not sure if you confirmed if that was your signature
17        on that document?
18   A.   Yes, that's my signature.
19   Q.   Thanks.  Did you have authorization to sign contracts
20        on this job on behalf of the Town of Falmouth?
21   A.   Yes.  Only after the Selectmen had approved a
22        project.
23   Q.   Okay.  Did you, to your recollection, ever tell Noah
24        Greenberg anything that would lead him to believe

Page 145

1         that he would be doing the rest of the job after the
2         preliminary plans?
3    A.   No.
4    Q.   Do you know if anyone else from the Town of Falmouth
5         ever told Noah Greenberg anything that would lead him
6         to believe he would be doing the rest of the job
7         after the preliminary plans that he did for Falmouth?
8    A.   Not to my knowledge.
9    Q.   If you would turn to Exhibit 12, which is the Request
10        for Qualifications.  If you could turn to what is
11        marked at the bottom 2, page 2, although, it's the
12        third page in.  Under Scope of Services, about
13        three-quarters of the way down the page, after a list
14        of five items, there is a blurb, I don't know if it's
15        a paragraph or not, "Preliminary plans for this
16        project were prepared in 1994 and may be used as a
17        guide of the Department's intent."  Did I read that
18        correctly?  Do you see where I'm reading?
19   A.   Yes.
20   Q.   I notice that the word "may" is used there.  What do
21        you infer from the use of the word "may"?
22             MR. RUSSELL:  Objection.
23   A.   They were included.  Like I say, they may be used as
24        a guide.  They were not plans to specifically be

Page 146

1    followed. As with any project, I like to see an
2    architect develop their own ideas, even if they are
3    different from what we had had initially.
4    Q. Let me ask you a follow-up question, so maybe I can
5        get one without an objection. Was there any
6        requirement on the part of the Town of Falmouth that
7        Greenberg's preliminary plans be used in the final
8        design to this project?
9            MR. RUSSELL: Objection.
10   A. No.
11   Q. Was there a requirement on the part of the Town of
12       Falmouth that the people applying to -- answering the
13       Request for Qualifications and, therefore, applying
14       for this job to do the final design, was there a
15       requirement that they look at the preliminary plans
16       by Greenberg?
17   A. No, there was no requirement.
18   Q. As far as you know, was Greenberg able to freely bid
19       on the DPW design job that was advertised in the
20       "Register" in 2001?
21   A. Yes.
22   Q. There was no impediment why Greenberg would not have
23       been considered for that job?
24   A. No.

Page 147

1    Q. To your knowledge, was permission needed from
2        Greenberg for the Town to copy his plans, his
3        preliminary plans?
4    A. No. Not to my knowledge.
5    Q. I want to ask you to go back to Heather Harper's
6        affidavit, which is Exhibit 28. Plaintiff's counsel
7        already asked you about the long paragraph, which is
8        paragraph 2 in Exhibit 28. I want to ask you some
9        more general questions. I understand that you were
10       not involved in the two projects that are listed, the
11       Falmouth Band Shell Project and the Falmouth Animal
12       Control Facility; is that correct?
13   A. That's correct.
14   Q. Do you have any more general knowledge about the
15       procedure that is talked about in this paragraph?
16   A. I don't know if I know what you mean by "general
17       knowledge."
18   Q. Let me try a better question. If you look at the
19       second sentence, it says, "The preliminary plans are
20       regularly done by someone other than the ultimate
21       designer." That's really the sentence that I'm
22       asking you about. Here's the question: Do you know,
23       in your experience, if that is the way these projects
24       are normally handled?

Page 148

1    A. Well, Heather Harper mentioned those two projects and
2        those were two projects she was mainly involved in.
3        I believe that is a case where someone had prepared a
4        preliminary and someone else prepared a final design
5        construction plan. Offhand, I can't think of any
6        projects that I am familiar with or have experience
7        with.
8    Q. Did Gannett Fleming ultimately use Greenberg's plans
9        in designing their final plans?
10           MR. RUSSELL: Objection.
11   A. I don't know if they used them. The design is not
12       similar.
13   Q. If you would look at Exhibit 22, this is Amendment
14       Number 1 to the design and construction contract
15       between Gannett Fleming and the Town of Falmouth?
16   A. Yes.
17   Q. You testified earlier about a sentence in the middle
18       of the large paragraph, and the sentence reads,
19       "These additional design services are associated with
20       significant changes in the project including size,
21       quality, and complexity as originally specified in
22       Task 3 of the Scope of Services, to address the
23       Town's program requirements." Did I read that
24       correctly?

