DEPOSITION of JEFFREY ALBERTI Taken 12/05/2005 (GREENBERG versus FALMOUTH)

SHEET 20  PAGE 77

**Page 77**

1  but I would assume that it was based on the
2  preliminary plans, since that was the only
3  information available at the time.
4  Q  The next bullet point item says, "Design of a new
5  3,000-plus-or-minus-square-foot addition to the
6  existing building for offices or lunch room,
7  administrative area, toilet facilities, and
8  reception area." Do you see that?
9  A  Yes. I do.
10 Q  Do you know where the 3,000-plus-or-minus-square-
11    foot figure came from?
12 A  Same answer on this. I don't recall exactly where
13    we came up with that number; except that I can
14    assume it came from the preliminary plans that were
15    available, the only information available at the
16    time of this document.
17 Q  Moving onto the next page, in the middle of the
18    page, there's a paragraph that begins,
19    "Administration Building Addition." Do you see
20    that?
21 A  Yes, I do.
22 Q  And the first bullet point under that says,
23    "Selective demolition of the existing building at
24    the main entrance." And is that what we talked

Parisi Court Reporting (508) 984-5502

**Page 78**

1  about previously?
2  A  No. It does not. No. It is not.
3  Q  What does that refer to?
4  A  Selective demolition as it's stated, selective. Not
5    complete demolition.
6  Q  Very good. What does it mean? What selective
7    demolition was to take place as contemplated by this
8    document Scope of Services?
9  A  That was yet to be determined as part of the space
10   needs and programming.
11 Q  Did the preliminary plans include selective
12   demolition of the existing building at the main
13   entrance?
14 A  My recollection is it included full demolition from
15   my recent review of the plans.
16 Q  The second item provides second-floor space within
17   the new addition for use as storage space. Do you
18   see that?
19 A  Yes. I do.
20 Q  And that was the second-floor space that the Town
21   requested at the June 5th meeting?
22 A  I believe that is what it's referring to, yes.
23 Q  They didn't really request it at that meeting. They
24   referenced that they would like to have a building

Parisi Court Reporting (508) 984-5502

**Page 79**

1  with a second floor. Is that more accurate?
2  A  That's accurate.
3  Q  I wanna ask you in particular about the next item.
4    The design will be based on an addition that is
5    structurally isolated from the existing building
6    such that no part of the structural system of the
7    existing building is modified as a result of the new
8    construction.
9         The design will also be based on
10   using a shallow foundation and concrete floor slab
11   on grade similar -- and grade of similar
12   construction to the foundations and floor slabs of
13   the existing building.
14        My question is based upon -- or
15   primarily related to the first sentence. So far,
16   we've indicated that the preliminary plans identify
17   roughly 3,000 plus or minus square foot of new
18   office space and administration areas. Is that
19   accurate?
20 A  That was my understanding.
21 Q  Did that design or was that design structured and
22   isolated from the existing building such that any
23   part of the structural system of the existing
24   building is modified as a result of the new

Parisi Court Reporting (508) 984-5502

**Page 80**

1  construction?
2  A  Are you referring to the preliminary plans?
3  Q  Yes.
4  A  I'm unable to answer that. That was -- that
5    information wasn't provided as far as I am aware.
6  Q  By looking at the plans, would you be able to tell
7    whether that set of facts was reflected on the
8    plans?
9  A  No. I wouldn't be able to.
10 Q  The next area says "Building Renovations." The
11   first bullet point item says, "Provide new locker,
12   shower, toilet facilities." Do you see that?
13 A  I'm sorry. Where are we again? Down -- yes.
14   I see that.
15 Q  Do you know whether new locker, shower, toilet
16   facilities were reflected on the preliminary plans
17   as part of the building renovations?
18 A  I'm sorry. Could you ask that one more time. Are
19   you referring to the preliminary plans?
20 Q  I am. The preliminary plans that were attached
21   as --
22 A  And do they have new locker, shower, toilet
23   facilities?
24 Q  In the building renovation.

