SHEET 39  PAGE 153

**Page 153**

1  Q  Sure.
2  A  GF 000340, GF 00029, GF 00016, GF 00018, GF 00019,
3     GF 00020, GF 00028, GF 00017, GF 00031, GF 00030,
4     GF 00037.
5  Q  And are those designated any other way on the
6     documents themselves other than these numbers that
7     we've been using? By plan number, for instance?
8  A  They are designated with plan numbers.
9  Q  And what are those plan numbers?
10 A  A, dash, 2A; A, dash, 5A.
11 Q  On the document that's been marked GF 00042, also
12    has a plan designation of A dash 2A. There's a
13    dimension here along the top of the page. This says
14    28 feet. Do you see that?
15 A  Yes. I do.
16 Q  Do you know if that dimension was retained in the
17    final Gannett Fleming drawings?
18 A  I don't recall if that dimension was retained in the
19    final drawings without looking at the final drawings.
20 Q  You have them in front of you. If you look at them,
21    does that help you answer the question?
22 A  Yes. It appears to be the same dimension.
23 Q  There's a dimension along the bottom of the page,
24    56 feet. Do you see that?

Parisi Court Reporting (508) 984-5502

**Page 154**

1  A  Yes. I do.
2  Q  We're referring to GF 00034. Will you tell me, was
3     that dimension carried through to the final --
4  A  This one?
5  Q  Yes -- Gannett Fleming's final plans?
6  A  This plan doesn't -- the final plan in Exhibit 21,
7     does not have a dimension shown.
8  Q  So you don't know to answer to that question without
9     referring to another document?
10 A  That's correct.
11 Q  Do you have an idea of whether this dimension was
12    carried forward?
13 A  I'll have to refer to the other document to verify
14    that.
15         MR. BARKER: Could I just state for
16    the record that Exhibit 21 does not have a Gannett
17    Fleming Bates Number; so it isn't a document that we
18    have produced. It's the one that's being presented
19    as the final plan.
20         MR. RUSSELL: But the Town produced
21    documents.
22         MR. BARKER: What's that?
23         MR. RUSSELL: The Town produced
24    documents that don't have GF numbers on them. Okay.

Parisi Court Reporting (508) 984-5502

**Page 155**

1  Q  On this page 000293, there's an item that says
2     finish to be, about two-thirds of the way down the
3     page. Do you see that?
4  A  Yes.
5  Q  And under that, it reads admin, sloped hip roof,
6     con for concrete base. Brick. Can you read the
7     item under that?
8  A  Standing metal roof on sloped admin roof.
9  Q  The final item, mezzanine -- mezzanine -- no.
10    Membrane roof in back. Can you tell me who made
11    these finish elections.
12 A  My understanding according to this document is
13    Mr. Owen made these recommendations.
14 Q  Does that include the membrane roof in back? Or is
15    that the existing roof that that refers to?
16 A  My understanding is that this would be for the
17    portion of the new roof.
18 Q  Where would the membrane roof be included? Would
19    that be in the vehicle storage area?
20 A  No. That would be included in the back portion of
21    the front building.
22 Q  Where there's no second story?
23 A  That's possibly what it could represent.
24 Q  Could it represent anything else?

Parisi Court Reporting (508) 984-5502

**Page 156**

1  A  Not that I'm aware of at this time.
2  Q  I'm going to show you three more plans, GF 00035,
3     GF 00022, GF 00023 and ask you if you recognize
4     those documents.
5  A  Yes. I recognize these documents.
6  Q  Can you tell me what they are.
7  A  A, dash 1A rev, which is GF 00035, is plan of the
8     existing garage as constructed in 1966. I believe
9     it was 1966.
10 Q  That actually says A dash 1 rev. Is that right?
11 A  That's correct.
12 Q  I thought you read into the record A, dash, 1A rev.
13 A  Oh, sorry.
14 Q  That's all right.
15 A  GF 00022, A, dash, 100 appears to be a plan of --
16    one plan of the floor plan for the new front
17    addition created by Gannett Fleming from scratch.
18         And GF 00023, also A, dash, 100,
19    appears to be the same plan I just mentioned, at
20    least one iteration of that plan.
21 Q  Out of all these plans, are there any plans that
22    are the latest in the Town that Gannett Fleming
23    worked from to create the final plans?
24 A  As I mentioned earlier, there are multiple

