UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11934-GAO

NOAH GREENBERG,
Plaintiff

v.

TOWN OF FALMOUTH and
GANNETT FLEMING, INC.,
Defendants.

MEMORANDUM AND ORDER
February 8, 2006

O'TOOLE, D.J.

This is a copyright case in which the plaintiff Noah Greenberg, an architect, claims that the Town of Falmouth and Gannett Fleming, Inc. an architectural firm, infringed his copyright by improperly utilizing Greenberg's preliminary plans in creating final plans for the renovation of and addition to a town building. Greenberg's claims were narrowed by my prior decisions granting in part Falmouth's motion for summary judgment as to the copyright infringement claims against it and granting Gannett Fleming's motion to dismiss the claims against it arising under Massachusetts General Laws ch. 93A. Greenberg's remaining claims are (1) a claim against Gannett Fleming for copyright infringement and (2) a claim against Falmouth for contributory infringement.

Greenberg now moves for a preliminary injunction seeking to bar the defendants from any further use of Greenberg's architectural drawings, as well as the drawings of Gannett Fleming, which Greenberg alleges are derivative of his own, in the construction of the building. For the following reasons, I conclude that Greenberg's motion ought to be denied.

**Preliminary Injunction Standard**

In determining whether to issue this preliminary injunction, I must weigh (1) Greenberg's likelihood of success on the merits, (2) the potential for irreparable harm to Greenberg if the injunction is denied, (3) the balance of the relevant impositions–here, the hardship to Falmouth and Gannett Fleming if they are enjoined contrasted with the hardship to Greenberg if the injunction is denied, and (4) the effect (if any) the preliminary injunction ruling will have on the public interest. See Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004); see also Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 611 (1st Cir. 1988).

**Likelihood of Success on the Merits**

To prove copyright infringement, Greenberg must prove (a) his ownership of a valid copyright and (b) the copying of his protected work by the alleged infringer. See Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 33 (1st Cir. 2001); Concrete Mach., 843 F.2d at 605. For the purposes of this motion, Greenberg's ownership of a valid copyright is not disputed. Whether there has been copying of the protected work consists of two separate inquiries.

First, a copyright plaintiff must prove as a factual matter that copying indeed took place, proven either directly or (more commonly) indirectly by circumstantial proof. See Yankee Candle, 259 F.3d at 33; see also 2 Abrams, Law of Copyright §§ 14:2, 14:4, 14:6 (2004). Copying may be proved indirectly by showing (1) the alleged infringer's access to the copyrighted work and (2) similarities between the two works that provide sufficient proof to support an inference of copying. See Yankee Candle, 259 F.3d at 33; Concrete Mach., 843 F.2d at 606; 2 Abrams, Law of Copyright §§ 14:6; 14:9, 14:11, 14:12.

Here, there is little dispute that Gannett Fleming had access to Greenberg's plans for a substantial period of time. Additionally, there are some similarities between the two plans. The parties primarily focus on the question whether there is "substantial similarity" between the plans. For the purposes of this preliminary injunction motion, I will assume, without deciding, that Greenberg's evidence would suffice to support an inference of actual copying and turn to the question of whether he has a likelihood of success in proving that there was infringement, which will likely be the dispositive inquiry on the merits of his copyright claim. See Yankee Candle, 259 F.3d at 33 (assuming, without deciding, that copyright plaintiff had proven that "actual copying" had taken place and proceeding to the infringement inquiry).

In order to prevail at this step, Greenberg will be required to "prove that the copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works 'substantially similar.'" Yankee Candle, 259 F.3d at 33. There is a two-step analysis to determine if the copying is so extensive that there is a "substantial similarity" between the alleged infringing work and the plaintiff's actual protected expression. See id. at 33-34; Concrete Mach., 843 F.2d at 606. First, the court must engage in "dissection" of the plaintiff's copyrighted work to determine what within it constitutes protected expression, setting aside those aspects not protected by copyright. See Yankee Candle, 259 F.3d at 33-34.[1] Once "dissection" has occurred, the plaintiff's actual protected expression is compared to the alleged infringing work to determine whether they are

---

[1] While a court should be careful not to "over-dissect" in cases where the copyright holder claims that the copyrightable nature of the material comes from a unique arrangement of a variety of non-copyright-protected elements, the First Circuit is approving of "the use of dissection analysis to disaggregate a visual work into its component elements for the purpose of removing the unprotectible [sic] elements contained within." See Yankee Candle, 259 F.3d at 34-37 (discussing approval of district court's extensive "dissection" of the various visual elements of plaintiff's allegedly copyright–protected product label).

3

"substantially similar." This is done by employing the "ordinary observer" test, asking "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protected expression by taking material of substance and value." See id. at 33; Concrete Mach., 843 F.2d at 607.

