UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

CIVIL ACTION NO. 04-11934-GAO

NOAH GREENBERG     )
    Plaintiff          )
                  )
v.                 )
                  )
TOWN OF FALMOUTH,  )
AND GANNETT        )
FLEMING, INC.,     )
    Defendants         )

**GANNETT FLEMING'S MEMORANDUM OF LAW,
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
AND GANNETT FLEMING'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Now comes defendant and cross-plaintiff Gannett Fleming Engineers and Architects, PC ("Gannett" or "GF"),[1] through its counsel of record, and hereby submits the following Memorandum of Law in Opposition to the Motion for Summary Judgment by Plaintiff Noah Greenberg ("plaintiff" or "Greenberg"), pursuant to U.S. District Court Local Rule 56.1.[2] In the alternative, Gannett Fleming cross-moves for summary judgment for defendants.

I.  **Introduction and Summary of Argument**

Plaintiff Greenberg is not entitled to summary judgment for three reasons: First, even affording plaintiff all favorable inferences on the merits, what is at issue here on summary judgment is whether the two sets of architectural plans are "substantially similar." They are not,

---

[1] The named Defendant in this case is Gannett Fleming, Inc. However, the contract between Gannett and the Town of Falmouth was with Gannett Fleming Engineers and Architects, PC, and that is the corporate entity that performed the design services on the subject job. Thus, Gannett Fleming, Inc. is a misnomer.

[2] Gannett is also filing herewith, its Separate Statement of Disputed and Undisputed Facts, in Opposition to plaintiff's Motion for Summary Judgment. Attached to Gannett's Separate Statement of Disputed and Undisputed Facts ("Facts") are documentary exhibits and referenced excerpts from deposition transcripts. Wherever Gannett cites to its Facts, it will do so by paragraph number in the following format: "Facts ¶__."

{00079288.DOC}

1

as a matter of law, even affording plaintiff favorable inferences. Second, plaintiff does not deserve favorable inferences on the merits of this case. As this Court found in its ruling on plaintiff's Motion for a Preliminary Injunction, plaintiff has a "relatively low" likelihood of success on the merits herein. Even a cursory comparison of the two sets of plans reveals that they are not very similar, and that most of the similarities are in non-protectable elements (such as basic geometric shapes, and design elements dictated by the topography of the physical site).

Third, even if plaintiff had better arguments on the merits than he does, he has not met his burden on summary judgment to show a sufficient factual record. Instead of concentrating on the overwhelming similarities between the two sets of plans, plaintiff's Facts focus on the relationships and communications among the three parties. There is no issue here that the Town did not circulate plaintiff's preliminary drawings to other potential architects/designers in 2001, or that Gannett Fleming did not briefly review plaintiff's preliminary drawings, before deciding to do its own design for the job from scratch. There is no disputing that plaintiff (belatedly) registered copyrights in his drawings and designs, nor that he (again belatedly) notified both the Town and Gannett of his alleged copyrights.

But what *is* at issue here is whether the plans are "substantially similar." An examination of plaintiff's 48 paragraphs of purportedly undisputed facts shows that plaintiff does not address this central issue, but rather wants this Court to infer from the dealings and contracts among the three parties that Gannett copied plaintiff's plans, without showing actual similarities between the plans.[3] A review of the two sets of plans and of the long list of differences between the two designs, neutralizes plaintiff's arguments based on contractual language: Comparing the

---

[3] For example, plaintiff selects certain language from the Scope of Services part of the initial contract for the job, between the Town and Gannett, referring to the architect "modifying" the "preliminary plans." Plaintiff tries to base his infringement case on language such as this – implying that Gannett was contractually obligated to modify Greenberg's plans – instead of demonstrating that Gannett *did* ultimately modify Greenberg's preliminary plans.

{00079288.DOC}

2

numerous and significant differences between the two sets of plans shows that Gannett did not "modify" Greenberg's plans, but rather designed its own.

## II. Pertinent Factual Background

Instead of using or copying plaintiff's initial plans, Gannett developed its own entirely different architectural plans for the Falmouth DPW project.[4] One look at the floor plans, included at pp.11 and 14 of plaintiff's Memorandum of Law in Support of his Motion for Summary Judgment ("Plaintiff's Memorandum"), shows just how striking the differences in plans are. As detailed below, even a cursory comparison between plaintiff's 1994 plans and GF's plans reveals that they envision different buildings, with completely different footprints, sizes, and dimensions, and with completely different layouts of rooms, walls, and number of rooms internally.