Page 149

1    A. Yes.
2    Q. I want to ask you again about size. Is it your
3        understanding that the project that Gannett Fleming
4        ultimately designed was significantly larger in
5        square footage than the project that Greenberg
6        designed in his preliminary plans?
7    A. I would say yes.
8    Q. I'm going to tell you some figures and you probably
9        won't know them offhand, but see if they are
10       approximate, to your understanding. Is it
11       approximately correct that Gannett Fleming's square
12       footage is somewhere in the neighborhood of 44,000
13       and Greenberg's square footage by comparison is
14       somewhere in the neighborhood of 32,000?
15           MR. RUSSELL: Objection.
16   A. That sounds about right.
17   Q. Without knowing the exact numbers, that's
18       approximately the size?
19   A. I've always indicated that we were talking a 40,000
20       plus or minor square foot addition.
21   Q. Actually, let me follow up on that, then, with
22       Exhibit 21. This is the initial agreement between
23       the Town and Gannett Fleming for architectural design
24       services. If you could turn to the Scope of

Page 150

1    Services, to page S-1.
2    A.  "F" as in Frank?
3    Q.  No, "S" as in Sam.  If you look down at the bottom
4        under Task 3, Design Specifications and Cost
5        Estimates.  Under paragraph 3.1, do you remember that
6        plaintiff's counsel asked you some questions about
7        these paragraphs?
8    A.  Yes.
9    Q.  I want to ask you to look at the square footage
10       figures that plaintiff's counsel asked you about and
11       these are plus or minus 29,000 square feet in the
12       metal building structure and then in the next bullet
13       point plus or minus 3,000 square feet in addition to
14       the existing office building.  Do you see where I'm
15       reading from?
16   A.  Right.
17   Q.  Did those square footages change significantly after
18       this contract?
19   A.  Well, they did increase.
20   Q.  Was it what you would call a significant increase?
21   A.  I would, yes.
22   Q.  Next, Exhibit 25.  This is an April 1, 2003 letter
23       from Gannett Fleming to Mr. Owen.  Now, you testified
24       previously that you signed this letter down below

Page 151

1        where it has your name; is that correct?
2    A.  Yes.
3    Q.  That's your signature?
4    A.  Yes.
5    Q.  It wasn't clear to me -- strike that.  Can you tell
6        me why you signed this letter instead of either the
7        Town counsel or the Town Administrator?
8    A.  Basically, I agreed with it.
9    Q.  Was it your understanding that by signing this
10       letter, you were concurring with the contents?
11   A.  Yes.
12   Q.  And that's sort of in furtherance of the final
13       paragraph where it says, "If you are in concurrence,
14       please sign below and return one copy for our files";
15       is that correct?
16   A.  Yes.
17   Q.  Were the Greenberg preliminary plans ever considered
18       as the final plans for the DPW building job?
19   A.  No.
20   Q.  Do you remember that Jeff Alberti, and possibly,
21       others from Gannett Fleming, had an assortment of
22       concerns about the Greenberg plans?
23       MR. RUSSELL:  Objection.
24   A.  I'm trying to recall.  The bottom line was that in

Page 152

1        conversations with Jeff Alberti, he concluded they
2        did not want to use the plans.
3    Q.  Right.  For example, do you remember Alberti speaking
4        with you, or at any other meeting that you were
5        present at concerning this project, concerning the
6        structural problems with moving load-bearing walls
7        that he believed the Greenberg plans would
8        necessitate?
9    A.  Yes.  Jeff Alberti didn't want to get into any major
10       wall movement within the building.  One reason being
11       the earthquake code, as I mentioned earlier.  It
12       triggers that code and it makes the project a hell of
13       a lot more expensive.
14       MR. BARKER:  I think that's all I have.
15       MR. RUSSELL:  I have a couple of more.
16       MR. SKRIP:  Off the record.
17       (OFF THE RECORD)
18       RE-EXAMINATION BY MR. RUSSELL
19   Q.  Mr. Barker asked you if Mr. Greenberg would have been
20       eligible to bid on this larger project and your
21       answer was sure, he would have been eligible to bid;
22       is that a fair characterization?  Did that
23       conversation ever take place with Mr. Greenberg?
24   A.  I don't think it did.  You know, I don't go out