Parisi Court Reporting (508) 984-5502

BARBARA ST. JEAN, RPR, CSR No. 127693

**SHEET 21   PAGE 81**

**81**

1  A  My recollection is they did.
2  Q  Mr. Alberti, I have a tough time understanding why
3     if on January 28th the Town said it didn't wanna use
4     the preliminary plans that sometime after that,
5     Gannett Fleming prepared a document that talked
6     about making substantial modifications to those
7     plans -- or I should say make modification to those
8     plans. Can you help me understand that for lack of
9     a better question.
10           MR. BARKER: Objection.
11  A  I'm not sure I understand your question. Could you
12     rephrase --
13  Q  Sure.
14  A  Could you reask it.
15  Q  You said that on January 28th, you told the Town you
16     didn't wanna use the preliminary plans.
17  A  Right.
18  Q  And after that, you prepared the Scope of Services.
19  A  That's correct.
20  Q  And the Scope of Services at task one discusses
21     modification to the preliminary plans.
22  A  Correct.
23  Q  And I'm un-- I'm having difficulty understanding how
24     the two are consistent. Does this document reflect

Parisi Court Reporting (508) 984-5502

**PAGE 82**

**82**

1     results of your conversation on January 28th with
2     Mr. Owen?
3  A  It includes both -- it includes -- as it stated in
4     the letter, it includes the stuff from the Request
5     for Qualifications, Request for Proposals as it was
6     referred to, plus our conversations with Mr. Owen
7     and information obtained during the site visit. So
8     it's a combination of all those meetings.
9           It doesn't necessarily preclude times
10     or include everything that was addressed in those
11     meetings.
12  Q  Where does this come from then? Where does this
13     task one come from?
14  A  Where does this task one come from?
15  Q  Yes.
16  A  This --
17  Q  Because you said the proposal -- go ahead.
18  A  This I believe comes from the Request for
19     Qualifications.
20  Q  So that was Gannett Fleming's understanding of what
21     was requested in their Request for Qualifications,
22     what's stated here in task one?
23  A  That's correct.
24  Q  Is this also -- task one, is this also consistent

Parisi Court Reporting (508) 984-5502

**PAGE 83**

**83**

1     with your conversation with Mr. Owen on
2     January 28th?
3  A  On January 28th, Mr. Owen said it was not necessary
4     for us to use the plans. He did not advise us or we
5     weren't directed not use them. He just indicated it
6     was not necessary for us to use the plans.
7  Q  As of the date that this document was prepared --
8  A  Uh-huh.
9  Q  -- was it Gannett Fleming's intent to modify those
10     plans as indicated in task one?
11  A  At the date that this document --
12           MR. BARKER: Objection.
13  A  -- was prepared, that was what was listed in the
14     Scope of Services.
15  Q  At the date this document was prepared, was it
16     Gannett Fleming's intent if it were awarded the
17     contract to design the D.P.W. facility to modify the
18     Plaintiff's preliminary plans as part of that
19     undertaking?
20  A  Not necessarily.
21  Q  Is that what task one says, however?
22  A  That is what's stated --
23           MR. BARKER: Objection.
24  A  -- in task one.

Parisi Court Reporting (508) 984-5502

**PAGE 84**

**84**

1  Q  Why would Gannett Fleming write something that it
2     didn't necessarily intend?
3           MR. BARKER: Objection.
4  A  This draft Scope of Services was prepared based on
5     information that was available at the time.
6           MR. RUSSELL: Would you mark that,
7     please.
8           (Whereupon the above-described
9                       document was then marked as
10                      Plaintiff's Exhibit No. 9)
11  Q  Mr. Alberti, the Court Reporter has marked as
12     Exhibit 9 a document on Department of the Public
13     Works letterhead dated February 5th, 2002,
14     addressed to Mr. Michael E. Haire, P.E., under the
15     signature of William B. Owen, P.E. Director.
16     Do you see that?
17  A  Yes. I do.
18  Q  Have you seen this document before?
19  A  Yes. I have.
20  Q  There's some handwritten notes on the document.
21     do you see those?
22  A  Yes. Yes, I do.
23  Q  Do you know who made those?
24  A  Those were made by myself.
25  Q  Can you -- starting at the top of the document to