Parisi Court Reporting (508) 984-5502

SHEET 40   PAGE 157

**Page 157**

1 iterations. This appears to be an iteration from
2 April of 2003.
3 Q  That would be GF 00023?
4 A  That's correct.
5 Q  Does that appear to be the latest in time out of all
6 of the drawings that we've been working with?
7 A  No. Exhibit 21 appears to be the latest in time.
8 Q  Other than Exhibit 21, does that one appear to be
9 the latest in time?
10 A  From what I have seen this afternoon in front of me,
11 it appears to be the latest.
12      MR. RUSSELL: Would you mark those,
13 please.
14      (Whereupon the above-described
             documents were then marked as
15      Plaintiff's Exhibit No. 23)
16      MR. BARKER: Wat Exhibit Number is
17 that?
18      THE WITNESS: Twenty-three.
19 Q  Mr. Alberti, I will show you to what has been marked
20 as Deposition Exhibit Number 23. And it consists of
21 four pages; the first reading Proposed First-Floor
22 Plan A; the second reading Proposed First-Floor
23 Plan B; the third reading Option C; and the fourth
24 reading Option C with a number of handwritten

Parisi Court Reporting (508) 984-5502

**Page 158**

1 notes. And I would ask if you have any idea what
2 those documents represent.
3      MR. SKRIP: Rich, you don't have a
4 copy of those, do you? They're not in the page
5 here.
6      (Handing of Document)
7      MR. SKRIP: Thanks.
8 A  These appear to --
9      MR. BARKER: Let him ask you a
10 question on it.
11      MR. RUSSELL: I think I did ask him a
12 question.
13      THE WITNESS: He did.
14      MR. BARKER: Sorry, Rich.
15      MR. RUSSELL: If he has an
16 understanding -- I don't even know what the question
17 is now -- if he has an understanding of what those
18 documents represent.
19 A  These documents appear to be continued iterations of
20 plans that were prepared by Gannett Fleming from
21 scratch.
22 Q  And are these later in time than the plans we've
23 been looking at so far, except for Exhibit 21?
24 A  These plans don't have dates on them; so I'm unable

Parisi Court Reporting (508) 984-5502

**Page 159**

1 to tell you the date they were generated.
2 Q  Let me show you what's been marked as GF 00015 and
3 ask you if you have an understanding of what that
4 document is.
5 A  It appears to be the existing conditions plan of the
6 rear of the site.
7 Q  Do you know who prepared that?
8 A  The existing conditions plan was provided to us by
9 the Town.
10 Q  The second set of drawings that we discussed that
11 weren't marked as an exhibit but generally have an
12 A, dash, number associated with them, do these
13 appear on the computer somewhere? Or did they at
14 one time?
15 A  Are you referring to on the computer at Gannett
16 Fleming or --
17 Q  Yes.
18 A  -- were they given to us electronically? I'm not
19 sure what you're asking.
20 Q  Well, who designed them.
21 A  This is an existing conditions plan; so we didn't
22 design that.
23 Q  Okay. Of the other ones, who designed GF 00022,
24 Proposed First-Floor Plan.

Parisi Court Reporting (508) 984-5502

**Page 160**

1 A  This prepared -- this appears to -- can I take a
2 look at it? This appears to be an alternative
3 generated electronically by Woodbrier Associates as
4 our subconsultant.
5 Q  Did Woodbrier Associates prepare all of these plans?
6 A  No. They did not.
7 Q  How can you distinguish a Woodbrier plan from a
8 Gannett Fleming plan?
9 A  I'm unable to distinguish between every single one
10 of these where they were generated.
11 Q  Was there some point where Woodbrier started
12 participating in the project?
13 A  Yes.
14 Q  And were there proposed first-floor plans that
15 existed at that time?
16 A  Yes. My understanding is we generated first-
17 floor -- Gannett Fleming generated first-floor plans
18 when we received the Town's approval. We then had
19 Woodbrier Associates put them into the computer.
20 Q  The various plans that Gannett Fleming prepared, can
21 you tell me actually how those were created; since
22 you keep saying they were created from scratch.
23 A  Yes. They were -- can you tell me which ones you're
24 referring to?