In general, a plaintiff may not lay claim under copyright law to mere ideas, as opposed to unique expressions of those ideas, which are protected. See Concrete Mach., 843 F.2d at 606; 2 Abrams, Law of Copyright § 14:21. This general concept has two important specific corollaries that are relevant here. First, a copyright plaintiff may not claim protection for things such as (a) common geometric shapes that are insufficiently original to qualify for copyright protection or (b) solely functional design choices. See Yankee Candle, 259 F.3d at 34-35. Additionally, under the merger doctrine, infringement will not be found if a particular idea can only be expressed in a very limited number of ways, including the way for which the plaintiff now attempts to claim copyright protection. See id. at 35-36; Concrete Mach., 843 F.2d at 606-07. If it can properly be said that "the idea merged with the expression," then an alleged infringer will be liable for infringement only if he had "nearly identically" reproduced the plaintiff's form of expression. Yankee Candle, 259 F.3d at 35-36 (merger doctrine applied to hold that plaintiff could not claim copyright protection for the use of pictures of certain commonly associated foods and flowers as representative of scents on candle labels); cf. Danielson v. Winchester-Conant Properties, Inc., 322 F.3d 26, 42-43 (1st Cir. 2003) (copyrighted architectural designs not subjected to the merger doctrine because there were multiple ways the land could be developed besides those in the copyright-protected plan).

Architectural drawings, such as Greenberg's here, are protected by the copyright laws. See Danielson v. Winchester-Conant Properties, Inc., 186 F. Supp.2d 1, 9-10 (D. Mass. 2002). The aspect of architectural design that is protected is the gestalt of the plans including things like an architect's choices regarding shape, arrangement, and location of buildings, the design of open space, the location of parking and sidewalks, and the combination of individual design elements. See id. at 10; see 17 U.S.C. § 101 (copyright statute defines "architectural work" as including "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features"). It is difficult to deconstruct a copyrighted architectural design into its separate design elements and analyze infringement on that basis. Nevertheless, Greenberg makes his argument in favor of a finding of infringement by picking out certain design elements that he says appear in both his design and Gannett Fleming's design, thus purportedly demonstrating the "substantial similarity" between the two designs. To the extent that Greenberg relies on these individual elements as the basis for his claim of infringement, his likelihood of success on the merits is diminished because some of these alleged similarities correspond to elements in his design that likely would not qualify as protected expression.

For instance, Greenberg claims that the substantial similarity between the designs is demonstrated in part by the use of forty-five degree angled walls for certain offices, design elements he claims are purely arbitrary and non-functional. In response, Gannett Fleming argues that (1) this shape is a common geometric shape used often in design in order to "open up" hallway intersections and avoid collisions, (2) in the Gannett Fleming design, these design elements occur in many more

5

and different places, and (3) the Gannett Fleming corridors are much narrower than Greenberg's and therefore the use of the forty-five degree angles is indeed functional (e.g. to avoid collisions). More importantly, however, basic geometric shapes are not, in and of themselves, sufficiently original to warrant copyright protection. See Yankee Candle, 259 F.3d at 35.

Another similarity between both plans is said to be the similar placement of the space dedicated to particular uses. Gannett Fleming argues that the fact that both plans place the administrative offices in the front of the building close to the road (to permit employee and public access) and the garages and service shops in the back (because there is no need for public access) is hardly surprising as it is standard industry practice and was probably done at the town's request. Such a functional element or idea is not the stuff of protected expression. See Attia v. Soc'y of New York Hosp., 201 F.3d 50, 54-56 (2d Cir. 1999) (assuming that copying did exist but finding no infringement because the things plaintiff claimed were copied were best viewed as rough "ideas" of general nature and not protected "expressions" where plaintiff claimed infringement due to the placement of a new building, the use of truss technology to transfer weight, the alignment of floor heights and corridors, the creation of a continuous traffic loop through the hospital complex, the placement of emergency services and ambulance parking along that roadway, the location of a pedestrian area and of mechanical equipment, and the arrangement of space on particular floors).

Therefore, these alleged similarities – forty-five degree angled walls at hallway intersections and the general placement of administrative/office space versus garage/service shop space – should be left out of consideration in analyzing the "substantial similarity" between the two plans.

Other similarities Greenberg relies upon likely would have existed regardless of who did the drawings. According to Gannett Fleming, some general similarities between the designs – including

the location of the additions and the use of a ninety-degree angle "setback" within the building – were dictated by site limitations. Apparently, there were various geographic limitations on the site limiting any potential addition to the existing building to only the east and west ends of that building. Additionally, Greenberg divides the building up into rectangular pieces for the purposes of analysis and argues that the left setback (the 90 degree angle where the first shape meets the second larger shape) is in the same location on both sets of plans. Gannett Fleming responds that this setback was dictated by the need to allow for circulation of vehicles around an existing fuel island the town wished to preserve. Although the record is not yet conclusive that these similarities result from an inability on the part of Gannett Fleming to develop the land in any other way, in which case the merger doctrine would dictate that these similarities should also be stripped away in judging the designs' similarity, see Danielson, 322 F.3d at 42-43, the current record does reveal that this is a possible finding and thus Greenberg's likelihood of success on the merits is further reduced.