### A. Timeline of Facts, Pertinent Dates

In 1994, plaintiff Greenberg developed preliminary plans for the Falmouth DPW project. Greenberg was paid for these preliminary services. Facts ¶75. Falmouth finally obtained funding, and started over in 2001, sending out its Request for Qualifications, Architectural Design Services ("RFQ") as of 5/18/01 (and advertised in the local register on 5/30 and 6/6/01.) In its RFQ, Falmouth included copies of plaintiff's initial drawings. Facts ¶¶8 and 19. One of these RFQ packets went to Gannett. Id. Part of the assignment from the Town, in its RFQ, was to review the existing plans for the previous project. However, as explained below, Gannett chose not to use these plans and designed its own, from scratch. Plaintiff submitted no proposal, the second time around. Facts ¶76.

During negotiations with the Town for the project, GF identified certain potential problems with the initial plans, and discussed these with Town officials at a 1/28/02 meeting. At

---

[4] See Facts ¶¶77 and 80. Obviously, this is the central disputed question of fact in this case.

{00079288.DOC}

3

that time, the Town agreed to consider GF's alternate designs for the job. On 3/7/02, the Town and GF entered into a contract for architectural services for the job. In meetings and interviews with DPW personnel, Gannett's Project Manager Jeff Alberti, in April and May of 2002, ascertained as much as he could about DPW's personnel and their space needs. A few months later, plaintiff's counsel notified Gannett that plaintiff reserved all rights in his plans, by letter of 6/7/02. By this time, Jeff Alberti had already decided to redesign the project from scratch, and he had obtained preliminary permission from Town officials to do so. Facts ¶77. These discussions continued at a 9/12/02 meeting between Gannett and the Town, at which Town officials reiterated their permission to Alberti that Gannett could do its own plans for the job and not use Greenberg's preliminary plans. Id. The next year, Greenberg registered his architectural drawings for the job.

**B.   Differences Between Gannett's Final Plans and Greenberg's Initial Plans**

Paragraphs 46 through 74 of Gannett's attached Disputed and Undisputed Facts detail multiple and significant differences between the two designs for the subject job, with support from the factual record. Without repeating all these details, some of the highlights are:

1.   Gannett Fleming's **total square footage of new structure** on this job was about 43,220 square feet, whereas Greenberg's square footage for new structure on this job measured approximately 32,600 square feet. Facts ¶46.

2.   The two sets of plans for the subject job vary dramatically as far as **building elevations**, and external style and appearance. Gannett's elevations consist of a gambrel-style building, and Greenberg's elevations consist of a high-pitch roof building. Id. ¶47.

3.   The following items/features were expressly programmed into Gannett's final plans for the subject job, whereas they were not (expressly) included in Greenberg's preliminary plans for the subject job: reception area in front office space, id. ¶48; copy room/file room and storage area in office space, id. ¶49; separate conference room for administrative assistants for the Falmouth Highway Department, id. ¶50; separate plumbing/sprinkler room, id. ¶51; separate public-only toilet facility in front office area, id. ¶52; separate toilet facility for Highway

Department Superintendent and Assistant Superintendent, id. ¶52; covered/canopied area to cover material and equipment stored outside (at back of garage area), id. ¶53.

4. Gannett and Greenberg programmed **lunchrooms** in the front office area differently. Gannet programmed two separate indoor lunch rooms, with one of them for the Parks Department and the other one for the Highway Department; whereas Greenberg programmed a central luncheon for both Parks and Highway, for them to use on a rotating basis, and programmed an outdoor terrace that could also be used for lunch (weather permitting). Id. ¶54.

5. GF programmed a **second floor** in its plans, with an elevator and two staircases, whereas Greenberg programmed no second story whatsoever (or elevator or stairs). Id. ¶55.

6. Gannett designed the largest garage space, at the back of the site, without any **interior columns**, in order to avoid collisions with the trucks using this space; whereas Greenberg designed a comparable area using interior columns, down the middle of the garage area. Id. ¶59.

7. GF programmed the facility to separate the Parks operations from the Highway operations; Greenberg programmed the facility to combine these operations in the same area. Id. ¶60.

8. GF programmed a new high-bay Parks Maintenance Shop; Greenberg did not include a high-bay area for these operations. Id. ¶63.

9. GF programmed **separate entrances** for Parks employees and Highway employees; Greenberg provide a central employee entrance. Id. ¶64.

10. GF did not program a **mezzanine** in the existing Repair Shop areas; Greenberg programmed a mezzanine in the existing Repair Shop. Id. ¶65.