Page 153

1        soliciting business from architects all over.  It's
2        up to them to respond to the Town's ad in the local
3        paper and advertisement in the "Central Register."
4        If I were to call every architect, that's all I'd be
5        doing.  I have other things to do.
6    Q.  Was there any discussion at all about who would be
7        preparing the future plans for the project?
8        THE WITNESS:  At what point?
9        MR. RUSSELL:  Up until May 2001.
10       THE WITNESS:  May of 2001; is that when we
11   hired Gannett Fleming?
12       MR. RUSSELL:  That is when you submitted, I
13   guess, the Request for Qualifications.
14       THE WITNESS:  Now, what was your question
15   again?
16   Q.  Did you have any discussion with Mr. Greenberg about
17       who would be preparing the final design drawings at
18       any time up until May 2001?
19   A.  No.
20   Q.  I think this is my last question.  In Exhibit 6, your
21       interrogatory answer indicates you had a conversation
22       with Mr. Alberti in January of 2002 about his not
23       wanting to use the plans.  And it was Response Number
24       6 that we went over in some detail, and Mr. Barker

WILLIAM OWEN                                                    NOVEMBER 30, 2005

Page 154

1    was successful in eliciting additional information
2    about those conversations, but you did indicate there
3    was a January 28, 2002 conversation where Jeff
4    Alberti indicated he did not want to use the plans,
5    Mr. Greenberg's plans; is that accurate?
6  A.  Yes.
7  Q.  In Exhibit 24, which is dated February 4th, you
8    indicated that sometime after that date, you did a
9    review of the Scope of Services that was included in
10    the contract between Gannett Fleming and the Town?
11  A.  That's what this memo from Mr. Calise indicates.
12  Q.  You indicated that this memo was helpful to you in
13    your review of the Scope of Services?
14  A.  I would say it is helpful, yes.
15        MR. BARKER:  This memo?
16        MR. RUSSELL:  Yes.
17  Q.  So, your review of the Scope of Services would have
18    occurred after that?
19  A.  I don't follow your question.
20  Q.  Well, it would have occurred after the date of this
21    memo?
22  A.  This is -- okay.  This was a memo on the fee
23    proposals.  From what I gather, he says such
24    evaluation of fee proposals.  Fee proposals, dollars.

Page 155

1  Q.  Okay.  Well, you indicated you did a review of the
2    contract between Gannett Fleming and the Town, which
3    has been marked as Exhibit 12?
4  A.  Right.
5  Q.  Did you do that review, do you recall, before or
6    after January 28th, 2002?  Actually, it's not Exhibit
7    12.  I'm sorry, it's Exhibit 21.  That document is
8    dated March 7th, 2002?
9  A.  The question?  Did I review the --
10  Q.  Did you review this after January 28th, 2002?
11  A.  Yes, I believe I did.
12  Q.  And despite the fact that they didn't want to use
13    Mr. Greenberg's plans, you have a whole six- or
14    seven-paragraph sentence that talks about using
15    Mr. Greenberg's plans on page 1; is that accurate?
16        MR. BARKER:  Objection.
17  A.  Well, as I mentioned earlier, if you're referring to
18    the square footages, that was the best available
19    information I had at the time.
20  Q.  No.  I'm referring to Task 1, review of existing
21    information?
22  A.  Okay.
23  Q.  And there's a whole paragraph there that talks about
24    using Mr. Greenberg's plans?

Page 156

1        MR. BARKER:  Objection.
2  A.  That was prior to when they got into the final
3    design.  They had not got into the design aspect of
4    this project when this document was prepared.
5  Q.  But they had indicated that they didn't want to use
6    the plans when this document was prepared?
7        MR. BARKER:  Objection.
8  A.  I don't think they -- I think that was after this
9    document was prepared, when they indicated they
10    didn't want to use the plans.
11  Q.  But you'll agree with me the first time they
12    indicated that was January 28, 2002?
13        THE WITNESS:  2000 what?
14        MR. RUSSELL:  2002, and I get that from
15    your interrogatory answers.
16  A.  It could be.  I'm not sure.
17  Q.  And that your review of this document was after
18    that date?
19        MR. BARKER:  Objection.
20  A.  All right.  This was a meeting regarding fees after
21    we had selected Gannett Fleming from the process of
22    weeding out the other architects.  That's when Jeff
23    Alberti told me they didn't want to use the plans and
24    I said, "Okay, don't use them.  Do your own thing."

Page 157

1  Q.  That was January 28th?
2  A.  Yes.
3        MR. RUSSELL:  That's all.
4        THE REPORTER:  For the record, would you
5    like a copy of the transcript, Mr. Barker?
6        MR. BARKER:  Yes, sure.  Yes, I would, and
7    a minuscript.
8        (DEPOSITION CLOSED AT 3:45 P.M.)

DUNN & GOUDREAU