Parisi Court Reporting (508) 984-5502

BARBARA ST. JEAN, RPR, CSR No. 127693

SHEET 25 PAGE 97

**Page 97**

1  sort of explains why February was crossed out and
2  March was put in.
3      MR. RUSSELL: Would you mark that,
4  please.
5      (Whereupon the above-described
          document was then marked as
6       Plaintiff's Exhibit No. 13)
7  Q  Mr. Alberti, marked as Exhibit 13 is a document on
8  Department of Public Works letterhead dated
9  March 7th, 2002, under the signature of William B.
10 Owen addressed to Mr. Michael E. Haire, P.E.
11 Do you see that?
12 A  Yes. I do.
13 Q  Have you seen this document before as part of this
14 litigation?
15 A  Yes. I have.
16 Q  And do you understand that at some point, there was
17 a contract for the above-captioned facility executed
18 between the Town of Falmouth and Gannett Fleming?
19 A  That's my understanding.
20     MR. RUSSELL: Would you mark that,
21 please.
22     (Whereupon the above-described
          document was then marked as
23      Plaintiff's Exhibit No. 14)
24 Q  Mr. Alberti, marked as Exhibit 14 is a document

**Page 98**

1  that has -- runs 14 pages. And at the top of the
2  first page, it reads Gannett Fleming Engineers and
3  Architect's, P.C., 150 Wood Road, Braintree, Mass.
4  02184. It reflects two telephone numbers and then
5  reads -- excuse me -- a telephone number and a
6  facsimile number and reads Agreement for
7  Architectural Design Services.
8      Do you have that document in front of
9  you?
10 A  Yes, I do.
11 Q  And would this be the contract that was executed
12 between Gannett Fleming and the Town of Falmouth
13 relative to the D.P.W. project?
14 A  That's what it appears to be. Yes.
15 Q  And to your knowledge, as of March 7th, 2002, these
16 were the terms that the Town and Gannett Fleming had
17 agreed to.
18 A  Yes. As of March 7th, those were the terms.
19 Q  And included in this contract is a Scope of Services
20 that begins on Page S-1.
21 A  Yes.
22 Q  And the scope of services continues to Page S-4.
23 A  That's correct.
24 Q  And these are the Scope of Services that Gannett

**Page 99**

1  Fleming offered to perform for the Town of Falmouth.
2      MR. BARKER: Objection.
3  A  This is the Scope of Services that was included in
4  our contract with the Town of Falmouth.
5  Q  Under the Scope of Services, task one, review
6  existing information, do you see that?
7  A  Yes, I do.
8  Q  Is this language borrowed from that Scope of
9  Services that we discussed earlier?
10 A  I haven't compared it word for word; but it appears
11 to be the same.
12 Q  And the last sentence of Scope of Services, to
13 modify the preliminary plan to incorporate the
14 modification accepted by the D.P.W. Do you see
15 that?
16 A  Yes. I do.
17 Q  And preliminary plan as used in that sentence refers
18 to the plan that was attached as Addendum A or
19 Appendix A for the Request for Qualification that we
20 discussed previously.
21 A  It appears to represent that, yes.
22 Q  To your knowledge, is there any reason why the word
23 is singular, preliminary plan, as opposed to plural,
24 preliminary plans? Is there any significance to

**Page 100**

1  that?
2  A  Not that I'm aware of.
3  Q  Do you know when this contract was prepared?
4  A  I don't know the date that this contract was
5  prepared at this time.
6  Q  Do you know who prepared it?
7  A  I don't know the individual that prepared it at this
8  time.
9  Q  Was it prepared by somebody at Gannett Fleming, do
10 you know?
11 A  My assumption is that it was prepared by somebody at
12 Gannett Fleming.
13 Q  You don't know who that is?
14 A  I do not at this time know who prepared this
15 particular document.
16 Q  Is it safe to say that the general conditions,
17 Pages G-1 through G-7 are pretty much a standard
18 document?
19 A  Yes. Those appear to be one, again, of Gannett
20 Fleming's standard contracts.
21 Q  Do you know who prepared the Scope of Services that
22 follows?
23 A  As I stated earlier on the draft, I believe that
24 this information could have been prepared by