Parisi Court Reporting (508) 984-5502

BARBARA ST. JEAN, RPR, CSR No. 127693

SHEET 43  PAGE 169

**169**

1  programmed into the plans?
2  A  There was a smaller -- no. Actually, I take that
3     back. There was no concrete wall proposed in the
4     administration addition.
5  Q  Was there a concrete wall employed anywhere in
6     Gannett Fleming's program for the D.P.W. facility?
7  A  Yes.
8  Q  And where was that?
9  A  That was on the vehicle storage garage addition.
10          MR. RUSSELL: Would you mark that,
11     please.
12          (Whereupon the above-described
13          document was then marked as
14          Plaintiff's Exhibit No. 27)
14  Q  Referring to Exhibit 26, this is a FAX to
15     Bill Owen. Do you see that?
16  A  Yes.
17  Q  And is this actually how the proposed elevations
18     were presented to him by facsimile transmission?
19  A  That appears to be correct, yes.
20  Q  And they would have been on this size paper,
21     eight-and-a-half by eleven?
22  A  Initially, yes.
23  Q  Okay. Mr. Alberti, marked as Deposition Exhibit 27
24     is a two-page document. That's on Gannett Fleming

Parisi Court Reporting (508) 984-5502

PAGE 170

**170**

1     stationery. This also says FAX transmittal near the
2     top. And I'd like to ask you if you've seen this --
3     if you've seen this document before.
4  A  Yes. I have.
5  Q  What does this document represent?
6  A  It represents a FAX that was sent to Woodbrier
7     Associates with a floor plan of the administration
8     addition which was prepared by Gannett Fleming from
9     scratch.
10 Q  Is it dated March 31st '03?
11 A  That's correct.
12 Q  What would Woodbrier have done with this?
13 A  My understanding is they would take this and create
14    a floor plan on the computer using this as a basis.
15 Q  How would Woodbrier know the dimensions of this
16    plan?
17 A  This plan doesn't appear to have a scale on it; so
18    I'm not sure how they would know the dimensions of
19    this plan.
20 Q  Is it your understanding that this is for the most
21    part the plan the Town was satisfied with and
22    proceeded with?
23         MR. BARKER: Objection.
24 A  I'd have to compare it to the existing plan to see

Parisi Court Reporting (508) 984-5502

PAGE 171

**171**

1     if it is the final plan that was used.
2  Q  You can't tell by looking at it?
3  A  Not without comparing it to the final plan.
4  Q  Well, did they approve of the -- did the Town
5     approve of additional floor plans or alternate floor
6     plans after March 31st, 2003?
7  A  My understanding is the Town did approve of changes
8     to the floor plans throughout the design development
9     and final design phase. Typically, they're minor
10    changes.
11 Q  So did they make any changes other than minor
12    changes after March 31st, 2003?
13 A  I can't recall at this time whether they made any
14    major changes to these plans after March 31st --
15 Q  Okay.
16 A  -- without comparing them.
17         MR. RUSSELL: Would you mark that,
18    please.
19         (Whereupon the above-described
                document was then marked as
20         Plaintiff's Exhibit No. 28)
21         MR. BARKER: I need a bathroom break
22    whenever we can stop.
23         MR. RUSSELL: Okay. We can stop
24    now.

Parisi Court Reporting (508) 984-5502

PAGE 172

**172**

1         (Off the Record)
2  Q  Mr. Alberti, marked as Deposition Exhibit 28 is a
3     document on Gannett Fleming stationery dated
4     April '01, 2003, addressed to Mr. William B. Owen
5     and under the signature of Donald B. Nicholas, P.E.
6     Do you have that document in front of you?
7  A  Yes. I do.
8  Q  Do you recognize that document?
9  A  Yes. I do.
10 Q  I'm gonna ask you about the second to the last
11    paragraph. "Any potential similarities between
12    Gannett Fleming's final design documents and
13    Noah Greenberg Associates' preliminary design
14    documents may be a result of industry standard,
15    space programming, and design development for a
16    facility of this nature. Do you see that?
17 A  Yes. I do.
18 Q  Do you have an understanding of the industry's
19    standard, space programming, and design development
20    of a facility -- for a facility of this nature?
21 A  Yes. I'm familiar with some of the industry's
22    standards associated with public works facilities.
23 Q  And is that what this letter refers to?
24 A  It appears to refer to that.