Once "dissection" has occurred, Greenberg would then need to prove that the protected elements of his plans and the Gannett Fleming plans are so "substantially similar" that "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." See Yankee Candle, 259 F.3d at 33; Concrete Mach., 843 F.2d at 607; see also Ideal Toy Corp. v. Fab-Lu Ltd., 360 F.2d 1021, 1022 (2d Cir. 1966) (the test is "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.").[2] Under this test, what matters the most are the overall similarities, not

---

[2] In arguing that Gannett Fleming's plans are "substantially similar" to his, Greenberg cites a statement in Roth Greeting Cards v. United Card Co., 429 F.2d 1106 (9th Cir. 1970) that "substantial similarity" is found when the accused work has captured the "total concept and feel" of the copyrighted work. Id. at 1110. This test, while pithier, is not a proper test to use for determining if "infringement" has occurred; it measures the similarities to the original work in toto

minor differences, between the two works. Slight, superficial, or trivial variations will be insufficient to defeat a finding of infringement. See Concrete Mach., 843 F.2d at 608. On the other hand, if the alleged infringer has made "substantial alterations in the design of a copyrighted work so as to provide a substantially different expression of the idea embodied in the copyrighted work," infringement will not be found. See id. Moreover, a defendant will not be held liable if the "points of dissimilarity . . . exceed the points of similarity" and "the remaining points of similarity are (within the context of the plaintiff's work) of minimal importance either quantitatively or qualitatively" See id.

After reviewing Greenberg's original drawing and the alleged infringing drawing created by Gannett Fleming as set out in Greenberg's memorandum and supporting exhibits, Greenberg's description of the purported similarities (appropriately limited by the foregoing dissection analysis), and Gannett Fleming's recounting of the various differences between the two designs, I conclude that it is likely that an ordinary, lay observer would find that "points of dissimilarity . . . exceed the points of similarity" and "the remaining points of similarity are (within the context of the plaintiff's work) of minimal importance either qualitatively or quantitatively." Concrete Mach., 843 F.2d at 608. Thus, Greenberg's likelihood of proving infringement and, therefore, likelihood of ultimate success on the merits is relatively low.

---

and does not limit itself to comparing the alleged infringing work's similarity with the plaintiff's protected expression. See 2 Abrams §§ 14:28, 14:45, 14:46. Thus, the "total concept and feel" test is out of step with the command of the First Circuit that, in determining whether alleged infringement has occurred, a court must only compare a plaintiff's protected expression (after "dissection") to the alleged infringing work. See Yankee Candle, 259 F.3d at 33-34. Thus, to the extent that Greenberg advocates for any test for infringement other than that described above –"substantial similarity" between the protected expression in his drawings and the alleged infringing drawings, he is incorrect.

8

While what matters most is the overall similarity between the works and not minor or trivial differences, see Concrete Mach., 843 F.2d at 608, these two works appear to have substantial differences in layout, floorplan, and size. It is not, as Greenberg alleges, that the Gannett Fleming design simply enlarged on his design by enclosing an open terrace in the front and creating office space within the enlarged space. As Gannett Fleming points out, there are a number of differences between the two plans ranging from differing styles of exterior elevations to widely divergent floor plans and space planning to the fact that Gannett Fleming's plan had a second level in the administration area while Greenberg's plan did not. A review of the drawings presented by Greenberg confirms many of these differences. It appears that there are, overall, substantial differences, not substantial similarities, between the two sets of plans.

Greenberg contends that the only real difference between the plans is that Gannett Fleming made the space bigger, a step he argues was necessitated by the growth in the DPW and thus greater space needs for the building. Greenberg in fact presents an enlarged drawing in his memorandum which is what he claims his plan would look like if he had (1) covered the front terrace area, (2) added office space in that area, and (3) added another corridor. He argues that this "modified" plan looks virtually identical to the plan of Gannett Fleming. This argument suffers from several defects. First, Greenberg's "modified" plan does not appear to the lay observer to be "virtually identical" to Gannett Fleming's. The overall differences between the plans appear to be more than just the enclosing of the front area, as Greenberg contends. In addition, this argument has a certain circularity to it. Greenberg seems to argue that if he had designed in this larger office space in the front of the building, then the Gannett Fleming plans would be virtually identical to his. In other

words, if he had designed his building so it looked like Gannett Fleming's, then Gannett Fleming's design would look like his. But the hypothetical appears to be counterfactual.