11. GF did not program any **new walls** within the existing maintenance facility; Greenberg programmed several new walls within the existing maintenance facility. Id. ¶66. GF did not program the removal of any load-bearing walls within the existing maintenance facility; Greenberg programmed the removal of several existing load-bearing walls within the existing maintenance facility. Id. ¶66.

12. **Parking**: GF parking layout includes segregated parking areas to the northeast, east, and southeast of the site. Greenberg's parking consists of one central parking area to the front (east) of the building. Id. ¶69.

13. Site amenities: Greenberg included an exterior terrace and extensive landscaping; GF did not include a terrace and very minimal landscaping. Id. ¶70.

14. **Site Circulation**: GF programmed the site for counter-clockwise circulation; Greenberg programmed for clockwise circulation. Id. ¶71.

15. GF programmed the site layout to take into consideration the **existing salt shed** operations; Greenberg did not program for existing salt shed operations. Id. ¶72.

This list is illustrative, not exhaustive. Notwithstanding plaintiff's protest to the contrary, the two sets of plans are not even similar, let alone substantially similar.

### III. Legal Argument: Under the Correct Two-Step Analysis for "Substantial Similarity", There Is No Question of Fact in This Case That the Two Sets of Plans Are Not Substantially Similar.

#### A. The Correct Two-Step Analysis, and Elimination of the Non-Protectable Aspects of Plaintiff's Preliminary Plans.

This Court's 2/8/06 ruling on the Preliminary Injunction set forth the two-step analysis for determination of substantial similarity, following the First Circuit in the Yankee Candle case. The first step is to:

> …engage in "dissection" of the plaintiff's copyrighted work to determine what within it constitutes protected expression, setting aside those aspects not protected by copyright…. Once "dissection" has occurred, the plaintiff's actual protected express is compared to the alleged infringing work to determine whether they are "substantially similar." This is done by employing the "ordinary observer" test, asking "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protected expression by taking material of substance and value." [Memorandum and Order of 2/8/06, pp.3-4].[5]

The Court's 2/8/06 opinion also pointed out that the "total concept and feel" test for substantial similarity, from the Roth Greeting Cards case "is not a proper test to use for" this purpose, because that test "measures the similarities to the original work in toto and does not limit itself to comparing the alleged infringing work's similarity with the plaintiff's protected

---

[5] Citing Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 33 (1st Cir. 2001), and Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 607 (1st Cir.), opinion after remand aff'd, 867 F.2d 606 (1st Cir. 1988); accord, Walker v. Timeline Films, Inc., 784 F.2d 44, 51-52 (2d Cir.), cert. denied, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986).

expression" only. Memorandum and Order of 2/8/06, pp. 7-8 n.2, *discussing* Roth Greeting Cards v. United Card Co., 429 F.2d 1106 (9th Cir. 1970).[6] The Court's opinion continued that "the 'total concept and feel' test is out of step with the command of the First Circuit that, in determining whether alleged infringement has occurred, a court must only compare a plaintiff's protected expression (after 'dissection') to the alleged infringing work." Id., *citing* Yankee Candle, 259 F.3d at 33-34.

But this "total concept and feel" test is what plaintiff uses. Plaintiff's Memorandum, p.10 ("substantial similarity is found when an accused work has captured the 'total concept and feel' of the copyrighted work"), *citing* Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 120-21 (8th Cir. 1987), *and* Roth Greeting Cards, 429 F.2d at 1110.[7]

Getting the test wrong for "substantial similarity," is not a mere technicality here. Once the analysis has eliminated the merged or functional aspects of the two sets of architectural plans for the subject site, not much else about them is similar. After we eliminate the purportedly distinctive 45° angles at interior corridors, as well as the location of offices and garage space on the site generally, what is left for comparison are two strikingly dissimilar sets of plans with different floor plans, layouts, sizes, arrangement of offices, and functions.

   1.   **The 45° Angles**

The plaintiff has again made much of his two 45° angles in interior walls in his preliminary plans (plaintiff's Memorandum, p.15). These angles occur on Gannett's plans at corners/intersections of corridors, which corridors are more narrow than the corridors on

---

[6] Roth Greeting Cards has been **superceded** by statute, as noted in Brush Creek Media, Inc. v. Boujaklian, 2002 WL 1906620, *3-4 (N.D. Cal. 2002).

[7] At p.17 of his Memorandum, plaintiff also alludes to a similar analysis--to the viewer's impression of similarity-- by citing to Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1004 (2d Cir. 1995), *and* Eden Toys, Inc. v. Florelee Undergarment Company, 697 F.2d 27, 34 (2d Cir. 1982). Knitwaves has not been followed, on other grounds, by the First Circuit, as stated in I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27 (1st Cir. 1998). Eden Toys has been **superceded** by statute, as stated in Weissmann v. Freeman, 868 F.2d 1313 (2d Cir. 1989), and other cases.