Parisi Court Reporting (508) 984-5502

BARBARA ST. JEAN, RPR, CSR No. 127693

SHEET 32  PAGE 125

**Page 125**

1  A  They were in a notebook.
2  Q  Did you use a questionnaire?
3  A  Yes.
4  Q  And how did you use a questionnaire?
5  A  A questionnaire was used as a guide in asking
6     questions to the D.P.W. personnel.
7  Q  But I'm just getting the sense you didn't actually
8     write on the questionnaire. You asked questions and
9     then would write on your notes.
10 A  That's correct.
11 Q  Is that correct? So there wouldn't be any
12    questionnaires that contained the results of your
13    interviews with D.P.W. personnel?
14 A  That's right. The results are contained in my
15    notebook.
16 Q  The notebook that you've referred to, is that
17    strictly your notebook? Or is it a Gannett Fleming
18    notebook?
19 A  It's the project notebook of Gannett Fleming.
20 Q  And to your knowledge, how many people contributed
21    to that notebook?
22 A  Everything in a notebook contained -- I believe
23    everything that's in that notebook was prepared by
24    myself.

Parisi Court Reporting (508) 984-5502

**Page 126**

1  Q  Okay. Let me just go over a couple of these
2     interviews with you. On April 17th, 2002, you
3     interviewed John Lyons and Don Swire. Is that
4     correct?
5  A  That's correct.
6  Q  And they indicated, 5th item, what you've identified
7     as the new administration public toilet rooms.
8  A  That's correct.
9  Q  What does that mean?
10 A  That means separate toilet facilities to be used
11    just by public that's visiting their facility.
12 Q  Item Number 9, offices for Highway Superintendent,
13    Assistant Highway Superintendent, Park
14    Superintendent, Assistant Park Superintendent, and
15    Dispatcher. Who provided you with that information?
16 A  John Lyons and Don Swire.
17 Q  And can you recall anything else about what they
18    told you about these office spaces indicated here?
19 A  Are you referring to what they were to include?
20 Q  Sure.
21 A  That may be listed further down in my notes.
22 Q  Okay. Did they indicate any additional office space
23    that they desired, office spaces?
24 A  At this time -- this summary does not appear to show

Parisi Court Reporting (508) 984-5502

**Page 127**

1     any other office spaces, except for the statement it
2     says separate office from the public entrance.
3     Separate, I should say. But in this summary, it
4     does not appear to be other office areas listed.
5  Q  Where does it say to separate?
6  A  On the second page.
7  Q  I see it. Oh. No, I don't. Where does it say it?
8  A  At the top, first bullet.
9  Q  Okay. There it is. Separate office areas from the
10    public entrance. Underneath that, a third bullet
11    point from the bottom in that list says, "If
12    possible, provide separate lunch locker facilities
13    for highway and parks."
14 A  Yes.
15 Q  Did they explain to you why they wanted separate
16    lunch and locker facilities for highway and parks?
17 A  My recollection is that was what they desired for
18    space needs. They didn't indicate a specific reason
19    for it.
20 Q  Moving onto the third page, near the middle is a
21    notation or there's an indication person interviewed
22    Brian Dale --
23 A  Yes.
24 Q  -- Park Superintendent, and Rocky.

Parisi Court Reporting (508) 984-5502

**Page 128**

1  A  Yes.
2  Q  Do you know who Rocky is?
3  A  Rocky Gomes I believe is his last name. He's an
4     Assistant Superintendent for Parks.
5  Q  And the third item under that, it says need
6     office space for Superintendent and Assistant
7     Superintendent.
8  A  That's correct.
9  Q  They each wanted their own office. Is that what
10    that means?
11 A  That's correct.
12          MR. RUSSELL: Would you mark that,
13    please.
14          (Whereupon the above-described
15          document was then marked as
15          Plaintiff's Exhibit No. 19)
16 Q  Mr. Alberti, the next document is a letter on the
17    stationery of the law office of Richard M. Russell.
18    And it's been identified as Exhibit Number 19. And
19    the only question I have about this is to your
20    knowledge, did Gannett Fleming receive that document
21    on or about June 7th, 2002.
22          MR. BARKER: Let me see it first.
23 A  Yes. To my understanding, we did receive this
24    document on or about June 7th, 2002.