Parisi Court Reporting (508) 984-5502

BARBARA ST. JEAN, RPR, CSR No. 127693

SHEET 48   PAGE 189

**Page 189**

1  Q  The preferred alternative was further modified and
2     refined by the Town to obtain the Town's preferred
3     adjacencies. Subsequently at a 9/12/02 meeting with
4     the Town, Alberti listed seven areas of deficiencies
5     in the existing plans and told Town representative
6     Bill Owen that he wanted not to use these plans.
7         My question is everything in the
8     paragraph, the second to the last paragraph occurred
9     prior to 9/12/02. Is that accurate? And the reason
10    I say that is just based upon use of the word
11    subsequently.
12        MR. BARKER: Objection.
13 A  When you say everything --
14        MR. BARKER: Including in that is
15    stuff you did not read into the record?
16        MR. RUSSELL: Well, the stuff I
17    didn't read into the record just talked about
18    locations of -- of, you know, programmed items.
19    What I'm trying to figure out is when the Town
20    selected a preferred alternative from several
21    alternatives, given that the Interrogatory says
22    after all of this happened, there was a meeting that
23    took place on 9/12/02. So my reading this is all of
24    this took place before 9/12/02. And I just want to

**Page 190**

1     confirm if my understanding is accurate.
2         MR. BARKER: Objection.
3  A  In order to answer that, I would want to go through
4     each one of these items to see what was done ahead
5     of time. I just don't want to make a general
6     statement that everything was done prior to it. The
7     programming was done prior to the 9/12/02 meeting.
8  Q  And what do you mean programming?
9  A  The space needs assessment.
10 Q  Okay. Now, did that -- did the space needs
11    assessment result in several alternatives? The Town
12    selected a preferred alternative from these several
13    alternatives.
14 A  No. The space needs assessment was used as a means
15    to develop alternatives.
16 Q  And as used in this Interrogatory, reading the last
17    two sentences from the second to the last paragraph,
18    the Town selected a preferred alternative from these
19    several alternatives. What do these several
20    alternatives refer to?
21 A  My understanding is the alternatives that we
22    reviewed earlier this afternoon, which was created
23    in November of 2002 -- 2002. That's correct.
24 Q  So would it -- well, let me ask you this. Does the

**Page 191**

1     word subsequently then appear to be in error?
2         MR. BARKER: Objection.
3  A  It -- it could be; but I'd have to look at each item
4     individually.
5  Q  What do you mean each item individually?
6  A  That's listed in this paragraph.
7  Q  Well, but isn't the paragraph saying everything that
8     happened occurred prior to September 12th, '02?
9         MR. BARKER: Objection.
10 A  The space needs assessment that's mentioned in this
11    earlier paragraph was completed prior to
12    September 12th, 2002.
13 Q  Okay. So that would be the first 30 days of the
14    schedule consists of space programming, including
15    type of spaces, that language?
16 A  Right. The alternatives were created in November.
17    The first alternatives created by Gannett Fleming
18    from scratch were created in November of 2002 from
19    my recollection.
20 Q  And who created those?
21 A  Those were created by me.
22 Q  And you were the person that identified many
23    deficiencies in the preliminary plans. Is that
24    correct?

**Page 192**

1  A  That is correct.
2  Q  And that was from your study of those plans.
3     Is that correct?
4         MR. BARKER: Objection.
5  A  Those were from my cursory -- my cursory review.
6     I did not study those plans in detail.
7  Q  And you were able to identify seven areas of
8     deficiencies in the existing plans based upon a
9     cursory review?
10 A  Yes. I was.
11 Q  Okay. Do you recall what those seven areas of
12    deficiencies were?
13 A  Yes, I do.
14 Q  What are they?
15 A  They included demolishing the existing structure in
16    the front of the building, the existing office to
17    the front of the building. It included removing
18    load-bearing walls in the existing facility. It
19    included inadequate height for the park maintenance
20    area. It included inadequate space for vehicle
21    maintenance activities due to mezzanine extending
22    too far. It included building out a vehicle storage
23    addition in the direction of the salt shed,
24    restricting traffic flow and access to the salt