In light of the foregoing, I assess Greenberg's likelihood of success on the merits of his copyright infringement claim against Gannett Fleming as relatively low. For the same reasons, his likelihood of success on his contributory infringement claim against Falmouth, which would only be viable if Gannett Fleming is found to have infringed, is similarly low.[3]

### Other Preliminary Injunction Factors

Given this ruling, close analysis of the other factors in the preliminary injunction calculus is not necessary. See New Comm Wireless Servs. v. Sprintcom, Inc., 287 F.3d 1, 9 (1st Cir. 2002) ("if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity"). Nonetheless, I address them briefly.     Greenberg argues that in a case involving alleged copyright infringement, it should be presumed that he will be irreparably harmed unless the infringing conduct is enjoined. It is true that the First Circuit stated that in cases where a plaintiff seeks a preliminary injunction based on an allegation of copyright infringement, (1) "irreparable harm is usually presumed if likelihood of success on the copyright claim has been shown" and "[t]here is, therefore, no need to actually prove irreparable harm when seeking an injunction," (2) the "balance of hardships" argument by a defendant "merits little equitable consideration" when the only hardship a defendant will suffer is lost profits from an activity which has been shown likely

---

[3] In a separate opposition, Falmouth argues that even if Greenberg were able to prove that Gannett Fleming committed copyright infringement and Falmouth somehow contributed thereto, he would nonetheless have little likelihood of recovery against them because he granted them an implied license to copy and share his plans. Given the foregoing discussion of Greenberg's likelihood of success on the merits in proving his infringement claim, it is unnecessary for the purposes of this motion to analyze the merits of the implied license argument.

to be infringing, even if the defendant's business relies nearly exclusively on the alleged infringing conduct and would be virtually destroyed by any injunction, and (3) "public policy rarely is a genuine issue if the copyright owner has established a likelihood of success: Since Congress has elected to grant certain exclusive rights to the owner of a copyright, it is virtually axiomatic that the public interest can only be served by upholding copyright protections." Concrete Mach., 843 F.2d at 611-12 (internal quotations and citations omitted). However, these principles are all based on a predicate finding that a plaintiff has shown a likelihood of success on the merits. In fact, the First Circuit's purpose in laying out these principles was to ensure that the district court evaluated the other preliminary injunction factors in light of the strength of the plaintiff's case on the merits. See id. at 612-13. Here, Greenberg has not made a showing of likely success for the reasons described above. In light of this, it is proper to consider whether the balance of hardships or other factors weigh in favor of entering a preliminary injunction notwithstanding the unlikelihood of his success on the merits.

It is difficult to find, in light of Greenberg's low likelihood of success on the merits, his delay in bringing this suit, and his post-complaint delay in seeking this injunction, that the continued construction of the Falmouth DPW facility would irreparably harm him in a way that cannot be compensated via a damages award if he ultimately succeeded on the merits of his claim. Additionally, the balance of the relevant hardships favors the defendants. If I were to grant Greenberg's request for a preliminary injunction, it would halt in its tracks a municipal construction project that was, at the time the preliminary injunction request was made, almost halfway complete. A preliminary injunction would also invite financial harm to Falmouth in the form of damages claims by contractors engaged to work on the project, potential I.R.S. penalties for failure to spend down

11

within the prescribed schedule the funds that were raised for the project using municipal bond financing, and the additional costs that would inevitably follow from the temporary cessation and delay of any major construction project. Falmouth also presented evidence that while the construction project is ongoing, town public works vehicles and equipment must be stored outside, a condition that would be prolonged if the injunction issued and that makes town equipment susceptible to damage and more difficult to utilize efficiently.

There is, as Greenberg points out, a strong public interest in upholding copyright law. However, Greenberg cannot rely on the strong public policy against copyright infringement– evinced by Congress in statutory form—to foreclose any traditional public interest analysis because, unlike in the cases he relies on for this proposition, see Concrete Mach., 843 F.2d at 611-12; Microsoft Corp. v. Action Software, 136 F. Supp.2d 735, 738-39 (N.D. Ohio 2001), he has not made a strong showing of likelihood of success on the merits here. As described above, the impact on the DPW building construction project and Falmouth would be high, thus negatively affecting Falmouth's ability to best serve the public interest.

## Conclusion

For the foregoing reasons, I conclude that Greenberg's Motion for Preliminary Injunction (Dk. #26) should be DENIED. This renders MOOT Greenberg's Motion to Waive Bond on Preliminary Injunction (Dk. #25).

It is SO ORDERED.

February 8, 2006                                    \s\ George A. O'Toole, Jr.
DATE                                                DISTRICT JUDGE