{00079288.DOC}

7

Greenberg's preliminary plans, and the angles serve to open up the intersections and minimize pedestrian collisions. The 45° angles are not necessarily copied, because they appear in different places on the two sets of plans, and Gannett's plans use more of them (in part because Gannett's corridors are narrower). Finally, basic geometric shapes are not sufficiently original for copyright protection. Yankee Candle, 259 F.3d at 35, *citing* Atari Games Corp. v. Oman, 979 F.2d 242, 247 (D.C. Cir. 1992), *and* Kitchens of Sara Lee, Inc. v. Nifty Foods Corp., 266 F.2d 541, 545 (2d Cir. 1959), *and* Williams S. Geiger Corp. v. Gigi Accessories, Inc., 1997 WL 458668, *2 (S.D.N.Y. 1997). This Court agreed with this position, in its 2/8/06 decision on the Preliminary Injunction, in which it found that the 45° angles should not be considered in the second step--the "substantial similarity" step of the analysis--because they are not protected "expressions" that can be infringed. Memorandum and Order of 2/8/06, p.6.

### 2. Limitations Dictated by the Configuration and Geography of the Site Itself

Both sets of plans place the administrative offices, which require public access, in the front of the complex, nearest to the road and to the public parking, in order to permit easier employee and public access; both sets of plans place the vehicle servicing and garage facilities towards the back of the complex, because there is no need for public access and this is closer to the salt shed and sand piles in the back. One reason for this placement is that the Town requested it. Facts ¶78. Another reason is the practical aspects of the design, of having the offices and public access in the front, closest to the road, and the vehicle storage and service areas in the back, away from the public. Greenberg himself acknowledged the practicality of this arrangement: "If you were greeting the public, you would want to have the public separated from the parking, most likely" (Greenberg Depo. 54:11-18), in order "to present a pleasant front to the public and keep the parking facility to the rear" (id. 54:22-55:4).

{00079288.DOC}

8

This general placement (offices in the front, and garages and service shops in the back) is not a copyright infringement. These are practical aspects of design that are dictated by the site itself, and that are not protectable.[8] This Court's 2/8/06 decision on the Preliminary Injunction found that these limitations dictated by the site itself were non-protectable "ideas," rather than protected "expressions" in the two sets of plans. Memorandum and Order of 2/8/06, p.6. Therefore, these aspects of the two sets of plans "should be left out of consideration in analyzing the 'substantial similarity' between the two plans." Id.

This is one respect in which plaintiff's Memorandum misunderstands the doctrine of merger (pp.19-20). Plaintiff contends that because Gannett "acknowledges that many variations" of the architectural plans "were possible," the merger doctrine would not apply in this case. But this misses the point. Merger arises as to those certain aspects of this job where many alternative designs were *not* possible, such as those aspects dictated by the geography and/or topography of the site. The merger analysis "often turns on the level of abstraction or generalization of the work being compared." Elijah Attia, 201 F.3d at 54. Where functional elements are involved, generalized notions of how to incorporate them or place them on a site would be considered "ideas," as opposed to "expressions." Id. at 55; *see also* Concrete Machinery, 843 F.2d at 606-07 (substantial similarity cannot be of mere concepts or ideas). Even when idea and expression are not completely inseparable, "there may still be only a limited number of ways of expressing the idea." Yankee Candle, 259 F.3d at 36, *quoting* Concrete Machinery, 843 F.2d at 606.

However, it is the generalized concepts that plaintiff himself testified were the basis for his infringement claims: When asked what the similarities between the two sets of plans were,

---

[8] *See, e.g.*, Elijah Attia d/b/a Architects v. The Society of the New York Hospital, 201 F.3d 50, 54-56 (2d Cir. 1999) (comparing two architectural designs for a new hospital building and parking facility, partly constructed over FDR Drive in New York; placement of floors, traffic patterns, alignment of corridors, and the placement of the building over FDR Drive were considered functional elements or "ideas" or concepts, rather than copyrightable expressions).

he responded, "the concept and the feel and the basic arrangement of spaces and the basic circulation pattern, that's mine" (Depo. 19:15-17, pp.131-132). Although he could not define "concept" and "feel," he further testified the plans "feel the same, they look the same because they are the same" (id. 19:20-23), that they have the same 45° angles, and the same "layout, with some changes in requirements, square footage, some variations" (id. 20:10-13). Other similarities were "the arrangement on the site" (id. 21:24), "the feel of the architecture" (id. 22:1-2, 22:4-6), the location of the entrance (id. 22:2-3), the materials used (id. 22:8), the height of the building (id. 22:8-9), the construction techniques and the use of "veneer masonry, steel stud construction, and the steel construction metal roofing" (id. 22:10-15).[9] These aspects are precisely the aspects that are not protectable, either because they were dictated by the Town (as to the location of the entrance or the building materials to be used), or because they were dictated by the site (see above).[10]

### B.  Plaintiff Has Not Met His Burden On Summary Judgment, Supported by Admissible Evidence in His Factual Presentation.