Parisi Court Reporting (508) 984-5502

BARBARA ST. JEAN, RPR, CSR No. 127693

SHEET 34   PAGE 133

**Page 133**

1    and Rocky Gomes.
2  Q And under that, it says will be phasing out.
3  A Yes.
4  Q Can you tell me what that means.
5  A I don't recall what that is referring to, as it
6    doesn't have anything after it.
7  Q On page GF 285, top of that page says 9/12/02,
8    meeting agenda.
9  A Yes.
10 Q Can you tell me what that is intended to indicate.
11 A That is an agenda I prepared to discuss at a meeting
12   with members of the Department of Public Works on
13   September 12th of 2002.
14 Q Moving onto the next page, top of the page says
15   issues. Do you see that?
16 A Yes. I do.
17 Q One, do not partially demolish small office area,
18   Chapter 34. Did I read that correctly, if you
19   accept that the abbreviations are forwards?
20 A Yes.
21 Q And is this a further agenda? Or is this notes of a
22   meeting that took place?
23 A This is a continuation of the agenda items that were
24   to be discussed at the meeting requesting to the

**Page 134**

1    Town that we do not want to use the preliminary
2    plans.
3  Q The Town had already told you you didn't have to use
4    the preliminary plans.
5  A That's correct. We wanted to confirm that we did
6    not need to use the preliminary plans.
7  Q And do not partially demolish small office area,
8    Chapter 34, can you tell me what that's intended to
9    mean.
10 A We were concerned that the removal of the small
11   office area as proposed in the preliminary plans
12   would drive up the construction costs because of
13   Chapter 34 -- Chapter 34 of the Mass. State Building
14   Code.
15 Q Now, I think earlier, you indicated that the
16   preliminary plans provide for the complete
17   demolition as opposed to the partial demolition.
18   Do you recall that?
19 A Yes. I recall that referring to a sketch on my --
20   on one of my notes.
21 Q Okay. I don't recall it as having taken place at
22   the time.
23 A Oh.
24 Q But you do recall that the preliminary plans didn't

**Page 135**

1    indicate for partial demolition of the small office
2    area in the front. It called for the -- or
3    indicated the complete demolition?
4  A Partial --
5        MR. BARKER: Objection.
6  A Partial demolition would refer to the entire
7    facility. And small office area is the area that
8    we're talking about being demolished completely.
9  Q Okay. So up until this point, there was still some
10   consideration about demolishing a small office area
11   completely.
12       MR. BARKER: Objection.
13 A No. We did not use the preliminary plans. We were
14   just indicating to the Town that we did not want to
15   use them; because we felt this would cause the cost
16   to drive up.
17 Q But you think the preliminary plans indicated the
18   demolition of a small office area. Is that correct?
19 A That is what we believe they -- is shown, correct.
20 Q The note said, "Do not partially demolish." Is that
21   what they say?
22 A The notes do say do not partially demolish.
23 Q And -- but it's your understanding that the plans
24   called for complete demolition?

**Page 136**

1        MR. BARKER: Objection.
2  A The -- the office area is a portion of the entire
3    facility.
4  Q I understand. So demolishing the entire small
5    office area would be a partial demolition of the
6    entire structure.
7  A That's --
8  Q Is that what that means?
9  A That's correct.
10 Q Item three, we cannot construct a central corridor
11   as shown on preliminary plans, too -- T-O-O -- many
12   load bearing walls. Can you tell me what that's
13   intended to mean.
14 A Yes. Chapter 34 discussed earlier talks -- refers
15   to removal of lateral-load resisting elements. In
16   the interior walls appear to be lateral-load
17   resisting elements. So the removal of those walls
18   would result in increased cost in the facility that
19   we didn't feel was warranted.
20 Q Did the actual load that was being borne, does that
21   have any significance under Chapter 34?
22 A I can't answer that. It would need to be answered
23   by a structural engineer.
24 Q Do you understand the question however?