Parisi Court Reporting (508) 984-5502

BARBARA ST. JEAN, RPR, CSR No. 127693

SHEET 49  PAGE 193

**Page 193**

1 shed. And I'm not counting. I apologize. But I
2 believe the last one was what we defined as improper
3 circulation around the site was counterclockwise.
4 Typical entry standard is designed counter --
5 counterclockwise circulation. And the site was
6 designed with clockwise circulation.
7 Q What does circulation mean?
8 A The direction that the vehicles travel through the
9 site.
10 Q Just a matter of the arrows on the ground saying to
11 go in this direction?
12 A That's correct.
13 Q Did you have to take any measurements or
14 determine -- strike that. Did you have to determine
15 any of the areas of the preliminary plans in order
16 to determine that they were insufficient?
17 A We needed to determine heights for the parks and the
18 vehicle maintenance division. We did not calculate
19 areas; but we needed to know where the vehicles were
20 going to be maintained. The mezzanine was extending
21 over the area that the vehicles would be maintained.
22 And we were able to quickly identify that as a
23 problem for the maintenance activities.
24 Q How did you determine heights?

Parisi Court Reporting (508) 984-5502

**Page 194**

1 A It was determined -- the height that was required
2 was identified by the Parks Department mechanic.
3 And when we met with him, he indicated that he
4 needed a higher roof because he couldn't lift his
5 vehicles.
6 Q Higher than the existing roof?
7 A That's correct.
8 Q And when you say that the preliminary plans were
9 insufficient in that respect, that's because they
10 didn't program raising the roof?
11 A I believe that is correct. There was no indication
12 on the plans from our cursory review that showed
13 that the roof would be raised.
14 Q How did you solve that problem?
15 A We constructed a separate parks maintenance bay as
16 part of the addition structure isolated from the
17 existing building with a high roof.
18 Q So you didn't try and raise the roof?
19 A No. We did not.
20 Q Was that ever considered?
21 A No. It was not.
22 Q Are those all the deficiencies that you can recall?
23 A Those are just a portion of the deficiencies that
24 we identified in our cursory review.

Parisi Court Reporting (508) 984-5502

**Page 195**

1 Q Well, tell me the rest of them.
2 A Again, I haven't studied the preliminary plans in
3 detail; so I'm not able to offer additional ones at
4 this time.
5 Q How much time did you spend in this cursory review?
6 A I can't recall the exact time; but it was a short
7 review. I don't recall sitting down and studying
8 them for hours at all.
9 Q Well, what did you consider short?
10 A Again, I -- I don't recall how long we studied the
11 plans, the preliminary plans.
12 Q If you don't recall how long it was, how do you
13 know it was cursory?
14    MR. BARKER: Objection.
15 A I know from the review that we conducted. It was
16 simply looking at the plans. There was no study
17 done of them. And I know that that didn't take
18 long.
19 Q If you could move ahead to answer Number 10, do you
20 have that in front of you?
21 A Yes. I do.
22 Q I'll point out a sentence in there, if I can. Right
23 here, "The Town approved the final floor plan done
24 by Jeff Alberti on 3/31/03. Do you see that?

Parisi Court Reporting (508) 984-5502

**Page 196**

1 A Yes. I do.
2 Q Is that your recollection of what happened?
3    MR. BARKER: Why don't you read the
4 question and the answer, however long it is -- it's
5 not too long -- to get it in context.
6    THE WITNESS: Okay. I've read it.
7 I'm sorry. What was the question?
8    MR. BARKER: It goes over here;
9 right?
10    THE WITNESS: Oh. I didn't see
11 that.
12    Okay. I've read the answer
13 Number 10 of the Interrogatories.
14 Q There's a sentence in there that says, "The Town
15 approved the final floor plans done by Jeff Alberti
16 on 3/31/03. Do you see that?
17 A Yes, I do.
18 Q Earlier, we marked as Exhibit 27 a facsimile that
19 reads -- well, a facsimile to Richard DeCoste at
20 Woodbrier from Jeff Alberti dated March 31, '03.
21 And the text of the facsimile transmission reads,
22 "Please see attached floor plan with comments from
23 the Town of Falmouth. The Town has approved the
24 attached layout as the final plan."