Plaintiff's 48 paragraphs of purportedly undisputed facts do not focus on the issue at hand--whether the two sets of plans are substantially similar. Plaintiff's factual record focuses on Gannett's access and on contractual requirements between the Town and Gannett at the beginning of the job (which subsequently changed). These facts do not show substantial similarity. For example, plaintiff focuses on some (inartfully drafted) contractual language

---

[9] Greenberg testified that not only did he use the "veneer masonry steel stud construction" technique on his own initiative, but that he "invented" this construction technique. Greenberg Depo. pp.22-23. His claim lacks credibility; but even if he did invent this construction form, its use was probably dictated by the Town. Regardless, a construction technique is not a protectable "expression," but rather a generalized "idea."

[10] In his deposition, Greenberg testified that he selected the site layout of having the offices in front and the garage and vehicle storage facilities in the back, and that he selected the green metal roof for the front (office) part of the job. Facts ¶¶78, 79. However, the Town's designated deponent William Owen testified that the Town had instructed both architects (including Greenberg) to put the offices in front and the garage and vehicle storage facilities in the back, and to use a green metal roof for the front/office part of the job. Id.

{00079288.DOC}

10

contained in the March 2002 Scope of Services between the Town and Gannett, which asked Gannett to perform "modifications" to Greenberg's "preliminary plans". Facts ¶¶28, 30. But this language from the early Scope of Services is not sufficient to carry plaintiff's burden on summary judgment, where both the Town and Gannett have repeatedly testified that they did *not* follow this requirement as to the final plans. Id. ¶¶77, 80. Plaintiff ignores the fact that the job requirements changed radically, early on, when Gannett requested permission to design its own plans for the job from scratch, and receive such permission from the Town. Id. ¶77. It is not disputed here that Gannett had access to Greenberg's plans, that the Town sent Greenberg's plans to Gannett (and other architects) with its initial Requests for Proposals, or that Gannett did cursorily review plaintiff's plans. What is disputed is that Gannett ultimately *copied* Greenberg's plans. Paragraphs ¶¶46 through 74 in Gannett's Facts, show admissible and supported evidence that the plans were *not* substantially similar. These Fact paragraphs are largely supported by deposition testimony from plaintiff or the Town or by documentary evidence such as the two sets of plans.[11]

Plaintiff's Memorandum (p.13) claims that "When the plaintiff's drawings are modified,... so that the design would not affect the existing structure, it becomes apparent that the plaintiff's design was retained in its entirety, almost inviolate." Plaintiff ignores the list (see above) of significant differences. The color-coded overlay attached at Exhibit A to the Alberti Affidavit, demonstrates the extreme differences of size and placement (within the confines of the existing site). The two sets of plans have very different sizes, layouts, floor plans, and office arrangements. Facts ¶¶46-74. Plaintiff creates a disembodied, illusionary drawing on p.14 of his

---

[11] Plaintiff makes much of Gannett and the Town using plaintiff's square footage figures for their first set of proposals and contractual language in 2001 and 2002. Facts ¶¶30-31. However, both Gannett and Town representatives have explained that these were the only figures available at the time, and that these figures changed dramatically by the end of the job. *See* Facts ¶46.

{00079288.DOC}

11

Memorandum, with his small number of rooms floating in a detached state.[12] Even using this floating technique, the plans still do not look alike. Nor do the plans on p.11 of plaintiff's Memorandum look alike, even without plaintiff's floating technique. Moreover, the comparison on p.11 is misleading, because the alignment on the actual physical site is not accurate. The rooms in plaintiff's drawing on p.11 were intended to be much further back on the actual site than the rooms pictured on p.11 in defendant's drawing. Facts ¶81.