Parisi Court Reporting (508) 984-5502

BARBARA ST. JEAN, RPR, CSR No. 127693

DEPOSITION of JEFFREY ALBERTI Taken 12/05/2005 (GREENBERG versus FALMOUTH)

SHEET 36   PAGE 141

**141**

1  time were we advised to stay within a certain
2  number. The Town requested that we perform an
3  independent space needs assessment.
4  Q  And this page we've been reviewing are further
5  agenda items -- is that -- are agenda items for a
6  meeting, not notes of a meeting. Is that correct?
7  A  That's correct.
8  Q  And you studied the preliminary plans in order to
9  make determinations about demolishing the small
10  office in front?
11       MR. BARKER: Objection.
12  A  I wouldn't say that we studied them. We did a
13  cursory review of the plans.
14  Q  And you made a cursory review of the plans in
15  determining that the central corridor was
16  problematic?
17  A  That is correct.
18  Q  Did you make any more review of the preliminary
19  plans other than a cursory review?
20  A  Prior to this initiation of the proceedings here, I
21  don't believe we did make any detailed reviews of
22  the preliminary plans.
23  Q  You did obtain some square-footage figures.
24  Gannett Fleming obtained some square-footage figures

Parisi Court Reporting (508) 984-5502

PAGE 142

**142**

1  from the plans, didn't they?
2  A  As I stated earlier, I believe that the square-
3  footage figures that were used in the Scope of
4  Services we assumed were based on the preliminary
5  plans, as that was the only information available
6  during that phase of the project, during the
7  creation of that scope.
8  Q  And when you say scope, you're talking about a
9  document that identifies the square-footage figures.
10  Is that what you're referring to?
11  A  That's correct. The document identifies the
12  approximate square-foot figures.
13  Q  If you could turn to page GF 00289, can you tell me
14  what this page reflects.
15  A  This page appears to represent comments from the
16  Town to the first alternatives that were created by
17  Gannett Fleming from scratch.
18  Q  When were those first alternatives created?
19  A  In November of 2002.
20  Q  When -- when did the Town comment on them?
21  A  November 6th, 2002.
22  Q  So they were created sometime between the first and
23  the sixth. Is that --
24  A  I don't recall the exact date, but that's a fair

Parisi Court Reporting (508) 984-5502

PAGE 143

**143**

1  statement.
2  Q  It's probably more fair to say they were kind of put
3  in final form between the first and the sixth. You
4  might have been working on them in October or
5  September.
6  A  Uhm.
7  Q  Or Gannett Fleming might have been.
8  A  I don't recall. I can't recall exactly when we
9  started and finished those drawings.
10  Q  What happened after the September 12th meeting?
11  What did Gannett Fleming do after that?
12  A  My recollection is we created additional
13  alternatives for the Town to review based on their
14  comments.
15  Q  Can you look through these and tell me if any of
16  those reflect the plans that you prepared after the
17  September 12th, '02, meeting.
18  A  I have plans here that appear to have been created
19  and discussed at the November, 2002, meeting.
20  Q  How many pages are there?
21  A  Four pages.
22  Q  And they have GF numbers?
23  A  They do.
24  Q  And can you tell me what those are?

Parisi Court Reporting (508) 984-5502

PAGE 144

**144**

1  A  Sure. GF 00024, GF 00025, 00026, and 00021.
2  Q  In that pile of papers, are there any other plans
3  that appear to be from that November time frame?
4  A  At that first meeting you're referring to?
5  Q  Well, you said after September, you prepared some
6  plans that the Town reviewed on November 6th.
7  A  Yes. I think I stated sometime beginning of
8  November we prepared plans.
9  Q  Sure.
10  A  Yes.
11  Q  And I want to know what plans that were -- were
12  reviewed with the Town on November 6th.
13  A  The four plans that I mentioned to you. However,
14  I'd like to add a note that the comments that are on
15  the plans are for a subsequent meeting from the
16  Town.
17  Q  Okay.
18  A  So these were reviewed at the November meeting. And
19  then further review was done in December.
20  Q  Are those the only plans that were available in
21  November of 2002 that you can recall?
22  A  As far as I recall, I believe those are the only
23  plans at this time.
24  Q  Referring back to your project notebook, page

Parisi Court Reporting (508) 984-5502

BARBARA ST. JEAN, RPR, CSR No. 127693