Parisi Court Reporting (508) 984-5502

SHEET 50  PAGE 197

**197**

```
 1       Is that plan the same plan that is
 2   referred to in answer to Interrogatory Number 10?
 3  A  That is my understanding. Yes.
 4  Q  So earlier when I asked you if this was the final
 5   plan and you had some hesitation --
 6  A  I think I --
 7  Q  Go ahead.
 8  A  I think in my response was these plans are further
 9   developed during the design development phase, which
10   was conducted after 3/31/03, and is further stated
11   in our response to the Interrogatories that the
12   final drawings were completed on 6/18/04. So that
13   was the preferred concept. And then the plans are
14   further refined during design development through
15   final design, as I mentioned earlier.
16  Q  Okay. But this is the final floor plan that they
17   approved?
18       MR. BARKER: Objection.
19  A  This is the final concept that they approved that
20   was still subject to minor modifications as the
21   design development plans were prepared.
22  Q  Thank you. Would you look at Interrogatory
23   Number 11. Do you have that in front of you?
24  A  Yes, I do.
```

PAGE 198

**198**

```
 1  Q  That reads, "To the extent that Gannett Fleming's
 2   floor plan designs for the Public Works maintenance
 3   facility project reflect office spaces with interior
 4   walls at 45-degree angles as grossly depicted below,
 5   identify who conceived this design for use in the
 6   Public Works maintenance facility project, when and
 7   how, and indicate whether any documents contributed
 8   to that conception." Can you tell me who created
 9   that concept for this project.
10  A  My recollection is that I created the 45-degree
11   angles on one of the concepts.
12  Q  Did you recognize that in Mr. Greenberg's plans that
13   you made a cursory review of?
14  A  At the time that this was included, I did not.
15  Q  You didn't recognize it?
16  A  At the time that this was done, I was not aware that
17   he had -- I had not remembered that he had done
18   this. This was done based on previous experiences
19   that we had with other public works facilities, as
20   well as designs that we've done in our own office.
21  Q  Well, the reason I ask -- one of the reasons I asked
22   is because the answer doesn't say who designed it
23   for Gannett Fleming.
24  A  This plan was prepared by myself.
```

PAGE 199

**199**

```
 1  Q  Okay. And you created the 45-degree angle concept?
 2  A  Yes. And my recollection was it was to open up the
 3   corridors at the request of the Town.
 4  Q  And when did the Town make that request?
 5  A  I don't recall the exact date that that was made.
 6  Q  What corridors did they want to open up?
 7  A  The main corridors where the employees would be
 8   travelling.
 9  Q  So those would be corridors that are reflected on
10   Gannett Fleming plans?
11  A  That's correct.
12  Q  Okay. Interrogatory Number 2, do you have that in
13   front of you?
14  A  Yes. I do.
15  Q  It says, "Identify the persons most knowledgeable of
16   the Defendant Gannett Fleming's conception,
17   development, preparation, and completion of plans
18   and/or design drawings for the Public Works
19   maintenance facility." And on the fourth line of
20   that answer is the name Noah Greenberg. Do you see
21   that?
22  A  Yes. I do.
23  Q  Can you tell me what Noah Greenberg would know about
24   Gannett Fleming's conception, development,
```

PAGE 200

**200**

```
 1   preparation, and completion of the plans and/or
 2   design drawings for the Public Works maintenance
 3   facility.
 4  A  I'm not sure I understand your question.
 5  Q  Well, the Interrogatory says identify the persons
 6   most knowledgeable of the Defendant Gannett Fleming
 7   conception, development, preparation, and completion
 8   of plans and/or design drawings for the Public Works
 9   maintenance facility. And then included in the
10   answer as one of these people is Noah Greenberg.
11       Can you tell me what Noah Greenberg
12   knows about the Defendant Gannett Fleming's
13   conception, development, preparation, and completion
14   of plans and/or design drawings for the Public Works
15   maintenance facility.
16  A  I cannot speak to what Mr. Greenberg knows.
17  Q  Well, why is he included in the Answer to that
18   Interrogatory?
19  A  I don't know.
20       MR. RUSSELL: Can you mark that,
21   please.
22       (Whereupon the above-described
                    document was then marked as
23            Plaintiff's Exhibit No. 34)
24  Q  Mr. Alberti, marked as Deposition Exhibit 34 is a
```

Parisi Court Reporting (508) 984-5502

BARBARA ST. JEAN, RPR, CSR No. 127693