Plaintiff contends that "Almost exclusively the defendants have pointed to the larger area their plans represent" in order to show differences between the plans. Memorandum p.17. While the overall size difference is indeed significant between the two sets of plans, Facts ¶46, this is hardly the only difference between the two sets of plans, id. ¶¶46-74. What *is* similar is that both designers have placed an office building in the front, garage and maintenance facilities in the back and on the side, that both designers used rectangular offices for the Parks and Highway Departments of Falmouth, and that both include bathroom facilities and lunch facilities. Almost everything else is different: the layout and arrangement of offices in the front, the separation in Gannett's plans of the Parks and Highway Departments, the establishment of each department's office areas and separate lunchrooms, the number of offices, Gannett's second floor, the planning and arrangement of the garages, the respective treatments of the salt shed area, parking on the site, and site circulation (to mention only some of the differences).

Plaintiff's Memorandum (pp.12-13) identifies a particular 28-foot dimension in Gannett's drawing that plaintiff contends is the same as a 28-foot dimension in plaintiff's drawing, thereby

---

[12] Gannett also challenges the admissibility of such disembodied, incorrectly aligned drawings as those appearing in plaintiff's brief (especially the drawing on p.14). This disembodied drawing of floating rooms is so inaccurate as to be irrelevant. Summary judgment should be supported by admissible evidence. *See generally* Schubert v. Nissan Motor Corp. in USA, 148 F.3d 25, 28-31 (1st Cir. 1998) ("conclusory assertions" in affidavit were not sufficient to defeat summary judgment); Kelly v. United States, 924 F.2d 355, 357-58 (1st Cir. 1991) (admissible evidence, beyond "proof based on errant speculation, optimistic surmise or farfetched inference," needed at summary disposition).

{00079288.DOC}

raising an inference of copying this dimension. But this 28-foot dimension is *not* in the same place on the site, as verified in the Alberti Affidavit. Further, Alberti independently determined the 28-foot measurement in Gannett's drawing by measuring equipment that would be going in and out of the Parks Department maintenance shop, without reference to plaintiff's drawings. Id.

Taking one of plaintiff's more specific contentions as an example, plaintiff states that "the east-most portion of the plaintiff's design is retained in the defendants' plans." Plaintiff's Memorandum p.12. First, plaintiff is apparently counting his outside terrace as an inside room. Second, that terrace would actually fall much further back, geographically (to the west), because the drawings pictured on p.11 of his Memorandum are not aligned as they would be on the site. Third, Gannett placed the dispatch office in the southeast corner of the new construction building so that the dispatcher could monitor the fuel island and salt shed out those windows, as well as monitor trucks coming and going from the site. In contrast, plaintiff placed the dispatcher in the middle of the building, where the salt shed could not be seen out the window. Fourth, Gannett made the dispatch office larger in case the Town needed extra personnel (for example, during a storm crisis). Fifth, Gannett put the Highway Department together in the south corner of its office construction area, and the Parks Department in the northeast corner. In contrast, Greenberg lined them up on the south side, with less space for each department. Plaintiff continues (p.12) that "the third area to the west is of the same north-to-south dimension and contains one office space and smaller toilet and mechanical spaces." Even assuming some such similarity (the referenced areas do not in fact look similar), these blocks of rooms are in different places on the physical site, in each set of plans, so this comparison is again specious.

Some of plaintiff's contentions suffer from the same circularity that his arguments as to the Preliminary Injunction did, as identified by this Court's ruling of 2/8/06. Memorandum and

{00079288.DOC}                                                                                      13

Order of 2/8/06, pp.9-10. Many of the plaintiff's specific contentions are premised on making some adjustment--that is, plaintiff states that if we just increase the size, make certain adjustments, and/or move the rooms east, then the plans look similar (e.g., Memorandum p.15). Such contentions beg the question, and merely state that if we make the adjustments necessary to make the plans more similar, then they look more similar. Such assertions actually highlight the differences, rather than the similarities, between the two sets of plans.

### C.   Gannett's Plans Do Not Constitute a Derivative Work.

Plaintiff raises the issue of exclusive rights to prepare "derivative works," at p.10 of his Memorandum.[13] Examples of derivative works are translations of an original written work or an arrangement of a musical work. 17 U.S.C. §101(a). The issue here (see above) is whether or not Gannett *copied* plaintiff's preliminary plans, as demonstrated by whether or not the two sets of plans are substantially similar. We do not believe this raises issues of a derivative work, but if it does, Gannett asserts that its plans are not a work derivative of Greenberg's plans for the same reasons discussed above that the two sets of plans are not substantially similar.

### D.   Plaintiff Cannot Use Gannett's Cross-Claim Against the Town as the Equivalent of a "Judicial Admission" Against Gannett, Because Gannett Is Permitted To Plead in the Alternative.

In plaintiff's Fact ¶44 and at p.17 n.6 of plaintiff's Memorandum, plaintiff attempts to use an isolated paragraph from Gannett's cross-claim against the Town in this case as, in effect, a "judicial admission" against Gannett. First, Gannett is permitted to plead in the alternative (pleading, in effect, that *if* Gannett is found liable to plaintiff, then Gannett will look to the Town to indemnify Gannett totally or to contribute a share of the liability to plaintiff). Labeling such

---

[13] Plaintiff cites <u>Atari, Inc. v. Northamerican Philips Consumer Electronics Corp.</u>, 672 F.2d 607 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). This <u>Atari</u> case was **superceded** by statute, as recognized in <u>Scandia Down Corp. v. Euroquilt, Inc.</u>, 772 F.2d 1423 (7th Cir. 1985), and its **overruling** was recognized by <u>Stanislowski v. Jordan</u>, 337 F.Supp.2d 1103 (E.D. Wis. 2004).

{00079288.DOC}

14

pleading in the alternative as an admission would effectively eliminate all cross-claims. Second, even if true, this does not fit the definition of a "judicial admission," which comes from a previous and separate case.[14] Third, plaintiff has mischaracterized what Gannett's cross-claim says here. Gannett's cross-claim against the Town for contribution and indemnification includes the following paragraph:

> 4. Gannett Fleming and Falmouth also have a special relationship as to this particular project, based on Gannett Fleming's reliance on Falmouth's provision of Plaintiff's plans and on statements that Plaintiff's plans should be reviewed in making new plans for the subject job. Therefore, Falmouth owes Gannett Fleming a duty of implied contractual indemnification in this case.

This paragraph speaks of reliance on "Falmouth's *provision* of Plaintiff's plans and on statements that Plaintiff's plans should be reviewed in making new plans"; it says nothing about relying on plaintiff's plans themselves. As discussed, Gannett did not rely on plaintiff's plans in making its own plans. Gannett rejected plaintiff's initial plans early in the project. Facts ¶77.

### E. Calling Plaintiff One of the "Most Knowledgeable Persons," Does Not Indicate That Gannett Copied Plaintiff's Plans.

Plaintiff's last, desperate factual allegation (Facts ¶45) is that because Gannett responded to plaintiff's interrogatory calling for "persons most knowledgeable" concerning factual allegations in the case, with plaintiff's own name (among many others), this somehow indicates that Gannett copied plaintiff's plans. In fact, Gannett's counsel, in drafting this answer listed first those persons from Gannett, next those persons from the Town, next those persons from plaintiff's side of the case, and finally Gannett's sub-consultants and their personnel, who might have knowledge concerning the factual allegations in the case. Gannett's interrogatory response

---

[14] *See, e.g.,* Hibernia Savings Bank v. Bomba, 35 Mass.App.Ct. 378, 384, 620 N.E.2d 787 (1993) (judicial admissions are admissions from another case that conclusively determine an issue and are evidence of such admission in the second case), *citing* General Elec. Co. v. Assessors of Lynn, 393 Mass. 591, 603 n.8, 472 N.E.2d 1329 (1984). Any language from Gannett's cross-claim in this same case cannot serve as a "judicial admission," under this definition, therefore.

{00079288.DOC}

was intended to provide as complete a list as possible of persons with knowledge concerning the allegations in the lawsuit, but it was not intended to imply that Greenberg had knowledge of Gannett's architectural plans because those plans were actually Greenberg's preliminary plans in disguise.[15] Such an admission would be anomalous and inconsistent with all of Gannett's contentions in this case.

### F. Courts Have Found That "Substantial Similarity" May Present Questions of Fact, Although the Issue May Be Decided as a Matter of Law.

As discussed, a court's analysis of whether illicit copying occurred in a copyright infringement case, normally consists of the following two steps: First, the court dissects the allegedly infringed work, and separates it into protectable and non-protectable aspects; next, the court compares the two works (the allegedly infringed and accused works) for "substantial similarity," using the "ordinary observer" objective standard. *See, e.g.,* Yankee Candle, 259 F.3d at 33-34 (1st Cir. 2001); Concrete Machinery, 843 F.2d at 608 (1st Cir. 1988); Walker, 784 F.2d at 51-52 (2d Cir. 1986). The First Circuit has often treated the first step of this "copying" analysis as a question of law, and the second step--the substantial similarity step--as a question of fact. Yankee Candle, 259 F.3d at 33-34 & n.5, *citing* Concrete Machinery, 843 F.2d at 608-09. Other First Circuit decisions have treated the issue of "substantial similarity" between two works being compared as a "mixed question of fact and law." *E.g.,* Segrets, Inc. v. Gillman Knitwear Co., Inc., 207 F.3d 56, 64 (1st Cir.), *cert. denied,* 531 U.S. 827, 121 S.Ct. 76, 148 L.Ed.2d 39 (2000), *quoting* O'Neill v. Dell Publishing Co., Inc., 630 F.2d 685, 687 (1st Cir. 1980). Because the comparison called for in the "ordinary observer" test is performed from the prospective of a layperson, it makes sense that the "substantial similarity" issue should normally be one of fact.

---

[15] Plaintiff, that is, is knowledgeable about his own allegations and contentions in this case concerning his plans and Gannett's plans for the subject job. He or his counsel must have had some knowledge of Gannett's plans in order to bring the lawsuit in the first place, under the requirements of F.R.C.P. 11.

{00079288.DOC}

16

*See* O'Neill, 630 F.2d at 688-90.

Most of plaintiff's cited cases in which "substantial similarity" was decided on summary judgment, awarded summary judgment to the *defendant* in an infringement case. *E.g.*, Yankee Candle, 259 F.3d at 33; Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994); Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 119-20 (8th Cir. 1987); O'Neill, 630 F.2d at 685-87. These cases simply found that no reasonable fact-finder could conclude that the two works were substantially similar. Id. The one case plaintiff cites where plaintiff won partial summary judgment on this issue is Segrets, 207 F.3d at 66, in which the First Circuit decided one of several "substantial similarity" issues as a matter of law. But the facts of that case are readily distinguishable from those of the instant case. In Segrets, defendant's employee admitted that the allegedly infringing designs were identical to plaintiff's designs, id. at 65, and defendant's own designer admitted that she purchased plaintiff's designs (on sweaters) and sent them to an overseas manufacturer for use as models for defendant's sweaters, id. at 59 & 62. Other than the colors of the sweaters, the two designs were "virtually identical," without any notable differences, and "intricate patterns" had been copied "line-for-line." Id. In contrast, in the instant case, both parties vigorously disagree over whether the architectural plans are "substantially similar." Facts ¶80. The long list of differences at the very least creates questions of fact, and it cannot be said that the two sets of plans are "virtually identical."

Further, this Court's 2/8/06 Memorandum and Order, denying plaintiff's Motion for a Preliminary Injunction, should help resolve the "substantial similarity" issue here. This decision characterized Greenberg's likelihood of proving infringement" as "relatively low" (p.8) and opined that the two sets of plans "appear to have substantial differences in layout, floor plan, and size," such that "it appears that there are, overall, substantial differences, not substantial

{00079288.DOC}

17

similarities, between the two sets of plans" (p.9). Gannett submits that "substantial similarity" in this case can be determined in its favor as a matter of law.

### IV. Gannett Fleming's Cross-Motion for Summary Judgment

Gannett Fleming cross-moves for summary judgment on the grounds set forth above. Gannett has argued that plaintiff is not entitled to summary judgment because the substantial similarity issues in this case at least present questions of fact. In the alternative, should this Court find that "no reasonable juror" could find substantial similarity between the two sets of architectural plans, such that Gannett is entitled to judgment as a matter of law, then Gannett respectfully requests summary judgment for defendants in this case.[16]

### V. Conclusion

For the foregoing reasons, Gannett respectfully asks this Court to deny plaintiff's Summary Judgment Motion, and/or grant defendants summary judgment. The plaintiff has not met his burden at summary judgment to show a lack of factual issues, with admissible evidence. His case on copying (substantial similarity) is weak, as pointed out by this Court's 2/8/06 decision, and even if plaintiff can identify an occasional similarity between the two sets of plans, most similarities are based on non-protectable ideas and functional elements. As a matter of law, the two sets of plans are not substantially similar.

---

[16] For examples of cases awarding summary judgment to defendants in copyright infringement cases, *see* Yankee Candle, 259 F.3d at 33-34; Kouf, 16 F.3d at 1045-46; Hartman, 833 F.2d at 120-21; O'Neill, 630 F.2d at 686-87.

{00079288.DOC}

## REQUEST FOR ORAL ARGUMENT

Pursuant to U.S. District Court Local Rule 7.1(D), defendant Gannett hereby requests oral argument.

Dated: 2/16/06

The Defendant,
GANNETT FLEMING, INC.

By its attorneys,

Paul Michienzie, Esq. – BBO #548701
John C. Barker, Esq. – BBO #637406
Michienzie & Sawin LLC
745 Boylston Street, 5th Floor
Boston, MA   02116-2636
Tel. 617-227-5660